## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF COLORADO

| | | |
|---|---|---|
| In re | ) | |
| | ) | |
| THE ASPEN CLUB & SPA, LLC | ) | Case No. 19-14158-JGR |
| EIN: 84-1581963 | ) | |
| | ) | Chapter 11 |
| Debtor-in-Possession. | ) | |
| | ) | _____ |
| In re | ) | |
| | ) | |
| ASPEN CLUB REDEVELOPMENT | ) | Case No. 19-14200-JGR |
| COMPANY, LLC | ) | |
| EIN: 46-5472246 | ) | Chapter 11 |
| | ) | |
| Debtor-in-Possession | ) | **(Jointly Administered Under** |
| | | **Case No. 19-14158-JGR)** |

## MOTION FOR ENTRY OF ORDER AUTHORIZING THE DEBTORS TO OBTAIN POST-PETITION FINANCING PURSUANT TO 11 U.S.C. §§ 361, 362 AND 364

Aspen Club Redevelopment Company, LLC and The Aspen Club & Spa, LLC, the above captioned debtors and debtors-in-possession (collectively the "**Debtors**"), hereby submit this motion (the "**Motion**"), seeking entry of an order authorizing DIP financing substantially in the same form as that which is attached hereto (the "**DIP Order**") pursuant to sections 361, 362, 364(c)(1), 364(c)(2)364(d), 364(e), 507 and 552 of title 11 of the United States Code (as amended, 11 U.S.C. § 101, *et seq*., the "**Bankruptcy Code**"), Rules 2002, 4001, and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rules 4001-2 and 9013-1 of the Local Bankruptcy Rules for the United States Bankruptcy Court for the District of Colorado (the "**Local Rules**"), (i) authorizing the Debtors to obtain post-petition financing; (ii) granting adequate protection pursuant to sections 361, 362, and 364 of the Bankruptcy Code, (iii) granting liens and

1

super-priority claims; and (iv) modifying the automatic stay.  In support, the Debtors state as follows:

## INTRODUCTION

The Debtors are seeking DIP financing in the short term to enhance, preserve and/or protect the value of the Project (as defined below) by preserving expiring entitlements and permits, and to pay certain site and critical path expenses that would otherwise frustrate the finished value of the Project  and perpetuate construction delays.  The DIP Credit Documents provide for both a $6,250,000 DIP Facility and a $110,000,000 Exit Facility.  To be clear, by this Motion the Debtors are only seeking approval of the DIP Facility at this time and not seeking or requiring any approval of the Exit Facility.  At any hearing on this Motion, the Debtors will request entry of the DIP Order substantially in the form attached hereto.   In further support of this Motion, the Debtors respectfully represent as follows:

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over the Debtor, their estates and this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicate for the relief requested herein includes sections 361, 362, 364, 503, 506, 507 and 726of the Bankruptcy Code, Bankruptcy Rules 4001, 6004 and 9014, and Local Rule 4001-2.

## BACKGROUND

2.      On May 16, 2019, debtor-in-possession The Aspen Club & Spa, LLC filed its voluntary petition for relief under chapter 11 of the Bankruptcy Code.  On May 17, 2019, debtor-in-possession Aspen Club Redevelopment Company, LLC filed its voluntary petition for relief under chapter 11 of the Bankruptcy Code.  Aspen Club Redevelopment Company, LLC is the wholly owned subsidiary of The Aspen Club & Spa, LLC.

3.      The Debtors are continuing in possession of their property and are operating their business as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request has been made for the appointment of a trustee or examiner, and no official committee has yet been established in these cases.   On May 20, 2019, the Court authorized the joint administration of the Debtors' cases for procedural purposes only.  *See* Order Granting Motion for Joint Administration, Docket No. 28.

4.      Debtor in possession Aspen Club Redevelopment Company, LLC owns certain real property known as the Aspen Club & Residences located within the City of Aspen in the State of Colorado encompassing: (i)  Six (6) to be completed 4 bedroom luxury condominiums with an aggregate of 16,200 square feet of living space, (ii) Ten (10) to be completed 3 bedroom luxury townhomes with an aggregate of 20,350 square feet of living space, (iii) Four (4) to be completed 4 bedroom luxury townhomes with an aggregate of 10,800 square feet of living space, (iv) Twelve (12) to be completed deed-restricted workforce housing units with an aggregate of 16,200 square feet of living space, (v) the to be completed world-class club, spa, and amenity package encompassing 60,838 square feet of usable space, (vi) all licenses, permits, plans, contracts, applications, governmental or municipal approvals pertaining to the Improvements, and (vii) any rents, revenues, profits, or income generated with respect to any of the collateral (items (i) through (vii) together with the Aspen Club & Residences and all other real property which the Debtors own and all other property interests, real, personal or intangible of the Debtors, now existing or hereafter acquired, including, without limitation, contract rights and property interests acquired post-petition, shall herein be collectively referred to as the "**Collateral**").[1]  The Debtors intend to

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the DIP Credit Agreement or the DIP Order.  This Motion is qualified in its entirety by reference to the provisions of the DIP Credit Agreement and the DIP Order.  To the extent of any inconsistency between this Motion and the proposed DIP Credit Agreement, the DIP Credit Agreement shall govern.

complete construction of the Collateral, and upon completion, manage a private membership health and performance center, offering state-of-the-art fitness, sports medicine, and lifestyle education programming, along with a world-class club and spa. In addition, the Debtors intend to sell and manage the surrounding townhome residences and club residences as monthly fractional deeded ownership interests with the right, but not the obligation, to participate in a rental pool managed by the Debtors (collectively along with the Collateral, the "**Project**").

5.      . Since 1976, the Aspen Club and Spa has been a pillar within the Town of Aspen, offering fitness and spa services with more than 1,300 active monthly memberships at the commencement of the Project.

6.      In 2007, the Debtors embarked on a re-entitlement and approval process which took more than 8 years and approximately $5 million to complete.

7.      In 2015, the Debtors obtained final approval to develop the Project, -and created Aspen Club Redevelopment Company, LLC, with free and clear ownership of the real property at a basis of $41,000,000 and closed on the multiple tranches of additional secured and unsecured financing to be used in the construction of the Project.

8.      In 2015, construction of the Project commenced and quickly progressed on-time and on schedule with completion slated for the fall of 2018.

9.      The Project immediately garnered tremendous market acceptance with more than $18,000,000 in presales with hard money deposits [which were returned once the Project stalled].

