# EFO FINANCIAL GROUP, LLC
**9115 Galleria Court**
**Suite 105**
**Naples, FL 34109**
**T: 239.580.7151**

September 16, 2019

**DEBTORS:**

THE ASPEN CLUB & SPA, LLC
ASPEN CLUB REDEVELOPMENT COMPANY, LLC
c/o Mr. Michael Fox
1450 Ute Avenue
Aspen, CO 81611

**DEBTOR'S COUNSEL:**

MARKUS, WILLIAMS, YOUNG & HUNSICKER, LLC
c/o Mr. James T. Markus, Esquire
1700 Lincoln Street
Suite 4550
Denver, CO 80203

**In re:** ONE HUNDRED FORTY MILLION AND NO/100 DOLLARS ($140,000,000.00) ("LOAN") EXIT FINANCING COMMITMENT LETTER FOR THE CHAPTER 11 PLAN OF REORGANIZATION AS PROPOSED BY (I) THE ASPEN CLUB AND SPA, LLC, AND (II) ASPEN CLUB REDEVELOPMENT COMPANY, LLC

Gentlemen:

In reference to the above-captioned matter, the Lender [as herein defined] is pleased to provide this non-assignable commitment (this "Commitment") to Borrower [as herein defined], to facilitate confirmation of Borrower's [as herein defined] joint plan of reorganization ("Plan of Reorganization") as proffered under Chapter 11 Case Number(s) 19-14158-JGR and 19-14200-JGR (collectively, the "Bankruptcy Case"), pending in the United States Bankruptcy Court for the District of Colorado ("Bankruptcy Court").

| | |
|---|---|
| **LENDER:** | **EFO Financial Group, LLC**, a Florida limited liability company, and/or its participants or assigns ("Lender"). |
| **BORROWER:** | (i) **The Aspen Club & Spa, LLC**, a Colorado limited liability company, debtor and debtor-in-possession under Case Number 19-14158-JGR, currently |

1

EXHIBIT A

pending in the Bankruptcy Court, and (ii) **Aspen Club Redevelopment Company, LLC**, a Colorado limited liability company, debtor and debtor-in-possession under Case Number 19-14200 currently pending in the Bankruptcy Court, both of whom shall be jointly and severally liable under the Loan, with each of the foregoing being jointly administered under the Bankruptcy Case (collectively, "Borrower" or "Debtor").

**LOAN PURPOSE:**   (i) Finance the Debtors' Plan of Reorganization, (ii) refinance the DIP loan facility, (iii) facilitate the payment of the mechanics lien holders and other creditors in the manner set forth in the Plan of Reorganization, (iii) enable a timely development/construction schedule, (iv) pay the costs of the Loan to the extent provided therein, and (v) serve as exit financing for the Debtor (collectively "Loan Purpose").

**AMOUNT OF LOAN/ADVANCES:**   The maximum aggregate principal amount of the Loan shall be **ONE HUNDRED FORTY MILLION AND NO/100 DOLLARS ($140,000,000.00)**, which amount includes the Interest Reserve [as herein defined], the Line Fee [as herein defined], the Commitment Fee [as herein defined], the Loan Servicing Fee [as herein defined], and the Closing Costs [as herein defined] which, together with any other fees or costs as provided for herein and/or in the Loan Documents [as herein defined], shall collectively be referred to as the "Maximum Loan Amount", which sum shall be loaned as follows:

A.      The Borrower shall make an application for a super-priority exit loan facility in the Maximum Loan Amount, to be made upon entry of the Final Order [as herein defined] of the Bankruptcy Court authorizing both the Exit Loan and, contemporaneously therewith, the Debtor's joint Plan of Reorganization, which shall incorporate the Loan according to the terms of this Commitment. Upon entry of the Final Order [as herein defined] of the Bankruptcy Court as to the Loan and Plan of Reorganization, satisfying the requirements of this Commitment and granting the liens and other rights described herein, which Final Order [as herein defined] has not been modified, stayed, vacated, amended or reversed and as to which (i) no, reargument, rehearing, or reconsideration is pending (the "Final Order"), and upon satisfaction of all conditions and requirements of this Commitment and of the Loan Documents [as herein defined] to be approved by the Bankruptcy Court and executed by the Borrower, the Lender shall make advances according to the terms of this Commitment (each disbursement of funds shall be referred to herein as an "Advance"). The Loan Advances shall be made in a series of disbursements for the Loan Purpose and to fund such other items as contemplated in the Debtor's Plan of Reorganization, provided they are consistent with the Budget [as defined herein] attached hereto as Exhibit "A". At the time of the Closing

2

EXHIBIT A

[as herein defined] of the Loan, the Commitment Fee [as herein defined], Loan Servicing Fee [as herein defined], Closing Costs [as herein defined], and any other costs as provided for herein or in the Loan Documents [as herein defined] pertaining to the Loan will be disbursed in full. Except as otherwise provided herein, in the Lender's discretion, in no case shall the Lender be required to advance more than the Maximum Loan Amount. Further, the initial Advance of the Exit Loan shall pay the then existing balance of the DIP loan, inclusive of accrued and unpaid interest and any applicable charges or expenses incurred pursuant to the terms of the DIP loan documents. For the avoidance of doubt, amounts repaid under the Loan may not be reborrowed.

B.      In addition, Lender may make disbursements on the Loan, in Lender's discretion and without further order of the Bankruptcy Court, to pay Lender's costs and expenses incurred both in connection with the Closing [as herein defined] of the Loan and in connection with the Bankruptcy Case (including, but not limited to, reasonable fees and costs of the Lender's counsel) and protection of Lender's Collateral [as herein defined], which advances may collectively result in a sum in excess of the Maximum Loan Amount and shall become part of the principal amount of the Loan.

C.      The following items must be satisfied as conditions precedent to Lender's obligation to disburse any portion of any Advance of the Loan:

(i)      All representations and warranties set forth in this Commitment, in each application for Advance and in all other Loan Documents [as herein defined] shall be true and correct in all respects (with respect to the initial Advance) and true and correct in all material respects (with respect to subsequent Advances) on and as of the date of any such Advance, with the same effect as if made and repeated on that date.

(ii)      As of the date of any such Advance,

(a)      Borrower is in full compliance with all of the covenants, agreements, obligations and undertakings required to be performed by Borrower under this Commitment, the applicable Final Order and under the other Loan Documents [as herein defined] unless compliance thereof shall have been waived in writing by Lender;

(b)      No event of monetary or non-monetary

3

EXHIBIT A

default as defined herein or in any other Loan Document, or with respect to the Borrower's obligations under the DIP Loan, and no event or condition which with the notice or the passage of time or both as prescribed herein or in such other Loan Document would constitute any such event of default, has occurred and has not been cured to Lender's reasonable satisfaction;

(c)     There shall have been no change in the condition of the Collateral [as herein defined] and the Improvements [as herein defined], and the Collateral [as herein defined] and Improvements [as herein defined] shall not have suffered any significant damage by fire or other casualty, that is damage by fire or other casualty in excess of FIVE HUNDRED THOUSAND AND NO/100 DOLLARS ($500,000.00), as determinted by Lender in its reasonable judgement, not adequately covered by insurance and no condemnation or adverse zoning or usage change proceedings shall have been commenced or threatened, and no law, regulation, ordinance, moratorium, or injunctive proceeding shall have been commenced or threatened by any governmental authority if the result of such law, regulation, ordinance, moratorium, injunctive proceeding, restriction or like matter would have the effect in Lender's reasonable judgment, of materially and adversely affecting the expected benefits to be gained by Borrower in connection with the Collateral [as herein defined] or by Lender in connection with its assisting Borrower in financing the subject transaction for any reason, whether because of Borrower's being prohibited or delayed in completing the Improvements [as herein defined] or otherwise;

(d)     All statements contained in Borrower's application for Advance are true and complete and all other certificates, statements and data furnished to Lender by or on behalf of Borrower or in connection with the transactions contemplated by this Agreement or any of the other Loan Documents [as herein defined] are true and complete in all material respects, and there are no facts or events known to Borrower which, if disclosed to Lender, would make such statements, certificates or data untrue in any material respect; and

4

EXHIBIT A

(e)     All documentation shall at all times be in form and content acceptable to Lender.

(iii)     It shall also be a condition to Lender's obligation to disburse any portion of any Advance of the Loan that Lender has received and approved the application for Advance from the third party inspector ("Inspecting Party") designated by Lender, and whose employment shall have been approved by the Bankruptcy Court, together with such certifications as may be required by Lender from the Inspecting Party, and the Architect (to be designated by the Borrower and approved by the Lender, and whose employment shall have been approved by the Bankruptcy Court). If any part of a disbursement of an Advance is not included in the Budget [as herein defined], the approval of Lender shall be required. Upon receipt of the appropriate application approved by the Inspecting Party and the Lender, funding shall occur within TEN (10) business days thereafter.

(iv)     Lender shall have no obligation:

(a) to make any Advance if any condition precedent set forth herein has not been fully satisfied;

(b) to make any Advance for a line item which exceeds the sums for such line item on the approved Budget [as defined below]; provided, the actual expenses for a line item may exceed the line item on the approved Budget [as herein defined] so long as another line item expense came in under the line item on the approved Budget [as herein defined]  by at least the amount of the overage and/or there remains a contingency amount in the approved Budget [as herein defined]  sufficient to satisfy the excess amount, as determined in the Lender's reasonable discretion;

(c) except where Borrower and Lender agree in writing, to make more than ONE (1) Advance in any one calendar month; or

(d) to make any Advance which would cause the aggregate of all Advances by Lender to exceed the Maximum Loan Amount.