10.      Currently, the construction of the Project is ongoing, but has not yet been completed. Townhomes units 1-5 are 80% complete with approximately 5-months of construction remaining; Townhome units 6-10 are 70% complete with approximately 7-months of construction remaining; Town home units 11-14 are 60% complete with approximately 8-months of

construction remaining; with condos 1-6 and the commercial component 30% complete with approximately 19-months of construction remaining:



11.     The Collateral is subject to multiple tranches of secured debt, as summarized in the list of pre-petition secured creditors attached hereto as **Exhibit 1** (collectively, the "**Pre-Petition Secured Creditors**").

12.     On September 4, 2015, Aspen Club Redevelopment Fund, L.P. recorded a deed of trust in the principal amount of $32,000,000 for the purpose of providing construction financing to the Debtors on a subordinated basis.

13.     On May 26, 2016, FirstBank recorded a first deed of trust in the principal amount of $45,000,000 for the purpose of providing construction financing to the Debtors.

14.     In the summer of 2017, FirstBank, the predecessor in interest to GPIF Aspen Club ("**GPIF**"), had funded the first $30,000,000 of a $45,000,000 construction loan, and declined to fund the second phase of $15,000,000. Furthermore, Aspen Club Redevelopment Company, which was to loan up to $32,000,000 on a junior secured basis had funded only $13,000,000.  Finally, a new investment raised to fill the shortfall from the Aspen Club Redevelopment Fund L.P. funding did not close when First Bank failed to fund phase 2 of its commitment[2].  As a result of these shortfalls, the Debtors were materially impaired with respect to their ability to finance the construction of the Project, pay vendors, contractors, and deliver completed units to those certain third party bonafide purchasers in accordance with their contracts.  These events cascaded and by September 2017, construction had halted.

15.     The Debtors attempted to work with the Pre-Petition Secured Creditors to reorganize for almost two years before filing for relief under chapter 11, including the first priority lender GPIF, which purchased the loan from FirstBank.  GPIF is a strategic lender and a potential direct competitor of the Debtors in the hospitality business with existing and competing luxury hospitality properties and nationally branded health and wellness facilities.

16.     Over at least the last year, the Debtors have attempted to negotiate and develop a debt restructure and/or workout with their Pre-Petition Secured Creditors, but to no avail.  None of the Pre-Petition Secured Creditors were willing to provide such necessary financing prior to commencement of these bankruptcy cases.

17.     Ultimately, a proposal submitted by the DIP Lender, which is not a Secured Creditor, evolved into the DIP Facility.  After extended good faith, arm's-length negotiations, the DIP Lender agreed to provide the DIP Facility on the terms set forth in the DIP Credit Agreement

---

[2] As of that time Debtor had secured approximately $18,000,00 presales of townhouse units for an average price of $1,125,000 for a 1/8 ownership interest which would have helped facilitate the completion of the construction.  .

- the DIP Lender has agreed to extend the DIP Facility in an aggregate amount of up to $6,275,000 which will prime the Pre-Petition Secured Creditors' claims.  Entry of the DIP Order will provide the Debtor with an initial $6.275 million advance to fund certain necessary expenses to preserve and protect the Collateral, to safeguard the Project, and advance these chapter 11 cases.

18.     The proceeds of the DIP Facility, which the Debtors estimate will be sufficient to support these entities through the pendency of this chapter 11 case until a plan, and will be used (a) primarily to fund the costs of site and critical path expenses, permits, HOA fees, real property taxes, insurance, and protection to safeguard improvements on the Property, (b) to fund the costs of administering these chapter 11 cases, and (c) to pay all fees, interest and expenses provided under the DIP Credit Agreement and authorized by the Court.  The significant terms of the DIP Facility and the DIP Order are summarized below.

19.     As a result of diminished liquidity, the Debtors have an immediate need to obtain debtor in possession financing to, among other things, (i) to protect and preserve asset value, (ii) enhance long-term asset value, (iii) to preserve expiring entitlements and permits, (iv) enable a timely development schedule, (v) pay critical obligations of the Debtor, and (vi) to otherwise preserve the value of the Debtors' estates.  The Debtors' access to sufficient working capital and liquidity through borrowing under the DIP Facility is vital to preserve both the  current and the future the enterprise value of the Debtors' estates.  Immediate and irreparable harm will be caused to the Debtors and their estates if such financing is not obtained, in each case in accordance with the terms of the DIP Loan Documents.

20.     The Debtors have explored other financing opportunities and options, but have been and continue to be unable to obtain financing on more favorable terms from sources other than the DIP Lender under the DIP Loan Documents. The Debtors are unable to obtain unsecured credit

allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense or secured credit allowable only under sections 364(c)(1), 364(c)(2), or 364(c)(3) of the Bankruptcy Code. The Debtors are unable to obtain secured credit under section 364(d)(1) of the Bankruptcy Code without (a) granting to the DIP Lender the rights, remedies, privileges, benefits, and protections provided in the DIP Order and in the DIP Loan Documents, including the DIP Liens and the DIP Super-priority Claims (as defined herein), (b) allowing the DIP Lender to provide the loans and other financial accommodations under the DIP Facility on the terms set forth in the DIP Order and in the DIP Loan Documents, and (c) granting to the DIP Lender the rights, remedies, privileges, benefits, and protections provided in the DIP Order and in the DIP Loan Documents, including Adequate Protection (as defined in the DIP Order) (all of the foregoing described in clauses (a), (b), and (c) above, collectively, the "**DIP Protections**").

## RELIEF REQUESTED

21.     The Debtors seek authority to borrow up to an aggregate amount of $6,275,000 as a DIP Loan pursuant to the DIP Credit Agreement.  The Debtors seek authority to borrow under the DIP Credit Agreement in accordance with the DIP Loan Budget ("**Budget**") on a final basis. A copy of the Budget is attached hereto as **Exhibit 2**.  If approved by the Court, the DIP Credit Agreement will grant the DIP Lender security interests in substantially all of the Debtors' Collateral (the "**DIP Liens**") and super-priority claims (the "**DIP Super-priority Claims**") pursuant to section 364(c)(1) of the Bankruptcy Code.  Further, the DIP Order provides Adequate Protection for the Obligations, including super-priority administrative claims.  In summary, the Debtors seek entry of the DIP Order:

a.      authorizing the Debtors to obtain post-petition financing pursuant to commitment, substantially in the form attached hereto as **Exhibit 3** (as amended, supplemented,

or otherwise modified from time to time, the "**DIP Credit Agreement**") by and between the Debtors, as borrowers, and EFO Financial Group, LLC, as lender (together with its participants, successors and assigns, the "**DIP Lender**"), and together with all other related agreements, documents, and instruments contemplated thereby (collectively, the "**DIP Credit Documents**"), including authorizing the Debtors to borrow up to the principal aggregate sum of $6,275,000.00, which amount includes the Interest Reserve, plus all other interest, fees, and expenses due and payable under the DIP Credit Documents (the "**Obligations**"), such financing to be (i) secured and perfected by first-priority senior secured lien against all Collateral, subject only to the carve-out for fees of the clerk of the Court and the Office of the U.S. Trustee (as more particularly defined in the DIP Credit Agreement, the "**Carve-Out**"), pursuant to sections 364(d) and 364(c)(2) of the Bankruptcy Code;

b.      providing adequate protection pursuant to sections 361, 362, and 364 of the Bankruptcy Code;

c.      granting the DIP Lender super-priority administrative claims in the case pursuant to section 364(c)(1) of the Bankruptcy Code, such claims to be senior in right of payment over any and all administrative expenses of the kinds specified in sections 503(b) and 507(a) of the Bankruptcy Code or otherwise, subject only to the Carve-Out (such credit facility being referred to herein as the "**DIP Facility**");

d.      modifying the automatic stay;

e.      as to only the DIP Facility, authorizing the Debtors to comply with the DIP Credit