(v)     With reference to all work performed and materials

5

EXHIBIT A

delivered on or after the date of filing of Debtor's petition for bankruptcy relief, Borrower will procure and deliver to Lender releases or waivers of mechanic's liens, and invoices, or paid receipts if requesting reimbursements, of all parties who have furnished materials or services or performed labor of any kind in connection with the construction of any of the Improvements [as herein defined].

(vi)     Evidence of title continuation or of an endorsement to the title insurance policy theretofore delivered, indicating that since the last preceding disbursement of an Advance, or the date of issuance of the title insurance policy, as the case may be, there has been no material adverse change in the state of title and no exceptions not theretofore approved by Lender, which endorsement shall have the effect of increasing the coverage of the policy by an amount equal to the proposed disbursement of an Advance then being made if the policy does not by its terms provide for such an increase.

(vii)     Copies (certified by Borrower and Inspecting Party to be true and correct) of all checks issued by Borrower since the immediately preceding disbursement of an Advance, in connection with the Property or construction of the Improvements [as herein defined] or any other use of the Loan proceeds, together with any and all other evidence of payments requested by Lender;

(viii) Should the above enumerated items be satisfactorily delivered and approved by Lender, in its sole and absolute discretion, Lender shall make such Advance within TEN (10) business days of its final approval.

(ix)     Lender's obligations to close the Loan shall also be expressly subject to the following conditions precedent:

(a)     On or before January 17, 2020, the Bankruptcy Court shall have entered a Final Order approving the Loan and contemporaneously confirming a Plan of Reorganization, the provisions of which are entirely consistent with the terms of this Commitment and otherwise acceptable to Lender in its sole and absolute discretion.

(x) The Final Order shall incorporate the terms of this Commitment and provided further that each of the following

6

EXHIBIT A

conditions shall have been satisfied in the sole and absolute discretion of the Lender:

(a) the terms and provisions of the Loan shall be consistent with this Commitment and otherwise satisfactory to the Lender, in its sole and absolute discretion;

(b) Lender and any applicable title insurer, shall be satisfied, in their sole and absolute discretion, that the Final Order authorizing the Loan shall result in Lender having a first priority lien and security interest in the Collateral [as herein defined], superior to any prepetition or postpetition interest in the Collateral [as herein defined] by any other entity whomsoever, except as set forth under Exhibit "E"[1];

(c) payment of all *real property and personal property* taxes and tax certificates for 2019 and previous years and provision in the Budget [as herein defined] for payment of all such taxes that will be due and payable during the term of either Facility;

(d) the Final Order with respect to the Loan shall unequivocally and irrevocably subordinate the security interests in the Collateral [as herein defined] of all entities having or claiming an interest in the Collateral [as herein defined] to the first priority security interests of the Lender, except as set forth under Exhibit "E";

(e) the Final Order with respect to the Loan shall provide that, upon the sale of completed Living Units [as hereafter defined] the Net Proceeds of Sale, Release Fee and Minimum Sales Price of such units shall be applied as set forth herein. After satisfaction of the Loan in full, the Net Proceeds of Sale of the remaining Living Units [as herin defined] shall be applied to the payment of liens inferior to the Loan in accordance with Plan of Reorganization;

[All sales of Living Units [as herein defined] shall be conveyed free and clear of liens, including, without limitation, all pre-petition liens held by any entity that was

---

[1] The Mechanic's Lien Claimants set forth in Exhibit "E" will be paid their Allowed Claims, together from the proceeds of the Loan, in accordance with the terms of the Plan of Reorganization.

EXHIBIT A

not paid in full at the Closing of the Loan in accordance with the terms of the Plan of Reorganization, so as to permit clear title to be transferred to third-party end users.]

(f) all tax liens other than those referenced in subparagraph (o), above, that encumber the Collateral [as herein defined] shall have been paid in full at or prior to the Closing [as herein defined] of the Loan; and

(g) the Final Order approving the Loan shall authorize, and the Borrower shall execute, an indemnification agreement satisfactory to the Lender, in its sole and absolute discretion, which indemnifies and holds the Lender, along with its professionals, harmless with respect to any claims whatsoever which may be asserted by any entity with respect to the Lender's interest in the Collateral [as herein defined].

**TERM:** The maturity date of the Loan shall be the date which is THIRTY (30) months after the date of the Closing [as herein defined] of the Loan ("Maturity Date").

The Borrower shall have the option, provided no default in the Loan Documents exist, to extend the term of the Loan for an additional TWELVE (12) months after the Maturity Date ("Loan Extension").

In the event of a Loan Extension, and at such time, the Borrower shall pay to Lender a loan extension fee of ONE AND NO/1000 PERCENT (1.000%) ("Loan Extension Fee") of the outstanding principal balance and accrued unpaid interest as of the Maturity Date.

**PAYMENTS TO LENDER:** A.    Any and all payments made to Lender shall be applied to the Loan as follows:

1  First, to any outstanding expenses due to Lender;

2  Second, to any accrued unpaid interest due under the Loan;

3  Third, to reduce the outstanding principal balance of the Loan.

B.    Provided there exists no Event of Default, Borrower shall pay to Lender seventy five percent (75%) of the Net Cash Flow from operations on a quarterly basis. "Net Cash Flow" means the Cash (exclusive of and not

8

EXHIBIT A

including Net Proceeds of Sale) received by the Reorganized Debtors during each calendar quarter following the Effective Date minus the sum of (a) the Cash paid out by the Reorganized Debtors during the same calendar quarter for expenses directly relating to operations of the Debtor' facilities, plus (b) the amount of Cash reserved by the Reorganized Debtors during such calendar quarter to meet future or accruing operating expenses, payroll expenses, compensation expenses, commissions (other than real estate commissions), fees and other accruing expenses and which reserve shall be determined by the Reorganized Debtors in the exercise of their reasonable business judgement.

C.      Should an Event of Default occur, one hundred percent (100%) of the Net Cash Flow from operations shall be payable to Lender on a quarterly basis until such time as the Event of Default is cured.

D.      Borrower shall pay to Lender a minimum of ninety percent (90%) of the Net Proceeds of Sale of each Living Unit ("Release Fee"). "Net Proceeds of Sale" means the amount of Cash paid to the Borrower through the sale of Living Units, minus the selling costs associated with the sale of the Living Units, including without limitation, real estate commissions, pro-ration of property taxes and utilities, transfer taxes, excise taxes, title fees, escrow fees, quarterly US Trustee fees (if still due and owing) and closing costs, but in no event shall the gross proceeds of sale be less than the amounts set forth in the schedules contained in Exhibit "C", attached hereto.

E.      So long as the Borrower is not in default, Lender shall allow the Borrower to disburse Net Proceeds of Sale to holders of claims as proposed under the plan as follows:

1.      100% of the Release Fees generated from the sale of Living Units shall be payable to Lender until such time that Lender has realized a $50,000,000 reduction of principal outstanding, together with interest not otherwise paid through the Interest Reserve, and applicable fees and costs due ("Initial Reduction");

2.      Upon Lender's receipt of its Initial Reduction,  Lender shall allow the Borrower to pay the next $10,000,000 of Release Fees to GPIF Aspen Club LLC ("GPIF");

3.      Upon the payments described in the immediately preceeding paragraph 2, then Lender shall then receive 100% of the Release Fees until such time that it has received an additional $50,000,000 reduction of principal balance, together with interest not otherwise paid

EXHIBIT A

through the Interest Reserve, and applicable fees and costs due ("Second Reduction");

     4.     Upon Lender's receipt of its Second Reduction, Lender shall allow the Borrower to pay the next $10,000,000 of Release Fees to GPIF;

     5.     Upon the payments described in the immediately preceeding paragraph 4, then Lender shall then receive 100% of the Release Fees until such time that Lender is paid-in-full

**PREPAYMENT:**

Borrower may prepay the Loan at any time. In the event of a prepayment, the Commitment Fee [as herein defined], the Loan Servicing Fee [as herein defined], the Line Fee [as herein defined], the Closing Costs [as herein defined] and/or other costs paid pursuant to the terms hereof and/or in the Loan Documents [as herein defined] shall not, under any circumstances, be refunded. Furthermore, should prepayment occur within the first THREE HUNDRED SIXTY (360) days after the date of Closing [as herein defined] of the Loan, the Lender shall retain and earn, in full, THREE HUNDRED SIXTY (360) days of the prepaid interest, computed at the Contract Rate [as herein defined] on the Maximum Loan Amount.

**BUDGET/USE OF PROCEEDS:**

Loan proceeds shall be used by Borrower in accordance with a budget in substantially the same form as that which is attached hereto as **Exhibit "A"** (the "Budget"), which Budget may be modified as approved by Lender, on or before the date of the hearing for approval of this Commitment.

**INTEREST/ INTEREST RESERVE:**

A.     The interest rate shall be the prime rate (as published by the Wall Street Journal), plus SIX HUNDRED FIFTY BASIS POINTS (650BPS) per annum, with a floor of TWELVE AND NO/1000 PERCENT (12.000%) (hereinafter the "<u>Contract Rate</u>"). The interest shall be adjusted monthly in accordance with those rates published by the Wall Street Journal as of the last day of each month.