Documents in all respects, and approving the terms and conditions of the DIP Credit

Documents; and

f.      limiting the Debtors' rights to surcharge against the Collateral under section 506(c)

of the Bankruptcy Code.

## SUMMARY OF MATERIAL PROVISIONS[3]

22.     Pursuant to Bankruptcy Rules 4001(b) and (c)(1)(B) and Local Rule 4001-2(a)(1),

the Debtors provide the following summary of the essential terms of the DIP Credit Agreement or

the DIP Order as applicable:

| Maximum borrowing available on a final basis: | $6,275,000 for DIP Facility.  DIP Credit Agreement p. 2 |
|---|---|
| Borrowing conditions: | Debtors must have filed this Motion on or before May 22, 2019, with entry of a final DIP Order entered within 45 days from the Petition Date.  The Title Company must issue a commitment for a title insurance policy with respect to the Collateral.  DIP Facility initial Advance of $6,275,000 is to be funded upon entry of a final DIP Order.  DIP Credit Agreement p. 18-23. |
| Interest rate: | The interest rate shall be the Secured Overnight Financing Rate (as published by the Federal Reserve Bank of New York), plus 950 basis points per annum, with a floor of 12%, and adjusted monthly.  Payment of such interest is monthly from the Interest Reserve account.  DIP Credit Agreement p. 9-10, and Budget Exhibit A to DIP Credit Agreement. |
| Fees, costs and charges paid or payable by Debtors or any other person or entity: | With respect to the DIP Facility, Debtors must pay a loan servicing fee equal to 1% of the Maximum Loan Amount, a Commitment Fee of 4% of the Maximum Loan Amount and Closing Costs. DIP Credit Agreement p. 11 . |
| Maturity: | The maturity date of the DIP Loan shall be the date which is 9 months after the date of the Closing of the initial advance. DIP Credit Agreement p. 9. |

---

[3] This summary of the DIP Credit Agreement is provided for the benefit of the Court and other parties in interest. *See* DIP Credit Agreement attached hereto as Exhibit 2. Capitalized terms used in this Motion but not otherwise defined herein shall have the meanings set forth in the DIP Credit Agreement.

| Events of default: | The Loan Documents shall contain events of default, notices of default, opportunity for cure, and remedies customarily required by DIP Lender. DIP Credit Agreement p. 16. |
| --- | --- |
| Remedies in the event of default: | The Loan Documents shall contain events of default, notices of default, opportunity for cure, and remedies customarily required by DIP Lender. DIP Credit Agreement p. 16. |
| Use of funds limitations: | Loan proceeds shall be used by Debtors in accordance with the Budget. DIP Credit Agreement p. 9-10. |
| Protections afforded under 11 U.S.C. § 364: | DIP Lender to receive superpriority claim pursuant to 11 U.S.C. § 364(c)(1) and priming liens pursuant to 11 U.S.C. §§ 364(d)(1). DIP Credit Agreement p. |
| Line item budget: | *See* DIP Credit Agreement, at Exhibit A. |

23.     Pursuant to Local Rule 4001-2, financing motions must, *inter alia*, (a) provide a summary of the essential terms of the proposed DIP Order including the terms listed in L.B.R. 4001-2(a)(1);[4] (b) identify the location of any such provision in the proposed form of order and/or loan agreement; and (c) provide the justification for the inclusion of each such provision. *See* Local Rule 4001-2.

24.     In accordance with the foregoing requirements, the Debtors hereby state that the DIP Order includes the following provisions of the type listed in Local Rule 4001-2(a)(1):

| Cross-collateralization: | None. |
| --- | --- |
| Provisions or findings of fact regarding validity, perfection or | None. However, the DIP Lender requires a finding that debtor Aspen Club Redevelopment Company, LLC is the owner of the Collateral and that the liens granted to the |

---

[4] L.B.R. 4001-1(a)(1) lists the following provisions:
    (A) maximum borrowing available on a final basis;
    (B) interim borrowing limit;
    (C) borrowing conditions;
    (D) interest rate;
    (E) fees, costs and charges paid or payable by debtor or any other person or entity;
    (F) maturity;
    (G) events of default;
    (H) remedies in the event of default;
    (I) use of funds limitations;
    (J) protections afforded under 11 U.S.C. §§ 363 and 364; and
    (K) line item budget for both the interim and final order periods, unless the Court orders otherwise.

| | |
|---|---|
| **amount of secured party's lien or debt that bind the estate:** | DIP Lender will be first priority liens upon the Collateral. DIP Credit Agreement p. 19, ¶ B. |
| **Provisions or finding of fact regarding relative priority of secured party's lien or debt and the lien or debt of a person not party to the stipulation:** | None. |
| **506(c) waivers:** | No costs or expenses of administration of these bankruptcy cases shall be surcharged against or recovered from or<br>against the DIP Lender.  DIP Credit Agreement p. 12-13, ¶ B and C. |
| **Provisions divesting Debtors of discretion in formulating a plan, administering the estate, or limiting access to the court to seek appropriate relief:** | The Debtors have the unfettered right to formulate a plan, however, the DIP Lender requires the Debtor to file a plan by July 1, 2019 which includes seeking approval of the Exit Facility by separate motion at that time.  DIP Credit Agreement p. 19-20, ¶ C. |
| **Releases of liability for creditor's alleged prepetition torts or breaches of contract:** | None. |
| **Waivers of avoidance actions:** | None. |
| **Automatic stay relief:** | Ten days after DIP Lender providing written notice of a post-petition event of default, DIP Lender may file an emergency motion for relief from the automatic stay, and Lender shall request that the Bankruptcy Court set an expedited hearing on a 48 hour notice to determine whether Lender shall be granted relief from the automatic stay to foreclose on its liens or take any other action available to Lender under the Loan Documents and applicable law.  Debtors retained the right to contest relief from stay.  DIP Credit Agreement p. 17. |
| **Waivers of procedural requirements for foreclosure mandated under applicable non-bankruptcy law:** | None. |
| **Adequate protection provisions that create liens on claims for relief arising under sections 506(c), 544, 545, 547, 548 and 549 of the Bankruptcy Code:** | None. |
| **Waivers effective on default or expiration, of the Debtors' right to move for a court order** | None. |

| | |
|---|---|
| pursuant to section 363(c)(2)(B) authorizing the use of cash collateral in the absence of the secured party's consent: | |
| Findings of fact on matters extraneous to the approval process: | None. |