B.     Monthly payments of interest only on the unpaid principal balance shall be due on the first day of each month for the prior month's interest until the Maturity Date of the Loan, at which time the entire balance of principal and accrued unpaid interest thereon together with any costs and expenses then owing, shall be due and payable in full. Monthly payments of interest shall be made from proceeds available under the Loan ("<u>Interest Reserve</u>") held by the Lender, provided, however, that nothing herein shall relieve the Borrower of the absolute obligation to pay interest and other amounts due in connection with the Loan.

10

EXHIBIT A

C.       Monthly payments will be computed on a 30-day month and a 360-day year, unless such computation results in the effective interest rate of the Loan exceeding the maximum rate of interest allowable under applicable state and federal law. It is hereby understood and agreed upon by and between the Borrower and Lender that the Lender does not intend, under any circumstances, to charge, collect, assess or receive interest, at an effective rate, in excess of the maximum rate allowable under applicable state and federal law. If the effective interest rate does exceed the maximum rate allowable by applicable state or federal law, the Borrower and Lender intend to and hereby agree to reduce the effective interest rate to the maximum rate allowable by state or federal law.

D.       Upon occurrence of an event of default, interest shall accrue on the Loan at the lower of (a) the sum of the Contract Rate and an additional EIGHT PERCENT (8.00%) or (b) the maximum effective interest rate allowable under applicable state or federal law on all amounts then outstanding from the date of default ("Default Rate"). Without limiting the generality of the foregoing, payments made more than five (5) business days past their due date shall be deemed to be in default and shall be assessed at the Default Rate. If the Default Rate's effective interest rate exceeds the maximum rate allowable by applicable state or federal law, the Borrower and Lender intend to and hereby agree to reduce the Default Rate's effective interest rate to the maximum rate allowable by state or federal law. Nothing herein shall relieve the Borrower of the absolute obligation to pay interest and other amounts due in connection with the Loan.

**UNUSED LINE FEE:**       Upon entry of the Final Order of the Bankruptcy Court authorizing the Loan, Lender shall be entitled to a monthly unused line fee (the "Line Fee") calculated on the basis of THIRTY FIVE (35) basis points (0.35%) per month of the principal amount of the Loan which has not been advanced, commencing at the Closing of the Loan. To the extent possible, monthly payments the Line Fee shall be payable monthly from the Interest Reserve together with each monthly interest payment calculated as set forth above. As each monthly installment of the Line Fee is due and when each Advance of the Loan is made, Lender shall be deemed hereunder to have funded such amount to Borrower who shall be deemed to have paid said amount to Lender. With each such payment and funding of the Line Fee, the principal balance of the Loan shall be increased by such amount.

**LOAN SERVICING FEE:**       At the time of the Closing [as herein defined] of the Loan, from the proceeds of such Advance, Borrower shall pay to Lender a loan servicing

11

EXHIBIT A

fee equal to ONE AND NO/1000 PERCENT (1.000%) of the Maximum Loan Amount with respect to the Exit Loan ("Loan Servicing Fee"). Lender shall provide Borrower a credit to the Loan Servicing Fee of the amount of the DIP loan servicing fee.

In the event of a Loan Extension [and at such time, and as a condition thereto], Borrower shall cause to be paid to Lender, an additional sum of ONE-HALF PERCENT (0.50%) on the outstanding principal balance and accrued unpaid interest of the Loan as of the Maturity Date ("Extension Servicing Fee").

**COLLATERAL/ OTHER RIGHTS:**

A.    The Loan shall be secured by a first priority mortgage (or deed of trust, financing statement and/or similar security instrument) lien on the Property and all other real property which the Borrower[2] owns and all other property interests, real, personal or intangible of the Borrower, now existing or hereafter acquired, including, without limitation, contract rights and property interests acquired post-petition (hereafter collectively referred to as, the "Collateral"). The Collateral shall also include, *but not be limited to,* that certain project known as the Aspen Club & Residences located within the City of Aspen in the State of Colorado encompassing: (i) SIX (6) to be completed 4 bedroom condominiums with an aggregate of 16,200 square feet of living space, (ii) TEN (10) to be completed 3 bedroom townhomes with an aggregate of 20,350 square feet of living space, (iii) FOUR (4) to be completed 4 bedroom townhomes with an aggregate of 10,800 square feet of living space, (iv) TWELVE (12) to be completed workforce housing units with an aggregate of 10,800 square feet of living space [items (i) through (iv) being herein referred to as the "Living Units"], (v) the to be completed club, spa, and amenity package encompassing 60,838 square feet of usable space [items (i) through (v) being hereafter referred to as the "Improvements"], (vi) all licenses, permits, plans, contracts, applications, governmental or municipal approvals pertaining to the Improvements, and (vii) any rents, revenues, profits, or income generated with respect to any of the collateral, (items (i) through (vii) shall herein be collectively referred to as the "Collateral"). The Collateral is more particularly described and additionally expanded under Exhibit B and B-1.

With the exception of those parties identified under Exhibit "E", the priming mortgage/deed of trust liens and security interests in favor of Lender shall be senior to any and all other prepetition or postpetition liens

---

[2] It is specifically understood, for purposes of emphasis and not limitation, that each individual entity collectively referred to herein as the "Borrower" shall each pledge all such enumerated property interests as security for the joint and several obligation of each such entity to pay the Loan in full and discharge each obligation enumerated in the Loan Documents.

EXHIBIT A

or interests, including, without limitation, judgment liens, liens imposed by applicable covenants, declarations and restrictions, mortgages, deeds of trust and security interests encumbering said Collateral to 11 U.S.C. §§ 364(d) and 364(c)(2). Lender's liens and security interests in the Collateral shall also be senior to all other interests of any party, including, without limitation, tax liens (except ad valorem taxes for 2019 and subsequent years). Lender's liens and security interests may be subject to deed restrictions, equitable servitudes or other rights in such Collateral as may be acceptable to Lender, its counsel and the Title Company (defined below) in their sole and absolute discretion. The Debtors' Plan of Reorganization shall provide, *inter alia*, that liens and security interests of all entities having or asserting pre-petition or post-petition liens or security interests in the Debtors' estate property, including those interests set forth in Exhibit "E", shall be transferred to the proceeds of the sale of any Collateral, to the same extent and priority as such liens may have enjoyed prior to such sale and, in any event, subordinate to the Lender's lien and security interest therein (except those interests set forth in Exhibit "E") until the Lender's Loan is paid in full.

B.      The Borrower hereby agrees not to seek to modify, subordinate, reduce, impair, alter, surcharge, extinguish or otherwise change or charge either the priming lien of the Lender pursuant to any provisions of Title 11 or other applicable law. None of the Lender's rights as set forth herein may be modified except with the express written consent of the Lender.

C.      Lender's mortgage/deed of trust liens and security interests shall not be primed, surcharged, altered or impaired, marshaled or otherwise adversely affected in any way, whether requested by a creditor of the Borrower or any other party. No claim or expense, except those that are the subject of a carve out in favor of United States Trustee fees, shall have priority over, or be *pari passu* with, Lender's rights in the Collateral. Except as provided in the immediately preceding paragraphs A and B, no administrative expense, and no claim allowed and payable under 11 U.S.C. §§ 330, 331, 503(b) 506(c), 507 or 726, shall have priority over, or be *pari passu* with, the Lender with respect to any asset of the Borrower which constitutes either the Collateral pursuant to 11 U.S.C. §364(d) or with respect to the claims of the Lender pursuant to 11 U.S.C. §364(c)(1).

D.      The Final Order authorizing the first priority liens in favor of the Lender and incorporating the terms and requirements of this Commitment, shall also contain both a finding by the Bankruptcy Court that the extension of credit and making of loans by Lender hereunder to Borrower is being made in good faith and, therefore, Lender shall be entitled to the full protections of 11 U.S.C. §364(e) and shall be made

13

EXHIBIT A

effective immediately without any stay of the effect of such Final Order so as to permit, in Lender's sole discretion, immediate funding within the provisions and protections of 11 U.S.C. §364(e).

E.      No order issued by the Bankruptcy Court, including any order confirming any plan of liquidation or reorganization, may be on terms inconsistent with the Final Order authorizing the Loan and granting the interests in favor of the Lender as herein set forth herein.   Any potential inconsistency, betwen such an order of the Bankruptcy Court and the Final Order, shall excuse Lender's performance.

**COVENANTS:**          In addition to all standard covenants required by the Lender in construction loans made under like circumstances, including all standard commercially appropriate terms in the Lender's absolute discretion, the Lender will require that:

A.      Borrower shall: (a) own the Collateral; (b) disburse funds for the payment of expenses only as set forth in the Budget; (c) comply with all provisions of the Final Order, this Commitment and the Loan Documents [as herein defined]; (d) present to the Lender such additional instruments as may be required for endorsements to the Title Insurance Policy as Lender may require insuring that each Advance of the Loan retain the lien priority described herein; (e) notify Lender in writing of any material adverse change in the Collateral, the financial condition of the Borrower or the financial viability or performance of the Borrower's property, or of economic conditions which may materially adversely affect the value or performance of the Borrower's property, and (f) comply with all statutory deadlines for filing a Chapter 11 Plan of Reorganization and the solicitation of acceptances of said Plan of Reorganization, as well as any timely confirmation of such a Plan of Reorganization.