25.      As noted above, the DIP Order and DIP Facility contain certain provisions that appear in Local Rule 4001-2(a)(2). Each such provision was specifically required by the DIP Lender and the DIP Lender indicated that they would not provide the DIP Facility absent such provisions. The DIP Facility provided by the DIP Lender represents the only viable source of financing for the Debtors and, given the material benefits of the DIP Facility, without which the Debtors would not be able to pursue their going concern reorganization or asset sale, the Debtors believe that these provisions are necessary and justified.  Indeed, by obtaining the proposed financing from the DIP Lender, the Debtors will have the best opportunity to preserve and maximize value by continuing their operations and paying the operating and restructuring costs and expenses projected to be incurred in the Budget.

26.      As supported below, the Debtors negotiated the terms of the DIP Facility in good faith and obtained the best possible deal that they could under the circumstances. As such, the Debtors respectfully submit that the DIP Lender provided fair consideration for the DIP Facility and the terms highlighted above.

27.      For these reasons, the Debtors respectfully assert that the inclusion of each of the highlighted provisions is justified under the circumstances and should be approved.

**A.      Waiver of Section 506(c)**

28.      Section 506(c) of the Bankruptcy Code permits the debtor to recover from property securing an allowed claim the reasonable costs of preserving such property.  The DIP Order

includes a waiver of section 506(c) by the Debtors.  It is well established that the Debtors are vested with the discretion to waive section 506(c).

29.     As a threshold matter, section 506(c) claims are available only to, and an asset of, the Debtors, and not to any other creditor or party in interest.  *See Hartford Underwriters Ins. Co. v. Union Planters Bank*, 530 U.S. 1, 6 (2000) ("the trustee is the only party empowered to invoke" section 506(c)); *see also In re Smart World Techs., LLC*, 423 F.3d 166, 181-82 (2d Cir. 2005) ("Section 506(c) . . . allows only the 'trustee,' or debtor-in-possession, to take advantage of this exception . . . . We read Hartford Underwriters to stand for the proposition that § 1109(b) does not entitle parties in interest, such as Smart World's creditors, to usurp the debtor-in-possession's role as legal representative of the estate."); *In re River Ctr. Holdings, LLC*, 394 B.R. 704, 717 (Bankr. S.D.N.Y. 2008) ("The Supreme Court has made clear that only the trustee has the power, under the plain language of the Code, to assert a section 506(c) claim."). Accordingly, there is no reason that these claims cannot be settled or traded for valuable consideration by their sole owner.

30.     Indeed, courts in this District have and continue to endorse section 506(c) waivers in final DIP orders. *See, e.g.*, Final DIP Order, *In re Willowood USA Holdings, LLC*, Jointly Administered Case No. 19-11079-KHT (Bankr. D. Colo. April 19, 2019) (Docket No. 297); Final DIP Order, *In re Midway Gold*, 15-16835-MER (Bankr. D. Colo. Nov. 6, 2015) (Docket No. 452); Final DIP Order, *In re Big Sandy Holding Co.*, 12-30138 MER (Bankr. D. Colo. Oct. 26, 2012) (Docket No. 66).

31.     In addition, the Pre-Petition Secured Creditors have liens on substantially all of the Debtors' assets.  Every dollar that the Debtors spend is a dollar of collateral dissipated.  The primary rationale of section 506(c) – that the estate not spend unencumbered funds for the direct and sole benefit of secured parties – is thus inapplicable in this case. As the Third Circuit noted in

*In re Visual Indus., Inc.*, 57 F.3d 321, 325 (3d Cir. 1995): "The rule understandably shifts to the secured party, who has benefitted from the claimant's expenditure, the costs of preserving or disposing of the secured party's collateral, which costs might otherwise be paid from the unencumbered assets of the bankruptcy estate, providing that such unencumbered assets exist." No such assets exist in this case. Where, as here, there are no unencumbered assets to spend because the Pre-Petition Secured Creditors have liens on substantially all of the Debtors' assets, a waiver of section 506(c) is necessary and appropriate.

32.     Notably, the borrowings by the Debtors under the DIP Facility will be used exclusively to preserve and protect the Collateral and the Project to the primary benefit of the Pre-Petition Secured Creditors. Under these circumstances a section 506(c) surcharge of the DIP Lender is inappropriate.

**B.     Right to Seek Automatic Stay Relief Upon Event of Default**

33.     The provision authorizing the DIP Lender to seek an expedited hearing lifting the automatic stay to the extent necessary for the DIP Lender to exercise remedies upon the occurrence and during the continuance of an Event of Default is necessary to protect the DIP Lender's rights without being subject to undue delay. The provision does not deprive the Debtor of notice and an opportunity to contest the exercise of remedies, as the DIP Lender must provide ten days' notice to the Debtors before seeking relief from the automatic stay before exercising its more severe remedies. As such, the provision merely shifts the onus from the DIP Lender to the Debtors without otherwise materially altering their substantive rights.

34.     Having advanced new money to the Debtors, it is reasonable and customary for the DIP Lender to be able to exercise remedies without further relief from the automatic stay if, as provided for here, an Event of Default occurs and continues notwithstanding notice of the same to

the Debtors and creditors in these cases.  Accordingly, the provision granting automatic relief from the automatic stay provisions of section 362 of the Bankruptcy Code for Events of Default is necessary and should be granted.

## AUTHORITY FOR APPROVAL OF DIP FACILITY

35.     "It is given that most successful reorganizations require the debtor-in-possession to obtain new financing simultaneously with or soon after the commencement of the Chapter 11 case."  *In re Ames Department Stores, Inc.*, 115 B.R. 34, 36 (Bankr. S.D.N.Y. 1990).  Section 364(c) of the Bankruptcy Code provides, among other things, that if a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, then the court may authorize the debtor to obtain credit or incur debt (i) with priority over any and all administrative expenses as specified in sections 503(b) or 507(b) of the Bankruptcy Code, (ii) secured by a lien on property of the estates that is not otherwise subject to a lien, or (iii) secured by a junior lien on property of the estates that is subject to a lien. 11 U.S.C. § 364(c).