B.      Borrower shall supply to Lender: (A) on or before the 15th day of each month during the term of the Loan, a receipts and disbursements statement relating to the operation of the Collateral including the use of Loan proceeds; (B) on or before the 15th day of each month during the term of the Loan, a schedule reflecting both all available Loan proceeds not yet disbursed, if any, and all outstanding costs; (C) within three (3) days after Borrower receives a copy of the same, copies of any and all appraisals of any of the Borrower's property and/or equipment; and (D) all information reasonably necessary for Lender to monitor its Loan to Borrower.

C.      So long as any portion of the Loan remains outstanding, the Borrower shall not seek or permit, and shall actively object to the request for entry of, (i) an order dismissing or converting the Bankruptcy Case; or

14

EXHIBIT A

(ii) any order which modifies the Final Order confirming the Plan of Reorganization, or authorizes, pursuant to any section of the Bankruptcy Code, the granting of any lien or security interest in any Collateral in favor of any party other than Lender or the obtaining of any credit or the incurring of any indebtedness that is entitled to superpriority administrative status equal to or superior to that granted to Lender; or any plan of reorganization inconsistent with the terms of the Commitment.

D.      The terms of the Final Order authorizing the Loan shall incorporate the Minimum Sales Price per Living Unit type and Minimum Sales Pace as aggregated, as attached hereto as Exhibit "C" and "D", respectively.

E.      With respect to the Loan, all of the exterior and interior finishes with respect to the Collateral, shall be subject to approval by a board of managers ("BOM"). The BOM shall include 4 individuals, (i) Mr. Michael Fox, (ii) an interior designer to be selected by the Borrower and approved by the Lender, (iii) the Third Party Inspector/Architect, and (iv) a representative to be selected by the Lender. The BOM shall ensure that (a) finishes used meet the quality and specifications set forth in the construction agreement and interior design agreement, (b) that the use of such appointments would generally be accepted by the market, (c) that the use of such appointments would not otherwise delay the construction period, and (d) that the use of such appointments would not otherwise cause the Borrower to exceed the stated Budget.

F.      All funds in Advances with respect to Budget line items enumerated as "Soft Costs" and "Hard Costs" shall be disbursed into a segregated account, and no disbursements therefrom may be made by Borrower without the joinder by the Inspecting Party, who shall first certify in writing that each such disbursement is in accordance with the Loan Documents [as herein defined], and that payment for work performed or materials supplied are appropriate and completed in a workmanlike manner. Monthly statements pertaining to the segregated account shall be distributed in a timely fashion to the Lender and Inspecting Party.

G.      With respect to the Loan, it shall also be a condition to Lender's obligation to make any advance that Lender has received the approval of the application for advance by the Inspecting Party (to be designated by Lender) and the Architect (to be designated by the Borrower and approved by the Lender), together with such certifications as may be required by Lender from the Inspecting Party hereof and, if any part of an advance is not included in the Budget, the approval of Lender shall be required.

H.      Lender shall have no obligation: (i) to make any advance if any

15

EXHIBIT A

condition precedent set forth herein has not been fully satisfied, (ii) to make any advance for a line item which exceeds the sums for such line item on an approved budget; provided, the actual expenses for a line item may exceed the line item on the approved budget so long as another line item expense came in under less than the line item on the approved budget by at least the amount of the overage and/or there remains a contingency amount in the approved budget sufficient to satisfy the excess amount; (iii) except for the initial Advance and where Borrower and Lender agree in writing, to make more than one (1) Advance(s) disbursement in any one month, and (iv) to make any Advance disbursement which would cause the aggregate of all Advances by Lender to exceed the Maximum Loan Amount.

I.      With reference to all work performed and materials delivered on or after the date of filing of Debtor's petition for bankruptcy relief, Borrower will procure and deliver to Lender releases or waivers of mechanic's liens, and invoices, or paid receipts if requesting reimbursements, of all parties who have furnished materials or services or performed labor of any kind in connection with the construction of any of the improvements.

J.      With respect to any deposits or monies related to the purchase of any of the Living Units, said deposits or monies shall be funded directly to the Lender at the time said deposits are made. Should any of the deposits made to Lender become refundable, then Lender shall refund such amounts directly to the applicable third party purchaser.

K.      As a precondition to any disbursement under any Advance, the Borrower shall provide: (i) evidence of title continuation or of an endorsement to the title insurance policy theretofore delivered, indicating that since the last preceding advance, or the date of issuance of the title insurance policy, as the case may be, there has been no material adverse change in the state of title and no exceptions not theretofore approved by Lender (including, without limitation, the filing of any mechanic's lien or consensual lien encumbering the Collateral), which endorsement shall have the effect of increasing the coverage of the policy by an amount equal to the advance then being made if the policy does not by its terms provide for such an increase; and (ii) copies (certified by Inspecting Party to be true and correct) of all checks issued by Borrower since the immediately preceding Advance, in connection with the Property or construction of the Improvements or any other use of the Loan proceeds, together with any and all other evidence of payments requested by Lender.

L.      Nothing in this Commitment or in any Loan Document resulting

16

EXHIBIT A

from the Court's approval of the Loan shall impose any duty on the Lender in favor of any third party, including, without limitation, the Debtors, their respective estates, the Office of the United States Trustee, any creditor or other third party.

M.      Borrower shall obtain the written approval of Lender, in Lender's reasonable discretion, prior to drawing funds from the contingency reserve with respect to the hard and soft costs.

N.      So long as the Borrower is not in default, , Lender shall allow the Borrower to use 25% of the net cash flow from operations to pay holders of claims as proposed under the plan. In the event of default, Lender shall receive 100% of the net cash flow from operations until such time that the default is cured.

O.      Borrower shall obtain Lender's approval for any commercial leases that Borrower wishes to enter into post confirmation, and such approval shall not be unreasonably withheld.

**DEFAULT/
REMEDIES:**

A.      The Loan Documents [as herein defined] shall contain events of default, notices of default, opportunity for cure, and remedies customarily required by Lender in its absolute discretion in transactions such as the Loan.

B.      In addition to other rights and remedies available under the Loan Documents [as herein defined] or applicable law, upon occurrence of an Event of Default [as herein defined] the following additional notice and cure provisions shall apply:

i) Lender, if it seeks to exercise its rights and remedies under the Loan Documents [as herein defined] with respect to the Event of Default, shall provide written notice (the "<u>Written Notice</u>") to the Borrower and Borrower's counsel of record. The Written Notice may be any written document providing notice of default, including, but not limited to, electronic communication.

ii) The Borrower shall have THIRTY (30) days from the receipt of the Written Notice in which to cure a monetary default or file a controverting affidavit with respect to the default and  THIRTY (30) days from the receipt of the Written Notice in which to cure a non-monetary default or file a controverting affidavit with respect to the default.

17

EXHIBIT A

iii) If an Event of Default is not cured within the prescribed time period, Lender may foreclose on its liens or take any other action available to Lender under the Loan Documents [as herein defined] and applicable law.

C.      The entire principal balance of the Loan, plus all accrued and unpaid interest (including interest at the Default Rate, from the date of the actual default notwithstanding the date the Written Notice is provided to the Borrower), fees and costs, through the date of payment, shall, in addition to default by Borrower under the Loan Documents as described above, automatically become due and payable upon any of the following events of defaults (i) the failure to cure any default as is set forth above, (ii) the modification of the confirmed Plan of Reorganization unless the modification proposes to treat Lender's claims in the same manner as provided in this Commitment and the Loan Documents, or such other treatment as the Lender, in its sole and absolute discretion, may agree in writing, (iii) post-confirmaton conversion of the Bankruptcy Case to a case under Chapter 7, (iv) post-confirmation appointment of a Chapter 11 trustee or examiner with expanded powers unless the Lender consents to such an appointment,(v) the imposition of any voluntary or involuntary lien or security interest in any Collateral in favor of any party other than the Lender the Collateral with respect to the Loan, the entire principal balance of the Loan, plus all accrued and unpaid interest (including interest at the Default Rate, from the date of the actual default notwithstanding the date the Written Notice is provided to the Borrower), fees and costs, through the date of payment, shall, in addition to default by Borrower under the Loan Documents [as herein defined] as described above, automatically become due and payable upon (i) the failure to cure any default as is set forth above (ii) the failure to obtain a satisfactory and signed-off final inspection by the City of Aspen with respect to Units 1-5 of the Townhomes within EIGHT (8) months of the start of construction; (iii) the failure to obtain a satisfactory and signed-off final inspection by the City of Aspen with respect to Units 6-10 of the Townhomes within NINE (9) months of the start of construction; (iv) the failure to obtain a satisfactory and signed-off final inspection by the City of Aspen with respect to Units 11-14 of the Townhomes within TEN (10) months of the start of construction; (v) the failure to obtain a satisfactory and signed-off final inspection by the City of Aspen for the Club facilities within TWENTY (20) months of the start of construction; (vi) the failure to reduce the principal balance of the Loan in accordance with the schedule as set forth under Exhibit "D", which schedule shall begin at the time of the Closing of the Loan; and (vii) the Improvements shall have been winterized and protected from the elements no later than November 1, 2019.