36.     A court may not approve secured or superpriority financing under section 364(c) of the Bankruptcy Code "unless the debtor demonstrates that it has reasonably attempted, but failed, to obtain unsecured credit under sections 364(a) or (b)."  *In re Ames*, 115 B.R. at 37 Courts consider various factors in determining whether obtaining post-petition financing pursuant to section 364(c) is appropriate, including whether (i) a debtor is unable to obtain unsecured credit under section 364(b), (ii) the transaction is necessary to preserve the assets of the debtor's estate, and (iii) the terms of the transaction are fair, reasonable and adequate under the circumstances.  *See In re DB Capital Holdings, LLC*, 454 B.R. 804, 822 (Bank. D. Col. 2011) (requiring the debtor to show that no alternative financing is available on any other basis, financing is in the best interests of the estate and its creditors, and that no better offers, bids, or timely proposals are before the court, among other factors); *In re Los Angeles Dodgers LLC*, 457 B.R. 308, 312-13 (Bankr. D. Del. 2011)

(noting these three factors in considering proposed post-petition financing) (citations omitted); *see also In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 37 (Bankr. S.D.N.Y. 1990) (noting that a court "may not approve any credit transaction under subsection (c) unless the debtor demonstrates that it has reasonably attempted, but failed, to obtain unsecured credit under sections 364(a) or (b)") (citations omitted); *In re Farmland Indus., Inc.*, 294 B.R. 855, 879 (Bankr. W.D. Mo. 2003) (noting that courts look to various factors including whether "the proposed financing is an exercise of sound and reasonable business judgment").

37.    A debtor need not seek unsecured financing proposals from every possible lender or lending source before seeking to incur secured post-petition financing, but should make a reasonable effort to seek other sources of less onerous financing. *Id.* at 40; *see also In re Showshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986); *In re 495 Central Park Avenue Corporation*, 136 B.R. 626, 630-31 (Bankr. S.D.N.Y. 1992). Rather, a debtor must demonstrate that it made a reasonable effort to seek credit from other sources available under Code § 364(a) and (b). *See Snowshoe*, 789 F.2d at 1088.

38.    Assuming the statutory predicates for post-petition financing have been met, courts generally defer to the Debtors' business judgment so long as the financing does not contain terms that leverage the bankruptcy process for the benefit of a third party over the estates and does not unfairly cede control of the reorganization process to a single non-debtor party. *E.g., In re Ames*, 115 B.R. at 40; *In re YL W. 87th Holdings I LLC*, 423 B.R. 421, 441 (Bankr. S.D.N.Y. 2010); *Frostbaum v. Ochs*, 277 B.R. 470, 475-76 (E.D.N.Y. 2002); *In re Curlew Valley Assocs.*, 14 B.R. 506, 513-14 (Bankr. D. Utah 1981).

39.    Similarly, this Court has previously explained the role of a debtor's business judgment in decisions to obtain post-petition financing as follows:

> As a debtor-in-possession, [the debtor] has authority to operate the business. The authority to operate that business necessarily includes the concomitant discretion to exercise reasonable judgment in ordinary business matters. The business of this debtor-in-possession includes oil and gas drilling operations. [The debtor's] best business judgment indicates these drilling operations are necessary and reasonable for the benefit of the estate. The discretion to act with regard to business planning activities is at the heart of the debtor's power. In exercising [the debtor's] business judgment of conducting its drilling operations, it has found it necessary to obtain loans to make these endeavors possible. This is in accordance with the exercise of its sound business discretion.

*In re Simasko Prod. Co.*, 47 B.R. 444, 449 (Bankr. D. Colo. 1985) (citations omitted). This Court further noted that "business judgments should be left to the board room and not to this Court." *Id.*

## A.      The Debtors Have an Immediate Need for DIP Financing

40.      As noted above, the Debtors need to access additional operating capital, primarily to preserve the existing entitlements and permits for the Project, and protect the Collateral.  Access to additional operating capital will enable the Debtors to demonstrate to its Pre-Petition Secured Creditors that it may continue to operate their businesses, maintain the Collateral and the Project, and pay necessary expenses during the crucial first days of its reorganization efforts and the pendency of this Chapter 11 case.

41.      Unless this Court authorizes the DIP Credit Agreement, the Debtors will be unable to fund these chapter 11 cases, or pay for services and expenses necessary to preserve and maximize the value of the Collateral and the Project.  Indeed, absent sufficient funds to preserve the existing entitlements and permits for the Project (including but not limited to payment of real property taxes, insurance, site and critical path expenses, HOA fees, and expenses related to the general protection of the Collateral and the Project), and operate and manage the Project in the ordinary course of business, the Debtors' ability to maximize the vale of the Collateral and the Project for the benefit of all creditors on both an "as is" basis and a completed basis.

42.     Unless the Debtors are authorized to obtain post-petition financing, the Debtors will not have sufficient available sources of working capital to enhance and preserve the Collateral and the Project.  The Debtors' ability to maintain and preserve the status quo and to otherwise fund their operations, is essential to maximizing the value of the Debtors' assets.

**B.     The Terms of the DIP Facility Are Fair, Reasonable and Appropriate**

43.     In determining whether the terms of post-petition financing are fair and reasonable, courts consider the relative circumstances of both the debtor and the potential lender. *In re Farmland*, 294 B.R. at 886-89; *see also Unsecured Creditors' Comm. Mobil Oil Corp.* v. *First Nat'l Bank & Trust Co.* (*In re Ellingsen MacLean Oil Co., Inc.*), 65 B.R. 358, 364-65 n.7 (W.D. Mich. 1986) (recognizing a debtor may have to enter into "hard" bargains to acquire funds for its reorganization).  Judged from that perspective, the terms of the DIP Facility are fair and reasonable. The DIP Facility provides the Debtors the liquidity it needs to preserve the entitlements and permits immediately and enhance the long-term value of the Collateral and the Project.

44.     In order to obtain much-needed capital and preserve and enhance the "as is" and "as completed" future value of the Project, before confirmation of a plan or consummation of a sale, the Debtors negotiated the DIP Credit Agreement with the DIP Lender through a good-faith, arm's-length process.  After thorough analysis, the Debtors and their advisors have concluded that the terms of the DIP Facility are reasonable and appropriate under the circumstances, and that the DIP Credit Agreement contains terms that are in the best interests of the Debtors, their estates, and other parties-in-interest.

45.     The terms and conditions of the DIP Facility are fair, reasonable and appropriate under the circumstances.  The Debtors believe, in their reasonable business judgment, that the DIP Facility is the best financing option available under the present circumstances, particularly given

the expedited timeframe within which they must make payments to preserve the existing entitlements and permits for the Project.