18

EXHIBIT A

**CONDITIONS:**     Lender's obligations to close the Loan shall be expressly subject to the following conditions precedent:

A.      By September 16, 2019, the Borrower shall file a motion, in form and substance acceptable to Lender, in its sole and absolute discretion, requesting (i) approval of the Loan as described herein, (ii) contemporaneously therewith, file a joint Plan of Reorganization and Disclosure Statement (collectively, the "Debtor's Plan") [the "Plan and Loan Motion"], which Plan and Loan Motion shall be in a form and substance acceptable to the Lender in its sole and absolute discretion, and which, *inter alia*, provides for, among other things: (i) approval of the Loan as described herein; (ii) authority to satisfy the DIP loan from the proceeds of the Loan; (iii) authority to grant the Lender the first lien priorities described herein with respect to all Collateral; (iv) provide that, in the event of a post-confirmation filing of a bankruptcy petition pertaining to any one of the Debtors or in which the Collateral forms part of the bankruptcy estate in any such post-confirmation case, that any such subsequent bankruptcy proceeding shall be deemed a related case under Federal Rule of Bankruptcy Procedure 1014, and shall be assigned to United States Bankruptcy Judge, Honarable Joseph G. Rosania, Jr.; (v) shall provide that the Bankruptcy Court shall consider on an expedited basis any applications for relief from the automatic stay in favor of the Lender; and (vi) in all other respects is consistent with the terms of this Commitment. A copy of this Commitment shall be attached to the Debtor's Plan of Reorganization and Loan Motion as filed and served on all parties in interest required to be so served. The Plan and Loan Motion shall have been served on all creditors of the Borrower, all parties with whom the Borrower has an executory contract with respect to the Collateral or any of the other Collateral, all taxing authorities having or asserting authority over the Borrower, all entities having an executory contract with the Borrower, all entities who have filed a Notice to Owner or asserted potential lien rights with reference to the Collateral or any component of the Collateral and all other parties in interest. A Final Order must be entered no later than January 17, 2020 authorizing the Loan and confirming the attendant Debtor's Plan of Reorganization under the terms set forth in this Commitment, finding that the Borrower is the owner of the Collateral and the approving documentation for the same, which Final Order authorizing the Loan shall have a copy of this Commitment attached thereto and incorporated in its entirety by reference, and shall be in form and substance acceptable to Lender, in its sole and absolute discretion, and which Final Order authorizing the Loan shall not have been appealed, modified, stayed, vacated, or reversed as further described above.

19

EXHIBIT A

B.      With regard to the Collateral which is real property, issuance of a commitment for and a lender's title insurance policy, in form and substance satisfactory to Lender in its sole and absolute discretion (collectively the "Title Commitment"), issued from a title company acceptable to Lender (the "Title Company"), , (i) insuring the Lender's first priority lien and security interest in the Collateral is consistent with the terms of this Commitment, without any exception, *inter alia*, for prepetition liens (other than those set forth in Exhibit "E") or other security interests, claims of mechanic's liens or unpaid Notices to Owner, (ii) insuring the advances made under the Loan even during the pendency of any appeal of the Final Order authorizing the Exit Loan or confirming the Plan of Reorganization, provided no stay has been entered with respect to the Final Order authorizing the Exit Loan or confirming the Plan of Reorganization; and (iii) all conditions contained within the Title Commitment shall have been satisfied to the satisfaction of the Title Company and Lender; (iv) delivery to Lender of the Title Commitment and a property insurance binder approved by Lender showing that the improvements are insured, at Borrower's expense, in an amount not less than the greater of (a) their respective fair market value, or (b) their respective replacement cost, and showing Lender as additional insured and loss payee; and (v) which confirms that the security interests of all entities having or asserting pre-petition or post-petition liens or security interests in the Debtors'estate property shall be transferred to the proceeds of the sale of any Collateral, to the same extent and priority as such liens may have enjoyed prior to such sale and, in any event, subordinate to the Lender's lien and security interest therein until the Lender's Loan is paid in full, all in accordance with the Debtors' Plan of Reorganization. The cost of all of the foregoing shall be borne by Borrower.

C.      The Borrower shall have (i) obtained such order of the Bankruptcy Court approving the Loan and attendant requirements of this Commitment, in form and content consistent, in Lender's sole and absolute discretion, with the terms of this Commitment, (ii) the Borrower shall have executed a definitive loan agreement, notes, deeds of trust or mortgages, security agreements, and other documentation and customary certificates, consistent with the terms set forth herein and otherwise in form satisfactory to Lender and its counsel; unless any such conditions are waived in Lender's sole and absolute discretion, (iii) the Final Order authorizing the Loan shall not have been appealed, stayed, modified or amended, and shall be in form and substance acceptable to Lender, and shall be made effective immediately without any stay of the effect of such Final Order, in Lender's sole discretion, immediate funding within the provisions and protections of 11 U.S.C. §364 (iv) the Court shall have entered a Final Order confirming the Debtor's Plan of Reorganization, the

20

EXHIBIT A

terms of which shall, (a) in the sole discretion of the Lender, be consistent with and incorporate the terms of this Commitment Letter or as otherwise satisfactory to the Lender no later than January 17, 2020, and (b) shall contain a provision pursuant to 11 U.S.C. §1146(a) confirming that the Loan and any documents given to secure the same are not subject to any state or local law imposing a stamp tax or similar tax, (iv) the Improvements shall have been winterized and protected from the elements in a manner satisfactory to Lender and Architect no later than November 1, 2019; and (v) in all other respects the status of the Bankruptcy Case is satisfactory to Lender, its counsel and the Title Company in their respective absolute discretion.

In addition, Borrower shall have provided Lender evidence satisfactory to Lender and the Title Company that all agreements and documents relating to the Loan and other requirements of this Commitment have been executed by the Borrower and the party executing such documents has the authority to bind the Borrower. In the event that any portion of the Loan proceeds are intended to be used to provide labor, services or materials to the Collateral, the Loan Documents [as herein defined] shall provide for such additional protections to the Lender as the Lender may, in its sole and absolute discretion, require pertaining to, *inter alia*, disbursements of Loan proceeds and conditions precedent to such disbursements. Additionally, Borrower shall provide such other legal opinions as may be required to ensure the Loan complies will all applicable state and federal legal requirements. All of the foregoing loan agreements, notes, deeds of trust or mortgages, escrow agreements, security agreements, other documentation and customary certificates, and this Commitment, shall be referred to herein, collectively, as the "Loan Documents". Each of the Loan Documents shall be in form and substance satisfactory to the Lender and Lender's counsel in their sole discretion.

D.      The Borrower shall have complied with all of the terms of the Loan Documents and there shall exist no event of default or set of circumstances which given the expiration of time or the giving of notice would give rise to an event of default under the Loan Documents.

E.      The Borrower, at its sole cost and expense, shall provide a survey or "update" of the existing survey of the Collateral, certified in accordance with ALTA standards to Lender and the Title Company prepared by a surveyor licensed by the State of Colorado, where such real property is located, showing such real estate to be free of material encroachments, overlaps and other survey defects, all in accordance with Lender's and Title Company's survey requirements. Alternatively, Lender may elect to accept the most recent survey available together with an affidavit confirming that

21

EXHIBIT A

there have been no physical modifications to the Collateral since the date of the most recent survey.

F.      All parties claiming prepetition or postpetition liens or other interests in the Collateral, including, without limitation, all creditors of the Borrower, all parties with whom the Borrower has an executory contract with respect to the Collateral or the improvements and all entities who have filed a Notice to Owner with reference to the Collateral (all such entities being collectively referred to as the "Parties in Interest") shall have received notice of the Motion and the hearings thereon, and (a) all such Parties in Interest shall have consented to, or shall not have objected to, the Loan, or (b) any objections of Parties in Interest shall have been specifically overruled in their entirety in the Final Order of the Bankruptcy Court authorizing the Loan and the Final Order confirming the Plan of Reorganization.

G.      This Commitment is subject to and conditioned upon the accuracy of all information, representations, exhibits and other materials submitted with or in support of the Loan request and there must be no adverse change in the condition, business or prospects of the Collateral or the Borrower prior to the disbursements of funds or during the term of the Loan.

H.      After conducting its due diligence, Lender, in its sole discretion, may choose not to enter into the Loan and terminate this Commitment, for any reason whatsoever.

I.      Borrower shall have demonstrated and/or Lender, in its sole discretion, shall have determined that there are no environmental, land use, zoning or other governmental or regulatory issues that will adversely impact the Collateral in its current "as is, where is" condition, the operations of Borrower or its ability to repay the Loan on the Maturity Date. Borrower shall have provided the Lender with any and all reports on such issues in its possession. Said reports shall be in form and substance satisfactory to Lender in its sole discretion.

J.      Borrower shall demonstrate the capability based upon its business plan, in the sole and absolute discretion of the Lender, of repaying the Loan on the Maturity Date.

K.      Lender, at its discretion, may waive any one or more of conditions set forth herein, but no such waiver shall be effective against Lender unless in writing and signed by an authorized representative of Lender.

22

EXHIBIT A

L.     The Borrower and general contractor shall have entered into an updated Guaranteed Maximum Price Construction Contract incorporating updated bids from all necessary subcontractors and materialmen, satisfactory in all respects to Lender in its sole and absolute discretion and consistent with the Budgets set forth in Exhibit "A".

**FEES & COSTS:**      A.     At the time of the closing of the Loan, Borrower shall pay to Lender a commitment fee calculated as FOUR PERCENT (4.00%) of the Maximum Loan Amount (the "Commitment Fee"), due and fully earned at Closing [as herein defined]. Lender shall provide Borrower a credit to the Commitment Fee of the amount of the DIP loan commitment fee.