46.     Likewise, the various fees and charges required under the DIP Facility are reasonable and appropriate under the circumstances, as the commitment fee for the DIP Loan is capped at 4% of the Maximum Loan Amount due and fully earned at Closing and the Closing Costs must be reasonable.  Courts have recognized that lender fees often are the only way to obtain financing and therefore have routinely approved such fees.  *See e.g., Resolution Trust Corp. v. Official Unsecured Creditors Comm. (In re Defender Drug Stores, Inc.)*, 145 B.R. 312, 316 (B.A.P. 9th Cir. 1992) (approving financing facility pursuant to section 364 that included a lender "enhancement fee"); *see also, e.g., In re Fortunoff Fine Jewelry and Silverware, LLC*, Case No. 08-10353 (JMP) (Bankr. S.D.N.Y. Feb. 22, 2008); *In re Delphi Corp.*, No. 05-4448 1 (RDD) (Bankr. S.D.N.Y. Jan. 5, 2007).

## C.     No Superior Financing Alternative Available and Adequate Protection

47.     The proposed DIP Order and the DIP Credit Agreement provide for granting to the DIP Lender for its benefit, a super-priority priming lien against all Collateral and the Project pursuant to section 364(d).  In order to satisfy the requirements of section 364(d)(1) of the Bankruptcy Code, a debtor need only demonstrate "by a good faith effort that credit was not available" to the debtor on an unsecured or administrative expense basis.  *Bray v. Shenandoah Fed. Savs. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986).  "The statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable."  *Id.*; *see also Pearl-Phil GMT (Far East) Ltd. v. Caldor Corp.*, 266 B.R. 575, 584 (S.D.N.Y. 2001) (superpriority administrative expenses authorized where debtor could not obtain credit as an administrative expense).  When few lenders are likely to be able and willing to extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to

conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom.*, *Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n. 4 (N.D. Ga. 1989).

48.     Despite their best efforts, the Debtors could not obtain post-petition financing of the type required for this chapter 11 case on an unsecured basis.  Further, the Debtors were unable to obtain post-petition financing on terms more favorable than those contained in the DIP Credit Agreement from any source other than the DIP Lender, including from any of the Pre-Petition Secured Creditors.  An impending UCC property sale scheduled for 3:00 p.m. on the May 16, 2019 petition date, the amount of secured debt against the Collateral and the Project in their current form, and the uncertainty surrounding the Debtors' recapitalization all have made it difficult for the Debtors to attract financing.

49.     The Debtors sought alternative sources of post-petition financing leading up to the Petition Date from several different sources, and had been in regular contact with the Pre-Petition Secured Creditors prior to obtaining an outside source of financing.  Compare *Suntrust Bank v. Den-Mark Constr., Inc. (In re Den-Mark Constr., Inc.)*, 406 B.R. 683, 689–92 (E.D.N.C. 2009) (inadequate showing of inability to obtain financing on less onerous terms where debtors failed to identify any of the unreceptive alternative sources they approached), with *First Sec. Trust Co. v. Vander Vegt*, 511 B.R. 567, 579-80 (N.D. Iowa 2014) (adequate showing based on uncontested testimony that 15 to 20 banks had been contacted about alternative financing); *see also In re L.A. Dodgers LLC*, 457 B.R. 308, 312–14 (Bankr. D. Del. 2011) (denying debtors' motion for approval of secured post-petition financing where "a better and unsecured loan" was available from an alternative lender); *In re Morgan & Co., Inc.*, 2008 Bankr. LEXIS 2654, at *6 (Bankr. E.D.N.C. Sept. 16, 2008) (denying debtor's request for approval of priming lien to secure debtor-in-

{Z0271662/2 }                                    21

possession financing where court was "not persuaded that none of the interested parties would fund the necessary $325,000 without a priming lien").  With the Pre-Petition Secured Creditors refusing to provide additional financing to protect and preserve the Collateral and the Project, the DIP Lender was the only entity willing to provide post-petition financing on a secured or unsecured basis, in compliance with section 364(d)(1)(A).

50.     In addition, in compliance with section 364(d)(1)(B) of the Bankruptcy Code, the DIP Facility provides for adequate protection to the Pre-Petition Secured Creditors in the form of enhancing and preserving the value of the Project by paying necessary insurance, real property taxes, HOA fees, permits that will expire in August 2019, site and critical path expenses, costs to secure and protect the Collateral and the Project, and other necessary costs to preserve existing entitlements, on which such senior lien in favor of the DIP Lender is proposed to be granted.  This adequate protection favors the Pre-Petition Secured Creditors by enhancing, preserving and/or protecting the value of the Project, and payment of such expenses is reasonable and necessary.

51.     Adequate protection is generally defined in section 361 of the Bankruptcy Code to include "an additional or replacement lien to the extent that such stay, use, sale, lease, or grant results in a decrease in the value of such entity's interest in such property . . . ." 11 U.S.C. § 361(2). "[C]reditors are entitled to adequate protection only to the extent that the value of the property securing their claim diminishes . . . ."  *In re Gallegos Research Group Corp.*, 193 B.R. 577, 584 (Bankr. D. Colo. 1995).  The term "adequate protection" has resisted precise definition, reflecting Congressional intent to permit maximum flexibility in structuring a debtor's proposal for adequate protection.  *See In re Briggs Transp. Co.*, 780 F.2d 1339, 1349 (8th Cir. 1985) ("The result of this carefully conceived [adequate protection] mechanism is temporary maintenance of the status quo as of the period immediately before filing, not a permanent bar to liquidation and reinvestment.")

52.     "Since 'value' is the linchpin of adequate protection, and since value is a function of many factual variables, it logically follows that adequate protection is a question of fact." *In re O'Connor*, 808 F.2d 1393, 1397 (10th Cir. 1987).  Adequate protection may take many forms, only some of which are illustrated in section 361.  *Travelers Ins. Co. v. American AgCredit Corp. (In re Blehm Land & Cattle Co.)*, 859 F.2d 137, 139 (10th Cir. 1988) (section 361 sets forth nonexclusive methods of providing adequate protection).

53.     For example, adequate protection includes that taxes be paid.  *See e.g., In re Briggs Transp. Co.*, 780 F.2d 1339, 1349 (8th Cir. 1985); *In re Pinto*, 191 B.R. 610 (Bankr. D.N.J. 1996); *In re Chang*, 185 B.R. 50 (Bankr. N.D. Ill. 1995); *In re East-West Assocs.*, 110 B.R. 675 (Bankr. S.D.N.Y. 1990).  Adequate protection further includes that insurance coverage be paid and kept current.  *Allied Credit Corp. v. Davis (In re Davis)*, 989 F.2d 208, 211 (6th Cir. 1993); *Mellon Bank v. Crystian (In re Crystian)*, 197 B.R. 803 (Bankr. W.D. Pa. 1996) (hazard insurance is an element of adequate protection, not separate collateral); *In re Elmira Litho, Inc.*, 174 B.R. 892, 902 n.9 (Bankr. S.D.N.Y. 1994).  The Debtors have the burden of proof by a preponderance of the evidence on the issue of adequate protection.  *See* 11 U.S.C. § 364(d)(2); *see generally Grogan v. Garner*, 498 U.S. 279, 286 (1991).