In addition, with each disbursement of the Loan, Borrower shall pay (a) all of Lender's reasonable costs and expenses related to the Loan (including Lender's reasonable travel and lodging expenses) and out-of-pocket expenses and the fees and expenses of Lender's counsel, all accrued as of such closing (which shall automatically become part of the Loan), (b) all recording costs (including applicable taxes) for filing the recordable Loan Documents, and (c) the cost of the Lender's Mortgagee Title Insurance Policy (the "Title Policy"), and the cost of the survey of the real property, all of such costs under (a)-(c) being collectively referred to as the "Closing Costs", and all such Closing Costs shall be paid at Closing [as hereafter defined].

B.     In addition, the Borrower shall pay to Lender the reasonable fees and expenses (including reasonable travel expenses, if any) of Lender's counsel in connection with this transaction, which such reasonable fees and expenses shall be deemed a part of the Loan secured by the Collateral. The reasonable legal fees of Lender's counsel shall be calculated on a time-spent basis, based upon the standard hourly rates of Lender's counsel generally charged to clients of that firm for similar matters and shall be paid from proceeds of the Loan.

C.     Borrower agrees that the Loan shall be without cost to Lender. Borrower assumes liability for and will pay all costs and expenses required to satisfy the Conditions hereof and the making of the Loan as provided hereunder (including the costs of the Title Policy and the survey).

**CLUB MEMBERSHIPS:**      With respect to the Loan, provided any of the current managers and members of the Borrower retain any legal or equitable interest in any management or equity interest in the entity which owns the facility currently known as Aspen Club & Spa following confirmation of the Debtor's Plan or any other confirmed plan of reorganization (the "Post-

23

EXHIBIT A

Confirmation Successor Entity"), and provided further that a Final Order has been entered authorizing the Loan contemplated by this Commitment, then in that event the Post-Confirmation Successor Entity shall provide complimentary and non-dues paying lifetime memberships in the facilities currently known as the Aspen Club and Spa to Lender and the immediate family and guests of its principals so long as any of the current managers and/or the Borrower hold any legal or equitable interest in the management or equity interest in any Post-Confirmation Successor Entity ("Lifetime Members"). The Lifetime Members shall pay no initiation fee or annual dues and shall pay the lowest rate available to either staff or management for all food, beverage and services offered by the post-confirmation club and Spa facilities. In addition, all guests of Hotel Lenado, located in Aspen, Colorado, shall be granted a complementary license to use of the Aspen Club and Spa facilities during their term of stay at Hotel Lenado for so long as any of the current managers and/or the Borrower holds any legal or equitable interest in the management or equity interest in any Post-Confirmation Successor Entity.

**HOSPITALITY:** So long as Lifetime Memberships referenced and described above remain effective, the Post-Confirmation Successor Entity shall provide to Lender, and/or its assigns, EIGHT (8) complimentary weeks per year in a timeshare unit within the Living Units based upon availability and not to interfere with planned stays by paying guests.

**STAND-BY FEE:** If this Commitment is not terminated by Lender as permitted hereunder, and upon entry of the Final Order approving the Loan, subject to the terms of this Commitment, a stand-by commitment loan fee in the amount of FOUR PERCENT (4.00%) of the Maximum Loan Amount shall be earned by the Lender ("Stand-by Fee") as follows:

The Loan Stand-by Fee shall be deemed earned by the Lender if, after entry of the Final Order approving the Loan, any of the following events occur: (i) the Borrower elects to not enter into the Loan under this Commitment for any reason, (ii) the Bankruptcy Court authorizes the Borrower to obtain financing from an existing creditor or other third party lender in lieu of Lender to fund a plan of reorganization and the financing is provided by such existing creditor or other third party lender, or (iii) the Borrower fails to satisfy any of the material (as determined by Lender in its sole discretion) Conditions contained in this Commitment (each of the foregoing being defined as a "Triggering Event"). Upon the occurrence of a Triggering Event, the Lender shall have an allowed administrative expense claim in the Bankruptcy Case for the amount of the Loan Stand-by-Fee, and the Lender and the Borrower shall be relieved of any further obligation under this Commitment; provided, however, that in the event

24

EXHIBIT A

the Borrower obtains financing from another lender, creditor or third party, the Loan Stand-by-Fee shall be paid in full, in cash, at the closing of such loan(s). If the Loan is not made by Lender as a result of Lender's election to not enter into the Loan, then the Stand-by Fee shall not be recorded as an administrative expense claim in the Bankruptcy Case and the Lender shall receive no other compensation for its services, and the Lender shall then have no further obligation to the Borrower under this Commitment.

**CLOSING:** The closing on the Loan shall take place as soon as practical after satisfaction of the Conditions contained herein, including without limitation, entry of a Final Order approving the Loan ("Closing"), in condition satisfactory to Lender in its sole and absolute discretion. Each successive disbursement on the Loan shall take place upon satisfaction of the Conditions contained herein.

**ASSIGNMENT:** Lender may assign any or all of its obligations and rights hereunder to one or more assignees or participants, and may collaterally assign the Loan Documents to Lender's lender under any existing or future loan arrangement. Lender intends to bring participants into this transaction either as assignees or indirectly as lenders to Lender. Borrower consents to Lender's sale, assignment or participation of all or a portion of the Loan, and Borrower agrees to execute any and all agreements and other documents reasonably requested by Lender and Lender's lenders to formalize such assignments of or participations in the Loan.

**USURY:** This Commitment is subject to the express condition that at no time shall the Borrower be obligated or required to pay interest at a rate which could subject Lender or its assignees to either civil or criminal liability as a result of being in excess of the maximum rate which the Lender or Borrower is permitted by law to contract or agree to pay or receive. If by the terms of this Commitment or the Loan Documents, the Borrower is at any time required or obligated to pay interest at a rate in excess of such maximum rate, the rate of interest hereunder and/or under the note shall be deemed to be immediately reduced to such maximum rate and interest payable shall be computed at such maximum rate and the portion of all prior interest payments in excess of such maximum rate shall be applied and shall be deemed to have been payments in reduction of principal balance or, if the Loan has not closed shall be void, and if Lender deems it a hardship to close the Loan under usury statutes, all fees paid to Lender shall be refunded and this Commitment shall be null and void.

It is also hereby understood and agreed upon by and between the Borrower and Lender that the Lender does not intend, under any

25

EXHIBIT A

circumstances, to charge, collect, assess or receive interest, at an effective rate, in excess of the maximum rate allowable under applicable state and federal law. If the effective interest rate does exceed the maximum rate allowable by applicable state or federal law, the Borrower and Lender intend to and hereby agree to reduce the effective interest rate to the maximum rate allowable by applicable state or federal law.

It is further understood and agreed upon by and between the Borrower and Lender that the Lender does not intend, under any circumstances, to charge, collect, assess or receive interest, at the Default Rate's effective rate, in excess of the maximum rate allowable under applicable state and federal law. If the Default Rate's effective interest rate exceeds the maximum rate allowable by applicable state or federal law, the Borrower and Lender intend to and hereby agree to reduce the Default Rate's effective interest rate to the maximum rate allowable by applicable state or federal law.

**CONFIDENTIALITY:** This Commitment is confidential. Until such time as the Commitment has been executed by each of the Borrower and the Lender, the Borrower shall not disclose the terms of this Commitment to any third party other than its officers, directors, professionals and advisors, until presented to the Bankruptcy Court. This provision shall survive the termination of this Commitment.

**SURVIVAL OF COMMITMENT:** A copy of this Commitment shall be attached to, and incorporated into, each and every order entered by the Bankruptcy Court with regard to the Loan. To the extent not inconsistent with the other Loan Documents, this Commitment and all of the terms and conditions contained herein shall survive the closing of the Loan and shall remain binding on the Borrower and Lender as part of the Loan Documents, provided, however, that if there should exist any disagreement between the terms of this Commitment and the terms of any of the other Loan Documents, the terms of the Loan Documents shall control.

**EXECUTION AND RELIANCE ON COUNSEL:** This Commitment may be executed in counterparts which, taken together, shall constitute one original. This Commitment is for the benefit of the Borrower only and may not be assigned except upon the prior written consent of Lender, which consent may be withheld for any reason or for no reason. No party other than the Borrower, or an assignee acceptable to Lender may rely upon the terms and conditions of this Commitment. This Commitment is executed by an individual strictly in his capacity as a

EXHIBIT A

representative of the Lender. By acceptance of this Commitment, Borrower agrees that no representative, member, partner, shareholder, employee or agent of the Lender shall be personally liable for the payment of any claim or performance of any obligations hereunder. This Commitment will be governed by and construed in accordance with the laws of the State of Colorado and of the United States, without regard to the principles of conflicts of laws thereof. **The Borrower had the benefit of advice of counsel in connection with the execution of this Commitment and the Loan contemplated hereby. This document has been negotiated at arm's length and in good faith between the Lender and the Borrower.**

**NON WAIVER:** No failure or delay on the part of Lender to exercise any rights under the Loan Documents shall operate as a waiver thereof, nor shall any single or partial exercise by Lender of any right under the Loan Documents preclude any further exercise thereof, or the exercise of any other right. Each and every right or remedy granted under the Loan Documents or under any document delivered thereunder or in connection therewith or allowed to Lender in law or equity shall be deemed cumulative and may be exercised from time to time.