54.     For providing the DIP financing under the DIP Facility, the Debtors propose a priming lien in favor of the DIP Lender.  Granting post-petition financing on a priming basis "is extraordinary and is allowed only as a last resort."  *DB Capital Holdings*, 454 B.R. 804, 822 (quoting with approval *In re Seth*, 281 B.R. 150, 153 (Bankr. D. Conn. 2002) ("The ability to prime is extraordinary")); *see also Resolution Trust Corp. v. SwedeLand Dev. Group, Inc. (In re SwedeLand Dev. Group, Inc.)*, 16 F.3d 552, 564 (3rd Cir. 1994); *In re Beker Indus.*, 58 B.R. 725, 736 (Bankr. S.D. N.Y. 1986).  When priming of liens is sought under section 364(d), courts have

considered the preservation and enhancement of collateral to be a critical component of adequate protection. *In re Dynaco Corp.*, 162 B.R. 389, 395 (Bankr. D.N.H. 1993) ("the concept [of adequate protection] consists of stability in collateral value rather than any particular level of value") (citation omitted); *Bankers Life Ins. Co. v. Alyucan Interstate Corp.*, 12 B.R. 803 (Bankr. D. Utah 1981) (holding similarly).

55.     Under the circumstances of these case where  there are multiple competing levels of secured claims and Debtor has been in frequent contact with the Pre-Petition Secured Creditors and as a result of competing divergent interest of the various tranches of secured debt they have been unwilling to provide any further financing. [5]  The Debtors submit the circumstances are extraordinary and warrant approval of the DIP Lien to preserve the value of the Collateral and the Project until a plan of reorganization may be confirmed or those assets may be sold.  *See In re Tashjian*, 72 B.R. 968, 973 (Bankr. E.D. Pa. 1987) (employing a holistic approach to determine adequate protection "with a particular focus upon the value of the collateral, the likelihood that it will depreciate or appreciate over time, the prospects for successful reorganization of the Debtor's affairs by means of the Plan, and the Debtor's performance in accordance with the Plan."); *see also In re Aqua*, 123 B.R. 192, 196-97 (Bankr. E.D. Pa. 1991).

56.     It is "extraordinary" that GPIF, or any other Pre-Petition Secured Creditor, is unwilling to provide post-petition financing for these purposes.  Akin to *Morningstar*, if this matter was in receivership, the same expenses detailed in the Budget would need to be paid immediately to preserve and protect the value of the Collateral and the Project.

---

[5] Counsel for the Debtors advised Counsel for GPIF of the bankruptcy filing and that the Debtors would be seeking to proceed with a proposed $6,250,000 DIP Financing.  GPIF's counsel indicated that it wished to be consulted about a proposed funding but has not provided any proposal either orally or in writing.

57.     The proposed adequate protection under the DIP Facility provides stability in value along with the enhancements, preservation and/or protection of the Collateral and Project both on an "as is" basis and on an "as completed" basis for the benefit of all Pre-Petition Secured Creditors pending a reorganization or a sale, by paying all taxes, insurance, permit expenses, entitlement expenses and all necessary site and critical path expenses.  The proposed payments from the DIP Facility under the Budget will improve and advance the Project, thwart expiration of permits and construction delays, and increase the current and finished value of the Collateral and the Project. In addition to preserving and protecting these assets, the Debtors intend to file a viable plan of reorganization on or before July 1, 2019 that will demonstrate reorganization is realistic in prospect.   Even if the Debtors' reorganization efforts and completion of the Project are unsuccessful, the funds from the DIP Lender would still enhance and preserve Project value on an "as-is" basis for GPIF and other Prepetition  Secured Creditors.

58.     Specifically, the DIP Facility will be used to pay only those certain expenses detailed in the Budget to protect the Project, enhance value and preserve the status quo against the risks of losing valuable entitlements and permits required for the Project to be completed, otherwise protecting and securing the Collateral and the Project as a going concern, and any other risks and events during construction that may adversely affect "as-is" value and completed value.

59.     Thus, to provide adequate protection for the interest of the Pre-Petition Secured Creditors, the Debtors were forced to seek outside funding for the DIP Facility as a result of the senior secured lender's refusal to do so.  The requested priming of the Pre-Petition Secured Creditors under the DIP Facility is the Debtors' last resort, and will preserve and protect the value of the Collateral and the Project until such time as the Debtors prosecute a plan of reorganization or consummate a sale.

60.     Under the circumstances, the DIP Facility is the best and only option available to the Debtors, and the DIP Lien is appropriate.

**D.     Adequacy of Budget**

61.     The Debtors will comply with the Budget based on all known costs to preserve the existing entitlements and historical costs of operation and management of the Project, reasonable projections regarding future operations and management, and the added costs of operating under chapter 11 of the Bankruptcy Code, including professionals' fees. The Debtors submit that the Budget is adequate based on all available information.

**E.     The DIP Facility Represents a Reasonable Exercise of the Debtors' Business Judgment**

62.     After appropriate investigation and analysis and given the exigencies associated with the Debtors' bankruptcy filing, the Debtors have concluded that the DIP Facility is the best and only available option in the circumstances of these cases.  Bankruptcy courts routinely defer to the Debtors' business judgment with respect to such matters, as "[m]ore exacting scrutiny would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially."  *Richmond Leasing Co. v. Capital Bank, N.A.,* 762 F.2d 1303, 1311 (5th Cir. 1985); *see also Trans World Airlines v. Travellers Int'l AG (In re Trans World Airlines, Inc.),* 163 B.R. 964, 974 (Bankr. D. Del. 1994) (noting that approval of interim loan, receivables facility and asset-based facility "reflect[ed] sound and prudent business judgment . . . [was] reasonable under the circumstances and in the best interests of [the debtor] and its creditors"); *Ames*, 115 B.R. at 40 (The court should defer to Debtor's "reasonable business judgment . . . so long as the financing agreement does not . . . leverage the bankruptcy process" and its purpose is to benefit the estate rather than another party-in-interest.).

63.     Here, the Debtors have exercised sound business judgment in determining that the DIP Facility is appropriate, and the Debtors have satisfied the legal prerequisites to borrow under the DIP Facility.  Specifically, as noted above, the DIP Facility will provide the Debtor with access to a $6.275 million after entry of the DIP Order which the Debtor and its advisors have independently determined should be sufficient to support the Debtor's activities through the pendency of this chapter 11 case until either a plan or sale motion is filed, preserve the existing entitlements, and preserve the value of the Project.