**INDEMNITY:** To induce Lender to enter into this Commitment, Borrower hereby agrees to indemnify upon demand and hold harmless Lender and its affiliates and each partner, trustee, shareholder, director, officer, employee, advisor, representative, agent, attorney and controlling person thereof (each of the above, an "Indemnified Person"), from and against any and all actions, suits, proceedings (including any investigations or inquiries), claims, losses, damages, liabilities or expenses (including legal expenses), joint or several, of any kind or nature whatsoever that may be brought or threatened by Borrower or any of its affiliates or any other person or entity and which may be incurred by or asserted against or involve any Indemnified Person (whether or not any Indemnified Person is a party to such action, suit, proceeding or claim) as a result of or arising out of or in any way related to or resulting from this Commitment, the Loans or any related transaction contemplated hereby or thereby or any use or intended use of the proceeds of the Loans; provided that Borrower will not have to indemnify an Indemnified Person against any claim, loss, damage, liability or expense to the extent the same resulted from the bad faith, gross negligence or willful misconduct of such Indemnified Person or any of its affiliates or related parties as determined by a court of competent jurisdiction in a final and non-appealable judgment. Notwithstanding any other provision of this Commitment, no Indemnified Person will be responsible or liable to Borrower or any other person or entity for damages arising from the use by others of any information or other materials obtained through internet,

27

EXHIBIT A

electronic, telecommunications or other information transmission systems. Borrower's indemnity and reimbursement obligations under this section will be in addition to any liability that Borrower may otherwise have and will be binding upon and inure to the benefit of the successors, assigns, heirs and personal representatives of Borrower and the Indemnified Persons.

Neither Lender nor any other Indemnified Person will be responsible or liable to Borrower or any other person or entity for any indirect, special, punitive or consequential damages that may be alleged as a result of this Commitment, the Loans or any related transaction contemplated hereby or thereby or any use or intended use of the proceeds of the Loan.

**USA PATRIOT ACT:**   Lender notifies Borrower that pursuant to the requirements of the USA PATRIOT Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (as amended, supplemented or modified from time to time, the "Patriot Act") Lender may be required to obtain, verify and record information that identifies Borrower, including the name and address of Borrower and other information that will allow Lender to identify Borrower in accordance with the Patriot Act and other applicable "know your customer" and anti-money laundering rules and regulations. This notice is given in accordance with the requirements of the Patriot Act.

**JURY TRIAL WAIVER:** **ANY RIGHT TO TRIAL BY JURY WITH RESPECT TO ANY ACTION, SUIT, PROCEEDING OR CLAIM ARISING IN CONNECTION WITH OR AS A RESULT OF ANY MATTER REFERRED TO IN THIS COMMITMENT IS HEREBY IRREVOCABLY WAIVED BY THE PARTIES HERETO.**

**OTHER:**   The Final Order shall also contain such waivers as Lender shall require entitling the Lender to immediately foreclose and otherwise enforce rights against the Borrower and the Collateral should the Borrower, either voluntarily or involuntarily, be subject of a subsequent case or proceeding under any title of the United States Bankruptcy Code, or otherwise default under the Loan or Loan Documents. Time is of the essence in all respects with reference to this Commitment.

As referenced in this Commitment, funding of the Loan is dependent upon, among other things, satisfactory negotiation of loan documentation between the Borrower and the Lender. The foregoing letter is not and is not intended to be exhaustive, but simply sets forth general terms and conditions upon which the Lender would be willing to make the Loan described herein. **This Commitment is not, in and of itself, a document that guarantees funding by the Lender to the Borrower in the amounts set forth herein. Only final loan documentation and satisfaction of the conditions set forth above ans in the final loan documentation will obligate the Lender to fund the Loan.** Any material deterioration of the financial condition of the Borrower or the

EXHIBIT A

condition of the Collateral, as determined by Lender in its sole discretion, between the execution of this Commitment and the Closing of the Loan will relieve the Lender of any obligation on the part of the Lender to fund the Loan.

If you find this Commitment to your satisfaction, please execute a copy of this document in the space provided herein below and return the same to the undersigned. Please have the manager of the Borrower execute this Commitment to the Lender, upon the terms and conditions contained in this Commitment.

We appreciate this opportunity to respond to your financing requirements. If you have questions regarding this letter, please call Mr. Renzo Renzi at (239) 580-7151.

Very truly yours,

**EFO Financial Group, LLC,**
a Florida limited liability company

By: _____
    Renzo Renzi, Manager


**BORROWER:**

**ASPEN CLUB REDEVELOPMENT COMPANY, LLC,**
a Colorado limited liability company

By:     _____

Name:   _____

Its:    _____


**THE ASPEN CLUB & SPA, LLC,**
a Colorado limited liability company

By:     _____

Name:   _____

Its:    _____


29

EXHIBIT A

condition of the Collateral, as determined by Lender in tis sole discretion, between the execution of this Commitment and the Closing of the Loan will relieve the Lender of any obligation on the part of the Lender to fund the Loan.

If you find this Commitment to your satisfaction, please execute a copy of this document in the space provided herein below and return the same to the undersigned. Please have the manager of the Borrower execute this Commitment to the Lender, upon the terms and conditions contained in this Commitment.

We appreciate this opportunity to respond to your financing requirements. If you have questions regarding this letter, please call Mr. Renzo Renzi at (239) 580-7151.

Very truly yours,

**EFO Financial Group, LLC,**
a Florida limited liability company

By: _____
        Renzo Renzi, Manager


**BORROWER:**

**ASPEN CLUB REDEVELOPMENT COMPANY, LLC,**
a Colorado limited liability company

By: _____
Name: _Michael Fox_____
Its: _Manager_____

**THE ASPEN CLUB & SPA, LLC,**
a Colorado limited liability company

By: _____
Name: _Michael Fox_____
Its: _Manager_____

29

EXHIBIT A

**JOINER BY PRINCIPAL AND MANAGER OF THE FOREGOING ENTITIES:**

The following individuals, being the members and managers of the foregoing entities join in this Commitment Letter to demonstrate their assent to the provisions of this Commitment Letter, and in particular, but not by limitation, the provisions in the sections entitled "CLUB MEMBERSHIPS" and "HOSPITALITY".

By: _____
     Michael Fox

30

EXHIBIT A

# EXHIBIT A

### EXIT FINANCING BUDGET

| Exit Financing, Budgetary Line Items | | $ Amounts |
|---|---|---|
| **Cost to Complete** | | |
| Hard Costs | | 57,002,620 |
| Soft Costs | | 17,879,455 |
| Retainage | | 2,240,221 |
| Hard & Soft Costs Contingency [Construction; FF&E] | | 6,000,000 |
| ***Total Cost to Complete*** | $ | 83,122,296 |
| | | |
| **Class 1: Allowed Mechanics Liens, Secured Claims** | | |
| PCL | | 4,760,896 |
| PCL Subcontractors | | 13,683,982 |
| Outside Contractors | | 1,469,567 |
| Estimated Interest & Fees Outstanding | | 6,609,633 |
| Retainage | - | 2,240,221 |
| ***Total Class 1: Allowed Mechanics Liens, Secured Claims*** | $ | 24,283,857 |
| | | |
| **Professional Fees** | | |
| Madigan + Company | | 285,000 |
| Ackman-Ziff Real Estate Group, LLC | | 750,000 |
| Markus, Williams, Young & Hunsicker, LLC | | 500,000 |
| United States Trustee [to-be-paid from working capital reserve] | | - |
| ***Total Professional Fees*** | $ | 1,535,000 |
| | | |
| **Other Costs to Effectuate Plan** | | |
| DIP Loan Repayment | | 4,200,000 |
| Closing Costs on Effective Date [estimate] | | 350,000 |
| Additional Working Capital Reserve | | 1,564,845 |
| ***Total Other Costs to Effectuate Plan*** | $ | 6,114,845 |
| | | |
| **Exit Lender Items** | | |
| Commitment Fee | | 5,600,000 |
| Loan Servicing, Administrative, and Bankruptcy Oversight | | 1,400,000 |
| Interest / Unused Line Fee Reserve [approximately 18-month reserve] | | 17,944,002 |
| ***Total Exit Lender Items*** | $ | 24,944,002 |
| | | |
| **Maximum Loan Amount** | $ | 140,000,000 |

31

EXHIBIT A

# EXHIBIT B
## LEGAL DESCRIPTION

<u>Collateral</u>: The Collateral for the Loan shall include the following:

(a)    The real property more particularly described on Exhibit B-1 attached hereto (the "Property"), together with all of the owner's right, title, interest, and privileges in all (i) streets, ways, alleys, easements, rights-of-way, licenses, rights of ingress and egress, vehicle parking rights and public places, existing or proposed, abutting, adjacent, used in connection with or pertaining to the Property or the improvements thereon; (ii) strips or gores of real property between the Property and abutting or adjacent properties; and (iii) all water and water rights pertaining to the Property;

(b)    Any and all improvements of any kind or nature situated, placed, or constructed on the Property;

(c)    All fixtures, materials, supplies, equipment, systems, and apparatus, now or hereafter attached to, installed in, or used in connection with (temporarily or permanently) any of the Property or its improvements, including motors, engines, boilers, furnaces, pipes, cleaning, call and sprinkler systems, fire extinguishing apparatus and equipment, water tanks, swimming pools, heating, ventilating, refrigeration, plumbing, laundry, lighting, generating, cleaning, waste disposal, transportation (of people or things, including but not limited to, stairways, elevators, escalators, and conveyors), incinerating, air conditioning and air cooling equipment and systems, gas and electric machinery, appurtenances and equipment, disposals, dishwashers, refrigerators and ranges, recreational equipment and facilities of all kinds, and lighting, traffic control, waste disposal, raw and potable water, gas, electrical, storm and sanitary sewer, telephone and cable television facilities, and all other utilities whether or not situated in easements;