64.     Under the circumstances, the Debtor's decision to enter into the DIP Facility is a reasonable exercise of its business judgment, and the Debtor respectfully submits that the DIP Order accordingly should be entered. *See, e.g.*, *In re Ames*, 115 B.R. at 38 (noting that courts permit debtors to "exercise their basic business judgment" when obtaining debtor-in-possession financing under section 364 of the Bankruptcy Code); *Trans World Airlines, Inc.* v. *Travelers Int'l AG* (*In re Trans World Airlines, Inc.*), 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving post-petition loan and receivables facility because the facility "reflect[ed] sound and prudent business judgment"); *see also In re Simasko Prod. Co.*, 47 B.R. 444, 449 (Bankr. D. Colo. 1985) ("[D]iscretion to act with regard to business planning activities is at the heart of the debtor's power.") (citation omitted).

65.     Accordingly, the Debtors submit that the DIP Facility is fair and reasonable and in the best interests of the Debtors, their creditors, their estates, and all parties in interest.  Nor does the DIP Facility unfairly leverage the bankruptcy process in favor of the DIP Lender or cede control of the reorganization to the DIP Lender.  The Debtor further submit that they should be authorized to enter into the DIP Credit Agreement and obtain access to the DIP Facility from the DIP Lender on the priming lien, secured and administrative "superpriority" basis described herein. The terms of the DIP Facility are fair and reasonable and in the best interests of the Debtors' estate.

**F.      The DIP Facility Was Negotiated in Good Faith**

66.      Pursuant to section 364(e) of the Bankruptcy Code, any reversal or modification on appeal of an authorization to obtain credit or incur debt or a grant of priority or a lien under section 364 of the Bankruptcy Code shall not affect the validity of that debt incurred or priority or lien granted as long as the entity that extended credit "extended such credit in good faith." *See* 11 U.S.C. § 364(e).

67.      Courts generally hold that "good faith" in the context of post-petition financing means, consistent with the Uniform Commercial Code, honesty in fact in the conduct or transaction concerned. *See Unsecured Creditors' Comm.* v. *First Nat'l Bank & Trust Co. (In re Ellingsen MacLean Oil Co.)*, 834 F.2d 599, 605 (6th Cir. 1987) (citing U.C.C. § 1-201(19)). Additionally, "[g]ood faith is measured with respect to the good faith of the lender as contrasted to that of the borrower." Transcript of Record *(Court Decision)* at 736:24-25, *In re Lyondell Chem. Co.*, No. 09-10023 (Bankr. S.D.N.Y. Mar. 5, 2009).  Moreover, a lender's desire to ensure that it is repaid, to make money on interest and fees and to protect prepetition positions are understandable and acceptable motivations for a post-petition lender in negotiating a deal. *Id.* at 737:6-14.

68.      The terms of the DIP Facility were negotiated in good faith at arms' length between independent third parties and all of the Obligations will be extended by the DIP Lender in good faith, as that term is used in section 364(e) of the Bankruptcy Code.  The DIP Facility has been extended in express reliance upon the protections afforded by section 364(e) of the Bankruptcy Code, and it should be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that the DIP Order or any provision thereof is vacated, reversed or modified, on appeal or otherwise.

## DEBTORS' RESERVATION OF RIGHTS

69.     Nothing contained herein is intended or should be construed as an admission as to the validity of any claim against the Debtors, a waiver of the Debtors' rights to dispute any claim, or an approval or assumption of any agreement, contract or lease under section 365 of the Bankruptcy Code.  The Debtors expressly reserve the right to contest any claims.  Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended to be, and should not be construed as, an admission as to the validity of any claim or a waiver of the Debtors' right to dispute such claim subsequently.

## APPROVAL ON A FINAL BASIS SHOULD BE GRANTED

70.     The Debtors submit that entry of the DIP Order, in the time periods and for the financing amounts requested herein, is appropriate.  The Debtors respectfully request that the Court authorize the Debtors to incur debt in an amount up to $6,275,000 under the DIP Credit Agreement, which the Debtors shall be permitted to use in accordance with the Budget.  For the reasons set forth above, the Debtors submit that access to this amount under the DIP Facility is necessary to preserve the value of the Debtors' estate for the benefit of its creditors and other parties-in-interest.

## REQUEST FOR WAIVER OF STAY OF DIP ORDER

71.     Given the nature of the relief requested herein, and the approaching deadline to pay the expenses to preserve existing entitlements and permits, the Debtors also seek a waiver of any stay of effectiveness of the DIP Order that may be imposed by Bankruptcy Rule 4001 or any other Bankruptcy Rule.

72.     As set forth above, the Debtors require access to the financing to be provided under the DIP Credit Agreement to prevent potentially irreparable damage to the Debtors' business, operations, the value of the Project, and the Debtors' ability to consummate a plan.  Accordingly,

the Debtors submit that ample cause exists to justify a waiver of any stay imposed by Bankruptcy Rule 4001, to the extent applicable.

## **NOTICE**

73.     The Debtors have caused notice of this Motion and the relief requested herein by sending complete copies of this Motion with all attachments to: (i) the Office of the United States Trustee for the District of Colorado; (ii) the Pre-Petition Secured Creditors, including all parties who are known, after reasonable inquiry, to have asserted a lien, encumbrance, or claim in the; (iii) known counsel for the Pre-Petition Secured Creditors; (iv) the creditors appearing on the Debtors' respective lists of top 20 unsecured creditors; (v) the Internal Revenue Service; (vi) the Securities and Exchange Commission; (vii) all parties to the DIP Credit Agreement; (vii) all entities that have requested notice in accordance with Bankruptcy Rule 2002; and (ix) all other known creditors of the Debtors.  In light of the nature of the relief requested herein, the Debtors submit that further notice of this Motion is neither required nor necessary.

## **NO PRIOR REQUEST**

74.     The Debtors have not previously sought the relief requested herein from this or any other court.

## CONCLUSION

WHEREFORE, the Debtors respectfully request this Court enter an order, substantially in the form attached hereto, granting the relief requested in this Motion and such other and further relief as may be just and proper.

Dated: May 22, 2019

MARKUS WILLIAMS YOUNG AND HUNSICKER LLC

By:  *s/ James T. Markus*
James T. Markus, #25065
John F. Young, #26989
Matthew T. Faga, #41132
1700 Lincoln Street, Suite 4550
Denver, Colorado 80203
Telephone (303) 830-0800
Facsimile (303) 830-0809
jmarkus@markuswilliams.com

*Proposed Counsel for the Debtors and Debtors-in-Possession*