(d)    Any and all leases, master leases, subleases, licenses, concessions, and other agreements (whether written or oral, or now or hereafter in effect) which grant to third parties a possessory interest in and to, or the right to use or occupy, all or any part of the Property, including all security and other deposits;

(e)    All, machinery, goods, general intangibles, money, insurance proceeds, accounts, trademarks, trade names, copyrights, chattel paper, instruments, investment property, letter of credit rights, inventory, deposit accounts or other funds or evidences of cash, credit or indebtedness deposited by or on behalf of owner with any governmental agencies, boards, corporations, providers of utility services, public or private, including reimbursable tap fees, utility deposits, commitment fees and development costs, any awards, remunerations, reimbursements, settlements, or compensation heretofore made or hereafter to be made by any governmental authority pertaining to any of the Collateral, and all other personal property of any kind or character which is now or hereafter situated in, on, or about the Property or used in or

32

EXHIBIT A

necessary to the complete and proper planning, development, construction, financing, use, occupancy, or operation thereof;

(f)     Any and all contracts, subcontracts, and agreements, written or oral, in any way relating to the construction of the improvements on the Property or the supplying of material (specially fabricated or otherwise), labor, supplies, or other services therefor, contracts, licenses, permits, and rights relating to living unit equivalents or other entitlements for water, wastewater, and other utility services whether executed, granted, or issued by a private person or entity or a governmental or quasi-governmental agency, which are directly or indirectly related to, or connected with, the development, ownership, maintenance or operation of the Property, whether such contracts, licenses, and permits are now or at any time thereafter existing;

(g)    Any and all other rights of the owner (i) to develop and/or operate the Property as a commercial and/or residential project, as the case may be; (ii) in any financing arrangements relating to the financing of or the purchase of all or any portion of the Property by future purchasers; and (iii) in all other contracts which in any way relate to the use, enjoyment, occupancy, operation, maintenance, repair, management or ownership of the Property.

33

EXHIBIT A

# EXHIBIT B-1
## LEGAL DESCRIPTION

TITLE PROPERTY DESCRIPTION
(1450 Ute Avenue, 1420, 1430 & 1450 Crystal Lake Road, Aspen, Colorado)

Parcel A:
Lots 15-A, 15-B, 15-C, 15-D and 15-E, Amended Final Plat of Aspen Club & Spa
Subdivision/Pud/Spa, according to the Plat thereof recorded July 16, 2015 at Reception No.
621569, County of Pitkin, State of Colorado.

Parcel B:
A pedestrian access easement as set forth in Deed of Access Easement recorded January 11,
1985 in Book 479 at Page 661.

Parcel C:
Easement for access and vehicular access as set forth on the Final Plat and Development Plan of
The Callahan Subdivision, recorded May 19, 1976 in Plat Book 5 at Page 7 and as Amended on
August 17, 1997 in Plat Book 6 at Page 16, and as amended November 1, 1996 in Plat Book 40
at Page 81.

Parcel D:
A non-exclusive access easement as set forth in Instrument recorded May 19, 1976 in Book 312
at Page 200.

Parcel E:
A non-exclusive easement and right of way over, upon across and under the portion of
neighboring Lot 5, Stillwater Ranch Subdivision, depicted and described as the easement area
on the drawing attached as Exhibit A to that Certain Easement Agreement recorded July 23,
2012 at Reception No. 590784.

Parcel F:
Easements as set forth in the Shared Expense Agreement for Callahan Subdivision Roads and
Pond recorded August 28, 1992 in Book 687 at Page 365, and Modification Agreement recorded
August 28, 1992 in Book 687 at Page 409 and Second Modification recorded August 5, 2002 at
Reception No. 470608.

Parcel G:
Those beneficial perpetual, non-exclusive easements for the purposes of vehicular and
pedestrian ingress and egress for access to the trash and recycle facilities; vehicular ingress,
egress and parking; and ingress and egress by pedestrians as granted and dedicated pursuant to
items 7, 9 and 17 on Page 1 of the Amended Final Plat of Aspen Club & Spa

34

EXHIBIT A

Subdivision/PUD/SPA recorded July 16, 2015 at Reception No. 621569.

Parcel H:
The beneficial perpetual, exclusive surface area parking easement as described and granted in the Easement Agreement shown as Exhibit A of the Amendment to Subdivision and Planned Unit Development Agreement Callahan Subdivions recorded March 31, 1997 at Reception No. 402937 and as amended by the Amended Club Parking Easement and Partial Vacation Agreement recorded May 4, 2001 at Reception No. 454225.

EXHIBIT A

# EXHIBIT C
## Minimum Sales Price

| MINIMUM SALES PRICE PER FRACTION | | | |
|---|---|---|---|
| Unit Type | 4-bd Townhome | 3-bd Townhome | 4-bd Condo |
| Squre Feet | 2,700 | 2,035 | 2,700 |
| January | $935,000 | $599,250 | $935,000 |
| February | $935,000 | $599,250 | $935,000 |
| March | $1,105,000 | $667,250 | $1,105,000 |
| April | Business Plan Does Not Call for Sale | | |
| May | Business Plan Does Not Call for Sale | | |
| June | $935,000 | $599,250 | $935,000 |
| July | $1,147,500 | $684,250 | $1,147,500 |
| August | $1,105,000 | $667,250 | $1,105,000 |
| September | $760,750 | $518,500 | $760,750 |
| October | Business Plan Does Not Call for Sale | | |
| November | Business Plan Does Not Call for Sale | | |
| December | $1,105,000 | $667,250 | $1,105,000 |

36

EXHIBIT A

# EXHIBIT D
## SALES PACE (MEASURED BY CLOSINGS AND/OR UNITS PLACED UNDER CONTRACT)

| Year 1 | Quarter | Sales / Qtr. | Aggregate Sales |
|--------|---------|--------------|-----------------|
|        | Q1:     | $0           | $0              |
|        | Q2:     | $0           | $0              |
|        | Q3:     | $0           | $0              |
|        | Q4:     | $10,000,000  | $10,000,000 [pre-sales] |

| Year 2 | Quarter | Sales / Qtr. | Aggregate Sales |
|--------|---------|--------------|-----------------|
|        | Q1:     | $9,800,000   | $19,800,000 [pre-sales] |
|        | Q2:     | $10,000,000  | $29,800,000 [pre-sales] |
|        | Q3:     | $10,000,000  | $39,800,000 [assumed grand opening] |
|        | Q4:     | $10,000,000  | $49,800,000     |

| Year 3 | Quarter | Sales / Qtr. | Aggregate Sales |
|--------|---------|--------------|-----------------|
|        | Q1:     | $10,000,000  | $59,800,000     |
|        | Q2:     | $10,000,000  | $69,800,000     |
|        | Q3:     | $10,000,000  | $79,800,000     |
|        | Q4:     | $10,000,000  | $89,850,000     |

EXHIBIT A

# EXHIBIT "E"

### SCHEDULE OF MECHANIC'S LIEN CLAIMANTS

| Class | Name of Holder |
|-------|----------------|
| 1A | Allman Drywall, Inc. |
| 1B | Ashley Concrete Structures, LLC |
| 1C | Brekhus Tile & Stone, Inc. |
| 1D | City of Aspen Water Department |
| 1E | ColoradoCrete, Inc. |
| 1F | Columbia Builders, Inc. |
| 1G | CTL Thompson Inc. |
| 1H | Eagle Glass and Mirror Inc. |
| 1I | Edge Construction Specialties, Inc. |
| 1J | Edwards Building Center, Inc. |
| 1K | Forte International LLC |
| 1L | Gateway Real Estate Investments LLC |
| 1M | Gould Construction, Inc. |
| 1N | Grand County Roofing & Sheet Metal, Inc. |
| 1O | IMI, Inc. |
| 1P | Imprint Hospitality, LLC |
| 1Q | InsulVail, LLC |
| 1R | Interface Communications Company |
| 1S | Ludvik Electric Co. |
| 1T | Mountain Man Masonry, LLC |
| 1U | Myers & Co., Architectural Metals |
| 1V | Orion Environmental, Inc. |
| 1W | Otis Elevator Company |
| 1X | OZ Architecture, Inc. |
| 1Y | PCL Construction Services, Inc. |
| 1Z | Pioneer Materials West Inc. |
| 1AA | Precision Construction West, Inc. |
| 1BB | PSI Crane & Rigging, Inc. |
| 1CC | RK Mechanical, Inc. |
| 1DD | Roberts and Com Inc. |
| 1EE | S2M Construction Co., Inc. |
| 1FF | Smuggler Finishes, Inc. |
| 1GG | Sopris Engineering LLC |
| 1HH | Specialty Wood Products, Inc. |
| 1II | Stanton Engineering Solutions, Inc. |
| 1JJ | Summit Sealants, Inc. |

EXHIBIT A

| 1KK | True North Hearth and Home, Inc. |
| 1LL | TWC, LLC |
| 1MM | United Subcontractors, Inc. |
| 1NN | Western Slope Concrete LLC |
| 1OO | Western States Fire Protection Company |

39

EXHIBIT A