## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| In re:<br><br>THE ASPEN CLUB & SPA, LLC<br>EIN: 84-1581963,<br><br>        Debtor. | Chapter 11<br><br>Case No. 19-14158 (JGR) |
| In re:<br><br>ASPEN CLUB REDEVELOPMENT<br>COMPANY, LLC<br>EIN: 46-5472246,<br><br>        Debtor. | Chapter 11<br><br>Case No. 19-14200-JGR<br><br>(Jointly Administered Under<br>Case No. 19-14158-JGR) |

## GPIF ASPEN CLUB LLC'S OBJECTION TO DEBTORS' MODIFIED JOINT SECOND AMENDED PLAN OF REORGANIZATION
### (Relates to Dkt. 652)

#6106801

## TABLE OF CONTENTS

**Page**

I.   PRELIMINARY STATEMENT ................................................................1

II.  FACTUAL AND PROCEDURAL BACKGROUND........................................5

    A.   The Bankruptcy Proceedings ................................................5

    B.   Key Provisions of the Debtors' Plan ........................................7

    C.   The Debtors' Ever-Increasing Assessment of Asset Value ....................7

    D.   GPIF's Determination of Value ..............................................9

III. OBJECTION AND BASIS THEREFORE........................................11

    A.   The Debtors' Proposed Exit Financing Dooms The Plan......................11

        i.    EFO's Priming Lien Is Unlawful Under Section 364..................11

        ii.   GPIF Is Not Adequately Protected As Required By Section 364.............13

        iii.  The Exit Financing Must Be Rejected As A Matter Of Public Policy ......18

    B.   The Plan Violates Section 1129(b)(2)........................................19

        i.    The Plan Fails To Provide For The Retention Of GPIF's Lien ................19

        ii.   The Plan Fails To Provide GPIF The "Indubitable Equivalent" Of Its Claim........................................21

        iii.  The Plan Fails To Provide GPIF An Adequate Cramdown Rate Of Interest........................................22

    C.   The Plan Violates 1129(a)(3) Because The Plan Was Not Proposed In Good Faith. ........................................28

    D.   The Plan Is Not Feasible And Violates 1129(a)(11)............................30

        i.    The Plan's Projections Are Inherently Flawed ..........................30

        ii.   The Plan Depends On Illusory And Unlikely Refinancing ......................32

    E.   The Plan Seeks To Manufacture An Impaired Consenting Class.........................34

        i.    Gerrymandering Classes Based On A False Valuation ............................36

        ii.   Substantive Consolidation For Voting Purposes ......................................38

    F.   The Plan Violates The Absolute Priority Rule. ......................................38

    G.   The Plan Improperly Consolidates The Debtors....................................40

IV.  CONCLUSION........................................43

#6106801

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re 20 Bayard Views, LLC,*
  445 B.R. 83 (Bankr. E.D.N.Y. 2011)..............................................................23, 28

*In re 266 Washington Assoc.,*
  141 B.R. 275 (Bankr. E.D.N.Y. 1992)..................................................................36

*In re 499 W. Warren Street Assoc., Ltd. P'ship,*
  142 B.R. 53 (Bankr. N.D.N.Y. 1992) ..................................................................14

*In re A&B Assocs., L.P.,*
  No. 17-40185-ECJ, 2019 WL 1470892 (Bankr. S.D. Ga. Mar. 29, 2019) .............22

*In re All. Well Serv., LLC,*
  551 B.R. 903 (Bankr. D. N.M. 2016) ..................................................................14

*In re Augie/Restivo Baking Co.,*
  860 F.2d 515 (2d Cir. 1988)...................................................................40, 41, 42

*In re Auto-Train Corp., Inc.,*
  810 F.2d 270 (D.C. Cir. 1987)......................................................................40, 41

*In re Autterson,*
  547 B.R. 372 (Bankr. D. Colo. 2016) ..................................................................35

*Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship,*
  526 U.S. 434 (1999)............................................................................................28

*Bank of Montreal v. Official Comm. Of Unsecured Creditors (In re American*
  *HomePatient, Inc.),*
  420 F.3d 559 (6th Cir. 2005) .......................................................................17, 23

*In re Bashas' Inc.,*
  437 B.R. 874 (Bankr. D. Az. 2010) ....................................................................24

*Matter of Briscoe Enterprises, Ltd., II,*
  994 F.2d 1160 (5th Cir. 1993) ...........................................................................35

*In re Campbell Sod, Inc.,*
  378 B.R. 647 (Bankr. D. Kan. 2007) ..................................................................13

*In re City of Colo. Springs,*
  187 B.R. ............................................................................................................35

*In re City of Colo. Springs Spring Creek Gen. Improvement Dist.*,
187 B.R. 683 (Bankr. D. Colo. 1995) ..........................................................35, 37, 38

*In re City of Detroit*,
524 B.R. 147 (Bankr. E.D. Mich. 2014) ................................................................12

*In re Dean*,
166 B.R. 949 (Bankr. D.N.M. 1994) ....................................................................39

*In re Deep River Warehouse Inc.*,
No. 04-52749, 2005 WL 2319201 (Bankr. M.D.N.C. Sept. 22, 2005) ....................24

*In re Den-Mark Constr., Inc.*,
406 B.R. 683 (E.D.N.C. 2009) .............................................................................17

*Matter of Ed Woods Livestock Inc.*,
172 B.R. 294 (Bankr. D. Neb. 1994) ....................................................................14

*In re Falls Event Ctr. LLC*,
600 B.R. 857 (Bankr. D. Utah 2019) ....................................................................40

*In re Ford Products Corp.*,
159 B.R. 693 (Bankr. S.D.N.Y. 1993) ...................................................................19

*In re Fox*,
No. 12-32462 HRT, 2013 WL 653048 (Bankr. D. Co. Feb. 21, 2013)
(Tallman, C.J.) .....................................................................................................27

*In re GAC Storage El Monte, LLC*,
489 B.R. 747 (Bankr. N.D. Ill. 2013) ...................................................................28

*In re Geijsel*,
480 B.R. 238 (Bankr. N.D. Tex. 2012) .................................................................13

*In re Geneva Steel Co.*,
281 F.3d 1173 (10th Cir. 2002) ......................................................................38, 39

*In re Griswold Bldg., LLC*,
420 B.R. 666 (E.D. Mich. 2009) ..........................................................................28

*Harzdog v. Federal Land Bank of Wichita (In re Hardzog)*,
901 F.2d 858 (10th Cir. 1990) .............................................................................25

*In re Hickey Properties, Ltd.*,
181 B.R. 173 (Bankr. D. Vt. 1995) .......................................................................12

*In re Investment Co. of the Sw., Inc.*,
341 B.R. 298 (10th Cir. BAP 2006) ................................................................21, 22

*In re L.B.G. Props., Inc.*,
   72 B.R. 65 (Bankr. S.D. Fla. 1987)....................................................................17, 20

*In re Las Vegas Monorail Co.*,
   462 B.R. 795 (Bankr. D. Nev. 2011) ............................................................................32

*In re Les Ruggles & Sons*,
   222 B.R. 344 (Bankr. D. Neb. 1998) ...........................................................................12

*In re Mosello*,
   195 B.R. 277 (Bankr. S.D.N.Y. 1996).........................................................................13

*In re Moultonborough Hotel Grp., LLC*,
   No. 10-14214, 2012 WL 5464630 (Bankr. D. N.H. Nov. 8, 2012) ...........................22, 23, 26

*Matter of MPM Silicones, L.L.C.*,
   874 F.3d 787 (2d Cir. 2017).....................................................................................23, 24

*In re N. Valley Mall, LLC*,
   432 B.R. 825 (Bankr. C.D. Cal. 2010).........................................................................32

*In re Novinda Corp.*,
   585 B.R. 145 (10th Cir. BAP (Colo.) 2018) ..............................................................35, 37

*In re Nw. Timberline Enters., Inc.*,
   348 B.R. 412 (Bankr. N.D. Tex. 2006).......................................................................25, 26

*In re Owens Corning, Inc.*,
   419 F.3d 195 (3d Cir. 2005).....................................................................................40, 41, 42

*In re Paige*,
   685 F.3d 1160 (10th Cir. 2012) ...................................................................................28

*In re RIM Dev., LLC*,
   448 B.R. 280 (Bankr. D. Kan. 2010) ...........................................................................21

*In re Riviera Drilling & Expl. Co.*,
   BR 10-11902, 2012 WL 6719591 (Bankr. D. Colo. Dec. 19, 2012), *aff'd*, 502
   B.R. 863 (10th Cir. BAP (Colo.) 2013) .....................................................................41, 42

*In re Rocky Mountain Land Co.*,
   2014 WL 13388292 ........................................................................................................26

*In re Rocky Mountain Land Co. LLC*,
   No. 12-21643 HRT, 2014 WL 1338292 (Bankr. D. Co. Apr. 3, 2014)
   (Tallman, C.J.) ................................................................................................. *passim*

*S & P, Inc. v. Pfeifer*,
189 B.R. 173 (N.D. Ind. 1995) ............................................................32

*In re SAI Holdings Ltd.*,
No. 06-33227, 2012 Bankr. LEXIS 3601, 2012 WL 3201893 (Bankr. N.D.
Ohio Aug. 3, 2012) ........................................................................12, 13

*In re Sherwood Square Assocs.*,
107 B.R. 872 (D. Md. 1989) ..............................................................20

*In re Stewart*,
571 B.R. 460 (Bankr. W.D. Okla. 2017) ............................................40

*In re Stratford Assocs. Ltd. P'ship*,
145 B.R. 689 (Bankr. D. Kan. 1992) ..................................................25

*In re Summers*,
594 B.R. 707 (Bankr. D. Colo. 2018) ................................................39

*In re Swedeland Dev. Grp., Inc.*,
16 F.3d 552 (3d Cir. 1994) ...........................................................16, 17

*In re Tempe Land Co.*,
No. 2:08-BK-17587, 2009 WL 1211622 (Bankr. D. Ariz. May 1, 2009) ........................16, 17

*Till v. SCS Credit Corp.*,
541 U.S. 465 (2004) .......................................................................23, 26

*In re Timbers of Inwood Forest Assocs., Ltd.*,
793 F.2d 1380 (5th Cir. 1986) ...........................................................13

*United States v. Redmond*,
36 B.R. 932 (D. Kan. 1984) ...............................................................12

*In re Valencia Flour Mill, Ltd.*,
348 B.R. 573 (Bankr. D. N.M. 2006) ................................................25

*In re Valley View Shopping Ctr. L.P.*,
260 B.R. 10 (Bankr. D. Kan. 2001) ...................................................25

*In re Vanderveer Estates Holding, LLC*,
293 B.R. 560 (Bankr. E.D.N.Y. 2003) ...............................................32

*In re Westport Holdings Tampa, Ltd. P'ship*,
No. 8:18-cv-2896-T-33, 2019 WL 4278760 (M.D. Fla. Sept. 10, 2019) ................13

*In re Windsor Hotel, L.L.C.*,
295 B.R. 307 (Bankr. C.D. Ill. 2003) ...........................................17, 18

*In re Winn-Dixie Stores, Inc.*
  356 B.R. 239 (Bankr. M.D. Fla. 2006) .................................................................25

**Statutes**

11 U.S.C. § 361 ...........................................................................................................13, 14

11 U.S.C. § 362(d)(3) ...................................................................................................6, 11

11 U.S.C. § 364 .........................................................................................................*passim*

11 U.S.C. § 364(d)(1) ..................................................................................................13, 16

11 U.S.C. § 506(a) ...........................................................................................................36

11 U.S.C. § 506(b) ...........................................................................................................31

11 U.S.C. §§ 541(a) .........................................................................................................11

11 U.S.C. § 1129(a) ...................................................................................................*passim*

11 U.S.C. § 1129(b) ...................................................................................................*passim*

11 U.S.C. § 1141(b) .........................................................................................................12

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| In re:<br><br>THE ASPEN CLUB & SPA, LLC<br>EIN: 84-1581963,<br><br>          Debtor. | Chapter 11<br><br>Case No. 19-14158 (JGR) |
| In re:<br><br>ASPEN CLUB REDEVELOPMENT<br>COMPANY, LLC<br>EIN: 46-5472246,<br><br>          Debtor. | Chapter 11<br><br>Case No. 19-14200-JGR<br><br>(Jointly Administered Under<br>Case No. 19-14158-JGR) |

## GPIF ASPEN CLUB LLC'S OBJECTION TO DEBTORS' MODIFIED JOINT SECOND AMENDED PLAN OF REORGANIZATION
### (Relates to Dkt. 652)

GPIF Aspen Club LLC ("GPIF")[1] respectfully files this Objection to the Debtors' Modified Joint Second Amended Plan of Reorganization of the Aspen Club & Spa, LLC ("ACS") and Aspen Club Redevelopment Company, LLC ("ACRC") (ACS and ACRC together, the "Debtors"), Pursuant to Chapter 11 of the United States Bankruptcy Code, Dated September 16, 2019; Amended November 22, 2019 and Modified January 8, 2020 and Amended January 28, 2020 (the "Plan," Dkt. 652).

### I.     PRELIMINARY STATEMENT

By requesting confirmation of the Plan, the Debtors ask this Court to depart from well-established bankruptcy law and create new law that fundamentally alters the relationship between

---

[1] Capitalized terms used herein and not otherwise defined shall have the meaning ascribed to them in the Plan and Disclosure Statement.

borrowers and secured lenders.  Apart from the absence of legal authority (which alone is fatal to confirmation), there are simply no facts that would justify this extraordinary request.

The Plan is entirely dependent upon the Court's approval of the Debtors' proposed Exit Financing—$140 million of new money that will prime the existing capital structure.  The Debtors offer scant legal authority for this brazen request, and the authority they do offer, section 364(d), prohibits the relief the Debtors seek according to its plan language and numerous cases cited herein.

The Plan also does not meet the requirements of cramdown under section 1129(b) because (a) it primes GPIF out of the money and therefore fails to provide for the retention of GPIF's lien, (b) provides GPIF with prime plus 1% pricing on a note junior to the Exit Financing that receives 12% interest (19% with fees) and therefore fails to provide GPIF with an adequate cramdown rate of interest, and (c) swaps real property collateral for unproven projections for an untested model for an unbuilt business, and therefore fails to provide GPIF with the "indubitable equivalent" of its claim.

In addition to these significant legal deficiencies, and even if this Court somehow found good reason to disregard existing precedent and create sweeping new law under sections 364 and 1129, the Plan fails factually on numerous counts.  The Plan relies on faulty assumptions and projections which render the Plan unfeasible and unconfirmable under 1129(a)(11).  The basic factual flaws relate to, among other things, (1) the Debtors' appraised value of the Aspen Club Project; (2) the Debtors' proforma business model, which inaccurately models several aspects of its business and contemplates two refinancings and the sale of the Aspen Club Project after five years; and (3) a proposed medical spa business.

First, the appraisal: the future value the Debtors assign to the Aspen Club Project is based on an appraisal that significantly underestimates costs and overestimates projected revenues. Erich Baum of HVS Consulting & Valuation, an expert retained by GPIF, will testify at the confirmation hearing and will explain these errors in the Debtors' appraisal. Mr. Baum will also testify that the present value of the Aspen Club Project is $75 million. Present value, as opposed to the Debtors' future value based on inherently speculative and flawed projections, is the metric by which the Court must determine whether GPIF is adequately protected.

Second, the proforma business model: the Debtors' proforma business model contains several errors and flawed assumptions that result in an overstatement of net operating income by over $14 million in the first five years, and a shortfall in refinance proceeds (which are proposed to be used to pay off GPIF) of $64 million. Loren Balsam of hotelAVE, an expert retained by GPIF, will testify to these errors at the confirmation hearing. Mr. Balsam surveyed the nation's largest and most sophisticated hospitality mortgage brokers to analyze the feasibility of the Debtors' proposed refinancings. All respondents surveyed concluded that the Debtors' proposed refinancings were not feasible. The most likely result of an attempted refinancing, the respondents agreed, was $75 million of refinance proceeds, significantly less than the nearly $140 million in refinance proceeds that the Debtors predict.

Third, the proposed medical spa: during the pendency of this bankruptcy, the Debtors have changed their business plan to include the operation of a medical spa providing aesthetic medicine treatments. The Debtors rely on this new business line for *$46 million in revenue over a five year period*—an entirely unrealistic projection. Glenn Morley of BSM Consulting, an expert retained by GPIF, will testify at the confirmation hearing and will explain why these revenues are

impossible to achieve.  Thus, the Debtors' assessments of value and feasibility are based on demonstrably unreasonable expectations about the value and success of the Aspen Club Project.

The Court has commented several times that this is a complex and important case.  The outcome of this bankruptcy is not only important to the local community in Aspen and Pitkin County, but it is also important to the banking and lending community—particularly secured creditors—throughout Colorado,[2] and possibly the entire United States.  Under this weight, the Debtors ask the Court to approve an exit facility based on section 364(d) with no legal authority indicating that approval would be proper and without explaining how the Court can ignore the numerous cases holding otherwise.  The Debtors then ask the Court to cramdown their secured creditors based on unproven and demonstrably erroneous projections for an unfinished project for an untested and novel fractional interest business model run by a first-time real estate developer. This relief is sought with no legal authority supporting such a position and numerous reasoned cases prohibiting it.

Finally, while a confirmation hearing of the Debtors' Plan will be heavy with spreadsheets, experts, and case law, one cannot miss the forest for the trees.  The result of confirming the Debtors' radical Plan would be that these Debtors leave bankruptcy with the same assets and management they entered with, but with 2.7 times the debt.  The proposition itself is absurd.  The Plan is guaranteed to fail and should not be approved.

---

[2] This is demonstrated by the fact that the Colorado Banking Association was granted leave to file an *Amicus* brief in support of GPIF's appeal of the Court's order denying GPIF's motion to lift stay.  *See Motion for Leave to File* Amicus *Brief, GPIF Aspen Club, LLC v. The Aspen Club & Spa, LLC and Aspen Club Redevelopment Company, LLC*, No. 19-43, Dkt. 56; *see also Brief of* Amicus Curiae, Dkt. 56-3 at 1.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

### A.    The Bankruptcy Proceedings

On May 16 and 17, 2019, ACS and ACRC filed voluntary petitions for bankruptcy under chapter 11.  *ACS Voluntary Petition*, No. 19-14158, Dkt. 1; *ACRC Voluntary Petition*, No. 19-14200, Dkt. 1.  The Court entered an order for joint administration of the cases for procedural purposes only.  *Order Granting Motion for Joint Administration*, Dkt. 28.

On May 22, 2019, the Debtors filed a motion to approve debtor-in-possession financing (the "DIP Financing Motion").  *Motion for Entry of Order Authorizing the Debtors to Obtain Post-Petition Financing Pursuant to 11 U.S.C. §§ 361, 362, and 364*, Dkt. 32.  The Debtors stated that the DIP loan was intended to preserve expiring entitlements and permits and to pay certain expenses necessary to preserve the construction site and avoid future construction delays.  *Id.*

Along with the DIP Financing Motion, the Debtors provided the Court with "DIP Credit Documents" providing for both a $6,250,000 DIP Facility *and* a $110,000,000 Exit Facility in exchange for a priming lien in favor of the lender, EFO Financial, LLC ("EFO").[3]  *Id.* at 2.  In the DIP Financing Motion, the Debtors claimed they were only seeking approval of the DIP Facility.  *Id.* at 2.  GPIF and other creditors objected and opposed the DIP Financing Motion because, among other reasons, the DIP Facility was inextricably linked to the Exit Facility.  For example, according to the lending documents, the DIP loan would be in default if the Debtors failed to file and obtain approval of a plan acceptable to EFO and a motion to approve the $110 million exit facility.  *See DIP Commitment Letter from EFO Financial to Debtors and Debtors' Counsel*, Dkt. 32-1 at  9 of

---

[3] Debtors' counsel, Markus Williams Young & Hunsicker LLC ("MWYH"), first represented EFO in negotiating the DIP Facility, then later represented the Debtors opposite EFO on the same facility.  *See Verified Statement of John F. Young*, Dkt. 8-1 at ¶ 6.  GPIF objected to the retention of MWYH on this basis, but was overruled. *See GPIF Aspen Club, LLC's Objection to Application to Employ Markus Williams Young & Hunsicker LLC as Counsel for Debtors*, Dkt. 71; *see also Minutes of Proceeding re: Application to Employ Markus Williams Young & Hunsicker LLC as Counsel for Debtor-in-Possession*, Dkt. 104.

46 ("On or before October 31, 2019, the Bankruptcy Court shall have entered Final order approving he Exit Loan and contemporaneously confirming a Plan of Reorganization, *the provisions of which are entirely consistent with the terms of this Commitment Letter and otherwise acceptable to Lender in its sole and absolute discretion*.") (emphasis added).  The Court ultimately approved a modified form of the Debtors' proposed DIP financing—one that specifically de-linked the DIP facility from the Exit Facility.

On May 31, 2019, GPIF filed a Motion for Determination that ACRC is subject to the Single Asset Real Estate ("SARE") provisions of the bankruptcy code.  Dkt. 53.  The Court granted that motion on July 23, 2019.  *Minutes of Proceedings*, Dkt. 262.  The Court permitted ACRC until September 16, 2019 to file a plan of reorganization.[4]  *Id.*

The Debtors filed the first iteration of their Plan of Reorganization on September 13, 2019. *Chapter 11 Plan of Reorganization*, Dkt. 321.  Three days later, the Debtors filed a motion for approval of exit financing under section 364.  *Motion to Approve Exit Financing Loan Agreement Under 11 U.S.C. § 364*, Dkt. 323 (the "Exit Financing Motion").  The Exit Financing Motion asks the Court to approve a $140,000,000 exit loan from EFO to the Debtors in exchange for a superpriority claim and first priority priming liens on the Debtors' collateral.   The Debtors filed four more iterations of their plan, the latest of which is dated February 27, 2020.  *See Modified Joint Second Amended Plan of Reorganization of the Aspen Club & Spa, LLC, and Aspen Club Redevelopment Company, LLC, Pursuant to Chapter 11 of the United States Bankruptcy Code, Dated September 16, 2019; Amended November 22, 2019 and January 28, 2020.*

---

[4] The Bankruptcy Code provides that creditors of SARE debtors may obtain relief from the automatic stay no later than 90 days after entry of the stay or 30 days after the court determines the SARE provisions apply unless the debtor commences monthly payments or files a plan of reorganization that has a reasonable possibility of being confirmed within a reasonable time.  11 U.S.C. § 362(d)(3).  The Court permitted the debtors additional time under § 362(d)(3).

B.      **Key Provisions of the Debtors' Plan**

The critical provision of the Debtors' Plan is the $140 million priming "Exit Financing." *See id*. at 28.  The Plan provides that, following confirmation of the same, EFO will lend $140 million to the "Reorganized Debtors" (which are notably distinct from the Debtors). *Id*.  In exchange for this loan, EFO will receive superpriority claim status and a first-priority priming lien, subordinate only to Allowed Mechanic Lien Secured Claims and all contractors, subcontractors, mechanics and materialmen performing work after the petition date consistent with non-bankruptcy law. *Id*.

Under the Plan, the Debtors intend for GPIF to receive a promissory note executed by the Reorganized Debtors in a principal amount equal to the Allowed Secured Claim Amount owing to GPIF, accruing at the rate of prime plus 1%. *Id*. at 22–23.  The terms of repayment of the promissory note are summarized as follows (a) 25% of net cash flow each quarter; (b) $10 million from net sale proceeds *after* the outstanding principal balance owed to EFO is reduced by $50 million; (c) the next $10 million *after* the outstanding principal balance owed to EFO is reduced by $100 million; and (d) 100% of all net sale proceeds after payment in full is made to EFO. *Id*. at 22–23.  No tenor is provided for the proposed new promissory note.

C.      **The Debtors' Ever-Increasing Assessment of Asset Value**

When they filed chapter 11 petitions in May 2019, the Debtors disclosed assets valued between $50 million and $100 million, and liabilities exceeding $100 million. *See ACRC Voluntary Petition*, No. 19-14200, Dkt. 1; *ACS Voluntary Petition*, No. 19-14158, Dkt. 1.  The Debtors are managed by Mr. Michael Fox, who is also major equity owner of the Debtors.  Mr. Fox was deposed on June 17, 2019, and was asked what specific value between $50 million and $100 million he assigned to the Debtors' assets.  He said he was "not sure.  55, 65, 75.  I mean, it depends on, again, from a process perspective, you know, how quickly we can get out of this

process and move towards finishing the asset."  *See* Exhibit A, *Deposition of Michael Fox*, at 104:5–105:7.

Nonetheless, in the Debtors' filed schedules of assets and liabilities, Mr. Fox averred that the value of the Debtors' assets had somehow increased to approximately $118 million.  *See ACR Summary of Assets and Liabilities*, No. 19-14200, Dkt. 32 (total of all property $118,895,001.00); *ACS Summary of Assets and Liabilities*, No. 19-14158, Dkt. 85 (total of all property (including ownership of all stock of ACRC) $118,802,821,20).  When asked what explained the increase from May to June, Mr. Fox responded that the $118 million figure was "based on an appraisal."  Exhibit A, *Fox Dep.*, at 105:8–13.  He admitted, however, that when he filed for bankruptcy on May 17, 2019, he already had a copy of the appraisal *and disagreed with it*.  *Id*. at 105:14–16.

In connection with their expert disclosures, the Debtors served an appraisal completed by Newmark Knight Frank ("Newmark").  This appraisal offers a prospective market value —a staggering $222 million "upon completion," and $244 million "upon stabilization":

| Value Conclusions | | | |
|---|---|---|---|
| Appraisal Premise | Interest Appraised | Date of Value | Value Conclusion |
| **Prospective Market Value "Upon Completion"** | | | |
| Fractional Residential | Fee Simple | 1/1/2022 | $122,900,000 |
| Lodging/Club Operations | Fee Simple | 1/1/2022 | $96,600,000 |
| Workforce Housing | Fee Simple | 1/1/2022 | $2,800,000 |
| **Total Prospective Market Value "Upon Completion"** | | | **$222,300,000** |
| **Prospective Market Value "Upon Stabilization"** | | | |
| Fractional Residential - "Upon Completion Value" | Fee Simple | 1/1/2022 | $122,900,000 |
| Lodging/Club Operations - "Upon Stabilizatoin Value" | Fee Simple | 1/1/2025 | $119,000,000 |
| Workforce Housing - "Upon Completion Value" | Fee Simple | 1/1/2022 | $2,800,000 |
| **Total Prospective Market Value "Upon Stabilization"** | **Fee Simple** | **1/1/2025** | **$244,700,000** |
| *Compiled by NKF* | | | |

*See* Exhibit B, *Newmark March 20, 2020 Appraisal* at 3.  Further, it offers an "alternative valuation," which Newmark describes as an investment value, of the Aspen Club Project of $284 million:

| Investment Value Summary | |
| --- | --- |
| Cost of Capital/Discount Rate | 6.0% |
| **Prospective Investment Value "Upon Completion"** | |
| Fractional Residential | $141,900,000 |
| Lodging/Club Operations | $140,100,000 |
| Workforce Housing | $2,800,000 |
| Total Prospective Investment Value Upon Completion | $284,800,000 |

The Debtors also prepared a proforma business model projecting revenues, costs, and profits from each contemplated business line (fractional ownership sales, rental management, health club, spa, food and beverage, etc.). The Debtors added an aesthetic medical facility to their offerings (sometimes referred to as a medical spa or MediSpa), and that facility accounts for a significant amount of revenue. Specifically, the Debtors' model projects that over its first five years, the medical spa will generate $46 million in revenue, or 26% of total enterprise revenue.

**D.     GPIF's Determination of Value**

GPIF is the largest secured creditor of the Debtors. GPIF is presently owed no less than $39 million, and that amount is secured by a first priority lien on ACRC's real estate. *See GPIF's Calculation of its Claim as of April 1, 2020*, Exhibit C. In connection with these bankruptcy proceedings, GPIF sought an appraisal from HVS Consulting and Valuation. *See Narrative Appraisal Report for the Aspen Club Resort (Partially Constructed), dated January 9, 2019* (the "HVS Appraisal"), Exhibit D. The HVS Appraisal reports the following asset values:

| VALUE CONCLUSION SUMMARY | | | |
| --- | --- | --- | --- |
| | As Is | When Complete | When Stabilized |
| Date of Value | November 11, 2019 | January 1, 2022 | January 1, 2025 |
| Exposure Time | 12 months or less | 12 months or less | 12 months or less |
| Reconciled Value | $75,000,000 | $178,800,000 | $190,100,000 |
| *Allocation of Property Components:* | | | |
| Real Property Value | $75,000,000 | $170,050,000 | $187,640,000 |
| Personal Property Value | 0 | 8,750,000 | 2,460,000 |
| Intangible Property Value | 0 | 0 | 0 |
| Total | $75,000,000 | $178,800,000 | $190,100,000 |
| Interest Appraised | Fee simple | Fee simple | Fee simple |

Mr. Erich Baum, who authored the HVS Appraisal, will testify at confirmation that the present value of the Aspen Club Project is $75 million. Mr. Baum's present value analysis is the key to the Court's determination of adequate protection. But even if the Court considers future projections of value in connection with the confirmation proceedings, Mr. Baum will testify that the Newmark appraisal inflates value by utilizing unjustifiable revenue projections. GPIF submits the HVS Appraisal in connection with this Objection and will make Mr. Baum available to testify about the appraisal at the confirmation hearing.

GPIF also engaged Loren Balsam to analyze the Debtors' pro forma business model. Mr. Balsam reviewed the Debtors' projections and identified several key errors that resulted in a significant overstatement of value—relating to both hotel operations and the Debtors' anticipated refinancings. Additionally, GPIF engaged BSM Consulting to analyze the feasibility of the proposed aesthetic medicine facility. Ms. Glenn Morley, an expert in the operation and management of plastic surgery, dermatology, and aesthetic medicine practices, will testify at the confirmation hearing that the projected revenues are not just unlikely, they are impossible to achieve under the parameters set forth in the Debtors' model. The Debtors' pricing for aesthetic medicine services is in many cases more than double what comparable businesses in the Aspen area charge. Additionally, Ms. Morley concludes that the Debtors' model understates overhead, fails to sufficiently account for ramp-up in operations, and fails to account for seasonality—i.e., that demand for aesthetic medicine services rises and falls during particular times of the year and that tourism in Aspen has peak seasons and off-seasons. GPIF will make Ms. Morley available to testify about the report at the confirmation hearing.

## III.    OBJECTION AND BASIS THEREFORE

**A.    The Debtors' Proposed Exit Financing Dooms The Plan.**

The Debtors' Plan is entirely dependent upon the Court's approval of the proposed Exit Financing, the key component of which is an unlawful priming lien.  The Debtors have asked the Court's authorization to borrow $140 million post-confirmation (this, on top of over $80 million in existing debt, the majority of which is secured).  The Debtors readily admit that "*[i]f the Exit Financing Motion is not approved by the Bankruptcy Court, then the Plan is, as contemplated, unconfirmable*."  *Debtors' Second Amended Disclosure Statement*, Dkt. 602 at 23 (emphasis added).  This critical fact bears repeating: the Plan is unconfirmable without the Exit Financing.  And yet the Debtors offer the Court no competent legal grounds on which the Exit Financing could be approved.  Neither section 364(d) nor any other provision of the bankruptcy code permits the approval of the Debtors' Exit Financing, and thus the Plan must fail.

### i.    EFO's Priming Lien Is Unlawful Under Section 364.

The plain language of section 364(d) forbids the Court's authorization of the Debtors' proposed post-confirmation Exit Financing.  Section 364(d)(1) provides:

> The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if—
>
> > (A) the *trustee* is unable to obtain such credit otherwise; and
> >
> > (B) there is adequate protection of the interest of the holder of the lien on the *property of the estate* on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d)(1) (emphasis added).  The Debtors' Exit Financing cannot satisfy either the "property of the estate" or "trustee" requirements of section 364(d).

The term "property of the estate" refers to a debtor's property interest from the time a chapter 11 case commences until a plan is confirmed.  *See* 11 U.S.C. §§ 541(a), 1141(b).  Upon

plan confirmation, however, those property interests "vest[] in the reorganized debtor, a new entity." *United States v. Redmond*, 36 B.R. 932, 934 (D. Kan. 1984); *see also* 11 U.S.C. § 1141(b) ("[T]he confirmation of a plan vests all of the property of the estate in the debtor."). Thus, once a plan is confirmed, "no property remains in the estate to which the superpriority lien can attach."[5] *In re Hickey Properties, Ltd.*, 181 B.R. 173, 174 (Bankr. D. Vt. 1995). For this reason, section 364 "does not apply to post-confirmation borrowings." *Id.*; *see also, e.g.*, *In re Les Ruggles & Sons*, 222 B.R. 344, 345 (Bankr. D. Neb. 1998) (holding that section 364(d)(1) does not apply after confirmation in chapter 12 cases and that "364(d)(1) should not be construed to impair the rights of a secured creditor under a confirmation plan."); *In re City of Detroit*, 524 B.R. 147, 276 (Bankr. E.D. Mich. 2014) ("[section] 364 does not apply to post-confirmation exit financing."). Section 364 simply does not permit the post-confirmation Exit Financing the Debtors propose.

Additionally, section 364 only applies where a "trustee" obtains the financing, which in most circumstances is a "debtor in possession" under section 1107. Of course, there is no "debtor in possession" after confirmation of a plan of reorganization. *See In re SAI Holdings Ltd.*, No. 06-33227, 2012 Bankr. LEXIS 3601, 2012 WL 3201893, at *7 (Bankr. N.D. Ohio Aug. 3, 2012) ("By its express terms, § 364(c) and (d) refer only to the obtaining of credit by the bankruptcy trustee, or Debtors-in-Possession in this case, and refer to incurring debt secured by a lien on 'property of the estate.' After confirmation of the Plan, Debtors were no longer Debtors-in-Possession . . . ."). Rather, upon reorganization—just as the Debtors' Plan indicates—the Debtors would emerge as new legal entities: the "Reorganized Debtors." *See* Plan, Dkt. 582 at § 1.58 (defining "Exit

---

[5] The Plan makes abundantly clear that all assets will leave the Debtors' estates and vest in the Reorganized Debtors. *See* Plan, Dkt. No. 652 at § 11.1 ("Except as otherwise explicitly provided in the Plan, on the Effective Date, all property comprising the Estates . . . shall vest in the Reorganized Debtors . . . ."). Thus, there is no Debtor property to which an EFO lien could attach. The assets that EFO looks to improperly encumber would belong to the Reorganized Debtors.

Financing" as the "loan to be advanced by the Exit Lender to the Reorganized Debtors upon Confirmation of the Plan."); *id*. at § 6.3. The debtor in possession will be distinct from the "Reorganized Debtors" and will not own any property. *Id*. at § 1.10. Thus, after confirmation, the absence of any debtor in possession ("trustee") further forecloses the Debtors' reliance on section 364. *See In re SAI Holdings Ltd.*, 2012 WL 3201893, at *7.[6]

ii.      **GPIF Is Not Adequately Protected As Required By Section 364.**

Section 364 also requires that a secured creditor must be adequately protected in accordance with section 361 when a court grants a lien on a debtor estate's property that is senior or equal to that of an existing prepetition secured creditor. *See* 11 U.S.C. § 364(d)(1)(B). This provision aims to protect a creditor against diminution in the value of its interest during the chapter 11 reorganization—*i.e.*, between filing of the petition and confirmation of a plan. *See, e.g.*, *In re Timbers of Inwood Forest Assocs., Ltd.*, 793 F.2d 1380, 1389 (5th Cir. 1986) ("[A]dequate protection . . . [is] intended to protect a secured creditor against a decrease in the value of its collateral due to the debtor's use, sale or lease of that collateral *during the stay*.") (emphasis added); *In re Geijsel*, 480 B.R. 238, 265 n.19 (Bankr. N.D. Tex. 2012) ("The proper time-span for assessing whether collateral has declined is from the date of the filing until the Court's ruling disposing of the case."); *In re Mosello*, 195 B.R. 277, 292 (Bankr. S.D.N.Y. 1996) ("Adequate protection must protect the creditor from diminution in the value of its collateral *during the reorganization process* . . . adequate protection is to safeguard the secured creditor from

---

[6] In prior briefing on this subject, the Debtors offered the Court two cases that do not address whether section 364(d) allows a post-confirmation priming loan. *See Debtors' Objection to GPIF's Motion for Relief from the Automatic Stay*, Dkt. 408 ¶¶ 14, 17 (citing *In re Westport Holdings Tampa, Ltd. P'ship*, No. 8:18-cv-2896-T-33, 2019 WL 4278760, at *3–5, 6, 10–13 (M.D. Fla. Sept. 10, 2019); *In re Campbell Sod, Inc.*, 378 B.R. 647 (Bankr. D. Kan. 2007)). In neither case did the secured creditor who would be primed by the proposed loan raise the threshold section 364(d) argument, which is likely why the courts included no discussion of it. *See GPIF's Response to Debtors' Objection to GPIF's Motion for Relief from the Automatic* Stay, Dkt. 428 (distinguishing *In re Westport* and *In re Campbell Sod*). These opinions are a far cry from clear precedent authorizing the Exit Financing the Debtors seek.

diminution in value of its interest *during the Chapter 11 reorganization*.") (internal quotes and citations omitted; emphasis in original); *In re 499 W. Warren Street Assoc., Ltd. P'ship*, 142 B.R. 53, 57 (Bankr. N.D.N.Y. 1992) ("The interest in [the] property sought to be protected under Code § 361 is the value of the secured creditor's collateral during the interim period between the filing of the petition and confirmation of a plan of reorganization, or dismissal of the case."). The specificity with which the case law discusses the applicable timeframe further demonstrates that section 364 is a misfit for post-confirmation priming exit financing. Section 361, like section 364, applies from the petition date to the confirmation date and consequently cannot apply to the Exit Financing, which requires the occurrence of confirmation as a condition precedent.

Section 361 lists three non-exhaustive ways a debtor may provide adequate protection of a secured creditor's interest under section 364. 11 U.S.C. § 361. The only avenue that the Debtors' proposal implicates is Section 361(3), which contemplates "granting such other relief" that will provide a secured creditor "the indubitable equivalent" of its interest in the collateral. *See id*. § 361(3). To do this, the Court must consider the value of the collateral. "Although no date is specified, the legislative history makes clear that, once a secured creditor's right to adequate protection arises, its collateral must be valued as of that date and the debtor must compensate the creditor for any subsequent decline." *In re All. Well Serv., LLC*, 551 B.R. 903, 906 (Bankr. D. N.M. 2016); *see also* 4 Collier on Bankruptcy ¶ 506.03 ("In general, courts typically hold that, for purposes of adequate protection, the value of the collateral is to be determined either as of the petition date or as of the date on which the request for adequate protection was first made."). "The ***present*** value of collateral must be protected and the collateral's hypothetical future value is not controlling for adequate protection purposes at the time of sale." *Matter of Ed Woods Livestock Inc.*, 172 B.R. 294, 296 (Bankr. D. Neb. 1994) (emphasis added). Mr. Baum's report values the

property supporting GPIF's lien at $75 million.  Based on this as-is valuation, and accounting for the amounts of the mechanics liens and DIP financing, approval of the $140 million exit financing will result in the elimination of GPIF's collateral and a *negative* equity cushion.

The Debtors argue that GPIF will be protected by "additional collateral to be created" and "periodic cash flows" from "yet-to-be-completed construction" that will take place after the exit financing is funded.  The Debtors' projections regarding that "additional collateral" and the "periodic cash flows" are not only speculative, they are demonstrably unreliable.  *See HVS Appraisal*, Exhibit D (explaining that the Debtors' appraisal significantly overstates the value of the Aspen Club Project); *hotelAVE Report*, Exhibit E (identifying numerous inaccuracies in the Debtors' business model resulting in a significant overstatement of net operating income, and explaining that the anticipated refinancings are unlikely to occur, and if they occurred, would result in $63 million *less* in refinance proceeds than the Debtors' model anticipates).

The only values the Debtors assign to the collateral are *future* values, which are insufficient to establish that GPIF will be provided the "indubitable equivalent" of its security interest.  *See Newmark Report*, Exhibit B.  For example, in *In re Packard Square LLC*, the bankruptcy court in the Eastern District of Michigan considered a request very similar to that which the Debtors make here.  574 B.R. 107 (Bankr. E.D. Mich. 2017).  In that case, a developer of a mixed-use project in Michigan sought an order under section 364 for post-petition financing of a proposed priming lien in the amount of $22 million (on top of approximately $54 million already owed under the original construction loan).  *Id*. at 113.  The debtor was required under section 361(3) to provide the secured creditor with the "indubitable equivalent" of the secured creditor's interest in the property securing the claims.  *Id*. at 117–18.  The debtor argued that the "secured creditors will realize the value of their interests in the collateral from the future increase in the value of the collateral which will

15

result when the Project is completed and the residential units and retail spaces are leased." *Id*. at

118.  In considering the Debtors' arguments, the court noted that all three valuations presented by

the Debtors' appraisal expert were based on "projections of the *future value* of the property after

the Project is fully constructed . . . and, thereafter, when the Project is fully rented." *Id*. at 121

(emphasis in original).  The Court further stated:

> But the Project is far from completed, and no part of the Project's apartment space
> or retail space is occupied and rented, so the Project is not currently producing any
> income. And there is inherent uncertainty about the future—including how long it
> will take and how much it will cost in the future to complete the Project and to fully
> rent it, and how much rental income will be generated in the future. For these
> reasons alone, the Court finds each of the three valuation amounts ascribed to the
> Debtor's real property by the Debtor's appraisal expert to be inherently uncertain
> and speculative to some extent.

*Id*. at 122.  The court ultimately determined that the secured creditor was not adequately protected

"in large part because [calculations of equity cushion percentages were] based on projections of

value that are several months into the future, and that are inherently uncertain and speculative . . .

."  *Id*. at 123.  The court held that this uncertainty and the small equity cushion percentages left

"too great a margin of risk to the existing lien holders—too great a risk that the proposed priming

DIP loan lien would impair the value of the existing liens."  *Id*.

Other bankruptcy courts have uniformly rejected similar attempts to substitute a secured

creditor's actual, tangible collateral with projections that future construction could create new

collateral or generate new revenue, as insufficient to satisfy Section 364(d)(1)(B).  *See, e.g.*, *In re

Swedeland Dev. Grp., Inc.*, 16 F.3d 552, 566 (3d Cir. 1994) ("[C]ontinued construction based on

projections and improvements to the property does not alone constitute adequate protection."); *In

re Tempe Land Co.*, No. 2:08-BK-17587, 2009 WL 1211622, at *2 (Bankr. D. Ariz. May 1, 2009)

("'Indubitable equivalent' requires more than a prediction of success for a project that, sixty days

from today, will still be in an unfinished condition, incapable of generating income, and in need

16

of additional financing."); *In re Den-Mark Constr., Inc.*, 406 B.R. 683, 702 (E.D.N.C. 2009) (rejecting the theory that improvements to the properties would "increase their value, thereby compensating [a secured creditor] for the loss of its priority").

"Those cases which have considered improvements to be adequate protection have done so *only* when the improvements were made in conjunction with the debtor's providing additional collateral beyond the contemplated improvements." *In re Swedeland Dev. Group, Inc.*, 16 F.3d at 566 (emphasis added). But the Debtors offer no such additional collateral to GPIF. Additionally, another decision held a project that would not be completed or capable of generating income within a mere sixty days failed to provide adequate protection to secured creditors. *See In re Tempe Land Co.*, 2009 WL 1211622, at *2. Here, however, Debtors' own evidence reflects that their project will not be completed for at least another two years. *See* Dkt. 379 at ¶ 22.

"Congress did not contemplate that a secured creditor could find its position eroded and, as compensation for the erosion, be offered an opportunity to recoup dependent upon the success of a business with inherently risky prospects." *In re Den-Mark Constr., Inc.*, 406 B.R. at 702 (internal quotations omitted). "The sole purpose of collateralization is to protect a lender against the possibility that a borrower's projections are not realized." *In re L.B.G. Props., Inc.*, 72 B.R. 65, 67 (Bankr. S.D. Fla. 1987). For that reason, courts "cannot justify the replacement of existing collateral with a projected property valuation." *Id.* (declining to confirm plan of reorganization). A priming lien therefore must be denied "[w]hen the effect of the new borrowing with a senior lien is merely to pass the risk of loss to the holder of the existing lien." *In re Windsor Hotel, L.L.C.*, 295 B.R. 307, 314 (Bankr. C.D. Ill. 2003); *see also In re L.B.G. Props., Inc.*, 72 B.R. at 67.

The Debtors' Plan eviscerates GPIF's security interest, rendering GPIF an *unsecured* creditor, by priming GPIF with $140 million in new money. The Debtors offer nothing more than

hopes of repayment from a project with inherently risky prospects that will not be completed until at least two years after the new loan is funded. This proposal passes the risk of loss to GPIF, the holder of the existing lien, which is the precise opposite of what Congress intended. *See In re Windsor Hotel*, 295 B.R. at 314.

    **iii.**    **The Exit Financing Must Be Rejected As A Matter Of Public Policy.**

Approval of the Debtors' proposed Exit Financing would upend commercial lenders' expectations that liens and security interests survive bankruptcy, which would profoundly impact the price and availability of commercial loans. For this reason, the Colorado Banking Association ("CBA") filed a Brief of *Amicus Curiae* (the "*Amicus* Brief") in support of GPIF's appeal of the Court's order denying GPIF's motion to lift stay. *See Motion for Leave to File Amicus Brief*, *GPIF Aspen Club, LLC v. The Aspen Club & Spa, LLC and Aspen Club Redevelopment Company, LLC*, No. 19-43, Dkt. 56; *see also Brief of* Amicus Curiae, Dkt. 56-3 at 1. The CBA represents more than 95 percent of the 131 banks operating in Colorado (76 chartered in Colorado, 55 out-of-state banks operating in Colorado, which have $160 billion in assets and 1,445 branches statewide).

In the *Amicus* Brief, the CBA explains that the outcome of this case matters to CBA members who regularly provide loans to businesses of all kinds throughout Colorado, the bulk of which are secured by a lien on some or all of the borrower's assets. *Id*. "Lenders are more likely to offer credit to businesses when their loans are secured by a priority lien on the borrower's collateral" because of the prospect of collection or recovery if the borrower defaults on the loan. *Id*. at 11–12. "Secured versus unsecured lending goes directly to the lender's underwriting analysis on whether or not to make the loan and, if made, on what terms or price. […] A lender gives great weight to the fact [that] its loan is secured and to its lien priority." *Id*. at 13.

The CBA argues that "allowing a Debtor to supplant a lender's first position lien at the confirmation stage of the case through a Section 364(d) priming lien . . . imperils the current

framework for secured lending and will ultimately result in higher lending costs and less credit availability for businesses . . . ." *Id*. at 14. Lenders determine the cost of credit by assessing the risk of extending credit. *Id*. at 15. Because secured lending takes into account the present state of bankruptcy jurisprudence, an expansion of the application of section 364(d) financing like what the Debtors propose will have "real world negative consequences." *Id*. at 14–15. "[I]ncreasing the instances where a lender's lien can be primed . . . calls into question the quality of a secured creditor's security," which will "lead to [an] increase in the cost all borrowers will face when attempting to obtain a loan." *Id*. at 16. Banks and other commercial lenders will also become reluctant to extend credit, even on a secured basis, which will be a significant cost to the economy and society as a whole. *Id*. The CBA's *Amicus* Brief demonstrates that the negative implications of confirming the Plan and Exit Financing are significant and far-reaching.

**B.     The Plan Violates Section 1129(b)(2).**

     **i.     The Plan Fails To Provide For The Retention Of GPIF's Lien.**

Section 1129(b)(2) provides that a secured creditor must "retain the liens securing such claim, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims." 11 U.S.C. § 1129(b)(2)(A)(i)(I). The Plan divests GPIF of its lien by allowing the Debtors to prime the existing equity structure with $140 million of new money. This means GPIF's lien position would detrimentally change from fully secured to *wholly unsecured* upon confirmation of the Plan. This is not permitted under section 1129(b)(2).

In *In re Ford Products Corp.*, 159 B.R. 693, 695 (Bankr. S.D.N.Y. 1993), the court concluded that a debtor's plan violated the "lien retention requirement in 11 U.S.C. § 1129(b)(2)(A)(i)(I)" and "fail[ed] to satisfy the fair and equitable standard" for an involuntary cramdown in 11 U.S.C. § 1129(b)(1) because the plan required two secured creditors to execute

agreements subordinating the priority of their liens to the previously-junior lease rights of certain commercial tenants. The plan's "fatal flaw" of involuntarily subordinating a secured creditor to another creditor "skewed the concept of absolute priority" and failed to ensure that "the claimants will retain their liens under the plan in accordance with 11 U.S.C. § 1129(b)(2)." *Id*.

Along similar lines, the court in *In re L.B.G. Properties, Inc.*, found that a secured lender would not retain its existing lien under a plan, as section 1129(b)(2) requires, where a new exit facility would prime the lender and degrade the lender's collateral position. 72 B.R. at 67. There, like here, the debtor tried to justify subordination of its secured lender by offering testimony that the property value would increase, which would offer protection for the existing lender's lien. The court found, however, that "[t]he sole purpose of collateralization is to protect a lender against the possibility that the borrower's projections are not realized. I cannot justify the replacement of existing collateral with a projected property valuation." *Id*.; *cf. In re Sherwood Square Assocs.*, 107 B.R. 872, 880 (D. Md. 1989) (permitting "lien subordination" because "the conditions for the subordination do not detract from the value of lien as security for the allowed amount of Fairfax's secured claim.").

The Debtors' Exit Financing proposal would prime GPIF's liens in violation of section 1129(b)(2). GPIF's lien position would change from fully secured to wholly unsecured upon the confirmation of the Plan because adding a $140 million superpriority lien on top of GPIF's lien eliminates GPIF's security. The Court should not, and may not, justify the replacement of GPIF's existing collateral with the Debtors' projected property valuation. Rather than retain the value of its security, GPIF would receive a note from the Reorganized Debtors, the value of which is speculative at best. Section 1129 simply does not allow this result.

### ii.      The Plan Fails To Provide GPIF The "Indubitable Equivalent" Of Its Claim.

The Debtors also cannot attempt to cramdown GPIF based on 1129(b)(2)(A)(iii), which requires that a secured creditor receive the "indubitable equivalent" of its claim. The Tenth Circuit has explained the "indubitable equivalent" standard by requiring that:

> [U]nder the treatment proposed in the [p]lan, there is no reasonable doubt that [the lender] will receive the full value of what it bargained for when it made its contract with Debtor. When a plan proposes to substitute or alter collateral, however, a secured creditor receives the indubitable equivalent of its claim only if the substituted collateral does not increase the creditor's exposure to risk.

*In re Investment Co. of the Sw., Inc.*, 341 B.R. 298, 319 (10th Cir. BAP 2006). The bankruptcy court for the District of Kansas similarly held:

> [W]here the debtor's plan openly rearranges the lien priorities of the respective secured creditors . . . the Court doubts that any of them will receive the full benefit of what they bargained for. The treatment exposes the secured creditors . . . to increased risk and exposure by denying them a safe and completely compensatory substitute for their collateral. This treatment alone is "**patently unconfirmable**."

*In re RIM Dev., LLC*, 448 B.R. 280, 291 (Bankr. D. Kan. 2010) (internal quotations omitted) (emphasis added).

Here, GPIF bargained for a $30 million loan, fully secured by a first lien on ACRC's real property. Under the Debtors' Plan, GPIF's lien position would be primed by $140 million, transforming GPIF's lien position from fully secured to a fully unsecured junior lien behind at least $110 million of new debt. This comes nowhere close to providing GPIF with the "indubitable equivalent" of its claim; to the contrary, GPIF is almost certainly deprived of its claim. Moreover, GPIF's exposure to risk would be exponentially higher under the Plan, which requires GPIF to rely on the Debtors' rose-colored hopes for a "projected revenue stream" based on "additional collateral to be created," instead of a fully secured senior lien on the Debtors' tangible real property. Substituting a first lien for a deeply subordinated junior lien, and swapping tangible real property in the form of dirt, steel, and concrete for the Debtors' promises of income five years

from today is not providing GPIF with the "full value of what it bargained for when it made its contract with the Debtor" as required by the binding precedent of the Tenth Circuit. *In re Investment Co. of the Sw., Inc.*, 341 B.R. at 319. Because the Plan does not provide GPIF with the indubitable equivalent of its claim, the Debtors cannot cramdown GPIF under 1129(b)(2)(A)(iii), and the Plan is unconfirmable on its face.

### iii.    The Plan Fails To Provide GPIF An Adequate Cramdown Rate Of Interest.

Under the Debtors' Plan, GPIF unquestionably does not retain its lien. But even if the Plan did retain GPIF's lien, the Plan still fails the fair and equitable test because it does not provide GPIF with the present value of its secured claim.

Section 1129(b)(2)(A)(i) of the Bankruptcy Code provides that while a plan can restructure non-consensually ("cramdown") a secured creditor's debt, to be approved a plan must provide that the creditor retain its lien and "receive[] deferred cash payments equal to the ***present value*** of its secured claim as of the effective date of the plan." *See In re Moultonborough Hotel Grp., LLC*, No. 10-14214, 2012 WL 5464630, at *5 (Bankr. D. N.H. Nov. 8, 2012) (emphasis added). "'Present value' is the current value of a future payment, and takes into account various risks that may arise between the present and future payment date(s)." *Id.* at *6. "The interest rate applied to the restructured debt is what ensures present value is received." *Id.* "A secured creditor receives the present value of its claim if the deferred payments, discounted to present value by applying an appropriate interest rate equals the allowed amount of the secured creditor's claim." *In re A&B Assocs., L.P.*, No. 17-40185-ECJ, 2019 WL 1470892, at *53 (Bankr. S.D. Ga. Mar. 29, 2019) (internal quotations and citations omitted).

A majority of courts, including at least one court in this District, employ a two-step approach to determine the appropriate interest rate. *See, e.g., In re Rocky Mountain Land Co. LLC*, No. 12-21643 HRT, 2014 WL 1338292, at *9 (Bankr. D. Co. Apr. 3, 2014) (Tallman, C.J.) ("While

the Tenth Circuit has not addressed the issue . . . this Court agrees with the reasoning of those

courts applying [the two-step approach]"); *Matter of MPM Silicones, L.L.C.*, 874 F.3d 787, 800

(2d Cir. 2017) ("We adopt the Sixth Circuit's two-step approach, which, in our view, best aligns

with the Code and relevant precedent"); *In re 20 Bayard Views, LLC*, 445 B.R. 83, 108 (Bankr.

E.D.N.Y. 2011) ("The majority of courts outside this Circuit to consider the issue have similarly

applied the two-step analysis[.]"); *Bank of Montreal v. Official Comm. Of Unsecured Creditors

(In re American HomePatient, Inc.)*, 420 F.3d 559, 568 (6th Cir. 2005).

The first step in the approach is to determine whether an "efficient market" exists for the

cramdown loan.  *See In re Am. HomePatient Inc.*, 420 F.3d at 568.  If it does, the market interest

rate should be applied.  *See id*.  An "efficient" market exists where the market "offer[s] a loan with

a term, size, and collateral comparable to the forced loan contemplated under the cramdown plan."

*Matter of MPM Silicones L.L.C.*, 874 F.3d at 800 (citing *In re Texas Grand Prairie Hotel Realty,

L.L.C.*, 710 F.3d 324, 337 (5th Cir. 2013)); *see also In re Moultonborough Hotel Grp., LLC*, 2012

WL 5464630, at *7 ("When deciding whether an efficient market exists, courts look to expert

evidence and evidence of actual loan offers.") (internal citations omitted).

If no market interest rate exists for a proposed cramdown loan, courts following the two-

step approach generally determine the appropriate cramdown interest rate by setting the prime

interest rate as a floor and upwardly adjusting for various risk factors (the determined rate referred

to hereinafter as the "Formula Rate").  *See In re Moultonborough Hotel Grp., LLC*, 2012 WL

5464630, at *6.  Moreover, if the Formula Rate "necessitate[s] an 'eye-popping' interest rate" then,

the plan should "probably not be confirmed" because it will not be feasible.  *See Till v. SCS Credit

Corp.*, 541 U.S. 465, 480–81 (2004) (internal citations omitted).

The goal of the two-step approach is to ensure that the creditor receives the fair and equitable value of its secured claim through deferred payments.

> If a Chapter 11 plan proposes a payment rate below the range of prevailing market rates for loans of comparable risk and duration or which does not take into account the actual risk of that loan, confirmation must be denied because the deferred payments will not yield the present value of the claim and, therefore, the plan is not fair and equitable and will not satisfy § 1129(b)(2)(A)(i)(II).

*See In re Bashas' Inc.*, 437 B.R. 874, 919 (Bankr. D. Az. 2010) (internal citation and quotations omitted).

Here, the Plan proposes to pay GPIF through a new promissory note of undisclosed tenor, bearing interest at prime plus 1%, or approximately 5.75% (the "Cramdown Loan"). At the same time, it proposes that the Debtors will enter into the Exit Financing which will carry a 12% interest rate (without factoring in fees). The Exit Financing will be secured by a senior position in the same collateral as the Cramdown Loan.

The Cramdown Loan cannot be said to provide GPIF with the present value of its secured claim as required by section 1129(b)(2)(A)(i) for at least two reasons. First, if the Court accepts the Debtors' position that the Exit Financing was negotiated in good faith as a reasonable exercise of their business judgement (*see Motion for Entry of an Order Approving Exit Financing Loan Agreement Under 11 U.S.C. § 364 and Granting Related Relief*, Dkt. 323 at ¶¶ 46, 50) then the Exit Financing's interest rate should be considered the "efficient market" rate for debt secured by a first lien in the collateral. *See Matter of MPM Silicones L.L.C.*, 874 F.3d at 800; *In re Deep River Warehouse Inc.*, No. 04-52749, 2005 WL 2319201 at *12 (Bankr. M.D.N.C. Sept. 22, 2005) (finding "an actual loan commitment . . . 'proof of the pudding' as to the applicable market rate of interest" and determining such loan commitment's interest rate to be the proper cramdown interest rate) (quoting *In re Prussia Assoc.,* 332 B.R. 572, 585 (Bankr. E.D. Pa. 2005)). Thus, as it pertains

24

to a first lien loan in the Collateral in the amount of $140 million with a term of 30 months, the market instructs that providing an interest rate of 12% (without factoring in fees) yields the present value of GPIF's claim.

Tenth Circuit precedent instructs that when a comparable market rate of interest exists it should not be ignored in determining whether the proposed cramdown loan's interest rate is fair and equitable. *See In re Stratford Assocs. Ltd. P'ship*, 145 B.R. 689, 701 (Bankr. D. Kan. 1992) ("*Harzdog v. Federal Land Bank of Wichita (In re Hardzog)*, 901 F.2d 858 (10th Cir. 1990) binds this Court to determine a 'market' rate of interest."); *see also In re Valley View Shopping Ctr. L.P.*, 260 B.R. 10, 36 (Bankr. D. Kan. 2001) ("[W]ether the creditor receives the market rate of interest can be determined by reference to similar if not identical loans, characterized by similarities in term and collateral."); *In re Valencia Flour Mill, Ltd.*, 348 B.R. 573, 577 (Bankr. D. N.M. 2006) (denying confirmation where debtors failed to show plan provided interest rate commensurate with market rate).

The Court should look to the Exit Financing's interest rate as a benchmark for the proper interest rate that the Cramdown Loan must carry for purposes of section 1129(b)(2)(A)(i). Courts have held that where an exit financing loan will be senior to a proposed cramdown loan, the cramdown loan must carry a higher interest rate than the exit financing loan's rate, so as not to deprive the cramdown lender of a market interest rate.[7] *See In re Nw. Timberline Enters., Inc.*, 348 B.R. 412, 431 (Bankr. N.D. Tex. 2006) (finding that where senior secured exit financing

---

[7] Interestingly, in the opposite situation, where a cramdown loan will be senior to the exit loan, courts have held that the cramdown loan should not carry an interest rate higher than the exit financing's rate. *See In re Winn-Dixie Stores, Inc.* 356 B.R. 239, 256 (Bankr. M.D. Fla. 2006) (finding that because debtors "went out into an efficient market" to procure exit financing which would be junior to cramdown loan, it would be inappropriate for cramdown loan to carry higher rate of interest than exit financing).

carried 13% interest rate, junior secured cramdown loan would need to carry higher interest rate because it "would be in an inferior lien position" to the exit financing).

Thus, to determine the market rate for the Cramdown Loan, the Court should look to the interest rate for the Exit Financing, which represents the efficient market rate for a first lien loan in the Collateral.  Because the Exit Financing will be secured by a senior lien position in the Collateral, the Cramdown Loan must carry a higher rate of interest to fairly compensate GPIF for its riskier loan.  *See id*.  Certainly, any other outcome would turn the goals of section 1129(b)(2)(A)(i) on its head by providing a below-market interest rate to a cramdown lender.  *See Till*, 541 U.S. at 477 (noting the goals of section 1129's present value standard are to "treat similarly situated creditors similarly, and to ensure that an objective economic analysis would suggest the debtor's interest payments will adequately compensate all such creditors for the time value of their money and the risk of default.") (internal citations omitted).

Second, even if the Court were to ignore the Exit Financing' interest rate (it should not) and determine the Formula Rate for the Cramdown Loan, that rate cannot fairly be said to be prime plus 1% given the multitude of risk factors present in this case.  Among other risk factors used in determining the Formula Rate, courts look to: (1) the circumstances of the estate; (2) the nature of the security; (3) plan feasibility; and (4) the loan's term.  *See In re Rocky Mountain Land Co.*, 2014 WL 1338292, at *7–9; *see also In re Moultonborough Hotel Grp.*, *LLC*, 2012 WL 5464630, at *5 (listing additional factors which courts consider including: the financial condition of the debtor at the time of confirmation, the loan-to-value ratio, loan's debt service coverage ratio, and the quality of any guarantors as relevant risk factors).  In this case, each of the risk factors compels a finding that the Cramdown Loan should carry a higher interest rate than prime plus 1%, which is a rate reserved for low risk debtors.  *See In re Rocky Mountain Land Co.*, 2014 WL 13388292,

at *8 ("[T]he general consensus among courts is that a one to three percent adjustment to the prime rate is appropriate, with a 1.00% adjustment representing a low risk debtor[.]") (quoting *In re Pamplico Highway Dev., LLC*, 468 B.R. 783, 795 (Bankr. D.S.C. 2012); *In re Fox*, No. 12-32462 HRT, 2013 WL 653048, at *4 (Bankr. D. Co. Feb. 21, 2013) (Tallman, C.J.) ("In the Court's experience, it is virtually unprecedented . . . to force a creditor to accept interest on its secured claim of only .75% over prime.").

The risks in this case are substantial.  As part of his analysis in this case, Mr. Balsam identified several key risks associated with the Aspen Club Project.  *See hotelAVE Report*, Exhibit E at 18.  The first is the novel "deeded fractional months" concept.  Mr. Balsam concluded that this structure, as opposed to the more common rotational structure, poses the risk of failure to sellout and uneven pricing of inventory.  *Id*.  Second, Mr. Balsam observes that *any* delay in the construction schedule, project overruns, or securing refinance proceeds would materially hamper the ability to satisfy the Exit Loan, GPIF's loan, and subordinate claim classes.  *Id*.  Further, Mr. Balsam notes that the Debtors' proforma business model does not account for any marketing spend after month 22 to support future sales of the fractional units.  *Id*.  Mr. Balsam also notes that the COVID-19 crisis has severely impacted the hospitality and restaurant industry.  *Id*.  The time that it will take for the market to recover is uncertain and has likely impaired the valuation of resorts in the near term.  *Id*.  Additionally, the lenders and mortgage brokers that Mr. Balsam surveyed commented that there are additional risks, such as the non-downtown location of the Aspen Club Project, and the fact that the best inventory will sell first, leaving existing lenders with the least valuable collateral.  These are just some of the risks associated with the Aspen Club Project.

The risks associated with the Debtors and the Cramdown Loan here are similar to risks in other cases where courts required cramdown interest rates greater than prime plus 3%.  *See e.g.*,

*In re Rocky Mountain Land Co.*, *LLC*, 2014 WL 1338292, at *9 (3.75% above prime appropriate where LTV ratio was 100%, loan not amortized over seven year term, and plan's feasibility predicated on debtor debt service payments in an amount greater than debtor's own projections); *In re Griswold Bldg., LLC,* 420 B.R. 666, 694-95 (E.D. Mich. 2009) (5% above prime appropriate where LTV ratio was 100%, loan had five year term with balloon payment feature, and there was a substantial risk of nonpayment due to lack of feasibility); *In re GAC Storage El Monte, LLC*, 489 B.R. 747, 764 (Bankr. N.D. Ill. 2013) (5.35% above prime appropriate to reflect risk of depressed rental and occupancy rates due to property's location, interest rate risk for 7 year term, and lack of equity cushion). Accordingly, prime plus 1% is a wholly inadequate rate of interest, and the Court should deny confirmation because the Plain fails to provide GPIF the fair and equitable value of its secured claim as required by section 1129(b). *See In re 20 Bayard Views, LLC*, 445 B.R. at 112 (denying confirmation where "significant risks" were not accounted for by "a risk premium of 1.5 percent" including that "[i]f the Property is liquidated, [creditor] faces a significant risk that it will recover less than the amount that it is owed").

**C.     The Plan Violates 1129(a)(3) Because The Plan Was Not Proposed In Good Faith.**

The debtors cannot show that the Plan was proposed in good faith. "[T]he test of good faith under § 1129(a)(3) focuses on whether a plan is likely to achieve its goals and whether those goals are consistent with the [Bankruptcy] Code's purposes." *In re Paige*, 685 F.3d 1160, 1179 (10th Cir. 2012). The United States Supreme Court has stated that the policies underlying Chapter 11 are preservation of going concerns and maximizing property available to satisfy creditors. *See Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 453 (1999).

The Debtors' Plan is intended to maximize the likelihood that management of the Aspen Club Project maintains its equity. Further, the Debtors' filings in this case reflect demonstrably false statements made and attested to by management to benefit management's friends and family.

28

Specifically, known unsecured creditors that are family and friends of Michael Fox were treated as secured creditors (the Debtors only corrected this after GPIF and other creditors objected).[8] Individuals with no filed or scheduled claims are treated as secured creditors.[9]  The Plan's early iterations sought to elevate junior creditors with a connection to Fox above third-party secured creditors with first-filed deeds of trust.[10]  Fox is empowered with investigating Fox, the claims of Fox's friends and family, [11] and numerous insider transactions that Fox has never disclosed in his schedules.[12]  Early plans sought to quadruple Fox's salary until GPIF objected.[13]  EFO principals and their family receive offensive kickbacks in the form of free life-long memberships, discounted food and services, eight free weeks of condo use, and free access for guests staying at an unrelated EFO affiliated resort in Aspen.[14]  These are just a few examples of the many provisions of the Plan that are intended to benefit the Debtors' insiders, which is a hallmark of a plan filed in bad faith. Thus, the Plan cannot satisfy the "good faith" requirement of section 1129(a)(3).

---

[8] The Debtors ultimately admitted this in their Amended Disclosure Statement.  *See Amended Disclosure Statement*, Dkt. 602 at 21 ("Although Class 6 Creditors appear to assert Secured Claims they do not appear to have perfected such Claims and are therefore unsecured.").

[9] *Id.* ("The Debtors' schedules will be amended so as to include Ken Fox, Candy Allen and Michael Margolis as the Holders of Allowed Mezzanine Debt Claims given that these individuals **failed to file proofs of claim** prior to the Bar Date but in fairness should be included in Class 6.") (emphasis added).

[10] *See Joint Plan of Reorganization of the Aspen Club & Spa, LLC, and Aspen Club Redevleopment Company, LLC, Pursuant to Chapter 11 of the United States Bankruptcy Code, Dated September 16, 2019*, Dkt. 321 (prioritizing the "Letter of Credit Claim" holders over the EB5 Lenders, despite the fact that the EB5 Lenders' liens were filed well before the Letter of Credit Claim holders filed deeds of trust.  *See also GPIF's Objection to Disclosure Statement*, Dkt. 412 at 18.

[11] *See Amended Disclosure Statement*, Dkt. 602 at 27 ("The Plan permits only Debtors and the Reorganized Debtors to file objections to any Claim . . . ."); *see also Plan*, Dkt. 652 at § 11.3 (permitting the "Reorganized Debtors" to compromise and settle various "Claims or Interests" after the Effective Date without further approval of the Bankruptcy Court.

[12] *See Exhibit D to GPIF's Objection to Disclosure Statement*, Dkt. 412-4 (listing highlighted insider transactions that were never disclosed in the Debtors' schedules).

[13] *Disclosure Statement*, Dkt. 325 at 18.

[14] *Id.* at 55.

**D.**      **The Plan Is Not Feasible And Violates 1129(a)(11).**

    **i.**      **The Plan's Projections Are Inherently Flawed.**

      The Aspen Club Project, as proposed by the Debtors, is a complex, multi-business operation.  Construction of the Aspen Club facilities was suspended in September 2017, with the project halfway completed.  At that time the Debtor had incurred materialmen and mechanics' liens of approximately $25,000,000 on a project with approximately $77,000,000 of consensual debt.  To date, the Debtors have never explained how they allowed this to happen.  The site has stayed in this partial state of completion for over two years.  The operating concept is unique in terms of its novel fractional-interest format (deeded months), and its large share of revenue (approximately 60%) to be derived from profit centers that are not typical for hotels and resorts.  Included in these atypical profit centers is an aesthetic medicine practice—a business line wholly new to the Debtors.  Hotel operating inventory is projected to be maximized in the off-season when the demand for and access to Aspen resorts is at its lowest.  As described above, and as will be explained fully in testimony at the confirmation hearing, Mr. Loren Balsam of hotelAVE, an expert in financing and operations of resorts and hotels, as well as Glenn Morley, an expert in the field of the business and operations of aesthetic medicine practices, have evaluated the Debtors' Plan and supporting projections.  They have concluded that the Debtors' proposal is not feasible.  Specifically, Mr. Balsam concludes that the modeling errors in the Debtors' proforma business plan overstate net operating income by $14 million, and the proceeds from the Debtors' contemplated refinancings will fall short of the Debtors' projections by approximately $64 million. *See generally hotelAVE Report*, Exhibit E.  The modeling errors include an overstatement of the average daily rate for residential units, an inaccurate commission split with owners who choose to rent their units, an unrealistic occupancy premium to the market in the slowest months of the year, an insupportable assumption that the property will stabilize (meaning it will achieve a fair share

of both market occupancy and rate) in the first year when the average time to stabilization is three years, and overstatement of spa and salon performance. *Id*. Similarly, Ms. Morley concludes that the Debtors' proposed medical aesthetics business will yield far less than the projected $46 million in revenue, and that the costs of running the business will substantially exceed the costs included in the Debtors' model. Among other things, Ms. Morley will testify that revenue is overstated because the Debtors cannot complete the projected number of treatments in a single day, the Debtors' model fails to account for seasonal fluctuations in demand, and the Debtors' pricing is significantly higher than the regional and national markets. Ms. Morley will also explain that the Debtors' flawed compensation model, among other things, results in significantly understated overhead.

Further, the Plan understates the claim amounts for creditors. The Plan provides that the claims of creditors in classes 1-6 are secured, meaning that these claims have been accruing post-petition interest since the Petition Date. *See* 11 U.S.C. § 506(b). However, the claim amounts in Debtors' model do not account for this interest. According to GPIF's calculations, GPIF is owed, as of April 1, 2020, $39,017,107. *See* Exhibit C. The Debtors' calculations in their model fall significantly short of that, stating that GPIF's claim is only $34,282,013. The Debtor makes the same mistake for other major creditors. The Debtors model states, for example, that $12,401,351 is owed to Revere High Yield Fund. According to GPIF's calculations to include interest, the amount of Revere's claim as of April 1, 2020, is $14,967,922. *Id*. The EB5 Lenders, according to the Debtors' model, are owed $13,500,000. According to GPIF's Calculations, the EB5 lenders are owed $14,736,375 with interest. *Id*. The addition of interest for these three creditors alone demonstrates a miscalculation of over $8 million. Thus, the Debtors' failure to properly account for accrued interest puts them millions of dollars behind.

ii.      **The Plan Depends On Illusory And Unlikely Refinancing.**

The Plan contemplates two separate refinancings—one after 24 months and one after 30 months.  The month 24 refinancing is forecasted to provide almost $100 million to pay down the Exit Financing.  The month 30 refinancing is forecasted to provide over $37 million to make a balloon payment on the GPIF Cramdown Loan.  In short, these refinancings are absolutely critical to the Plan's success (or failure).

Section 1129(a)(11) "requires the plan proponent to show concrete evidence of a sufficient cash flow to fund and maintain both its operations and obligations under the plan." *S & P, Inc. v. Pfeifer*, 189 B.R. 173, 183 (N.D. Ind. 1995) (quoting *In re SM 104 Ltd.*, 160 B.R. 202, 234 (Bankr. S.D. Fla. 1993)).  Although "[r]eorganization plans need not completely amortize reorganization debt to be confirmed, [] if refinancing is anticipated, the plan proponent has to produce some credible evidence about the likelihood of that refinancing."  *In re Las Vegas Monorail Co.*, 462 B.R. 795, 800 (Bankr. D. Nev. 2011).  For this reason, "courts have refused to confirm plans whose feasibility turned on future sales of property, or future refinancings, absent an adequate showing that such sales or refinancings would be likely to occur."  *Id.* at 800–01; *see, e.g.*, *id.* (denying confirmation because plan required debtor to make substantial balloon payment in seven years and would likely require refinancing); *In re Vanderveer Estates Holding, LLC*, 293 B.R. 560 (Bankr. E.D.N.Y. 2003) (upholding secured creditor's objection to confirmation where plan required debtor to refinance in ten years and projections showed that debtor would not be able to secure refinancing based on valuation of secured asset).  Conversely, the need for future refinancing may not preclude a finding of feasibility where projections show a substantial pay down of the loan or accumulation of cash that will assist the refinancing on favorable terms.  *See, e.g.*, *In re N. Valley Mall, LLC,* 432 B.R. 825, 838 (Bankr. C.D. Cal. 2010).

In this case there is not an "adequate showing" that the Debtors' projected refinancings will occur, and indeed the evidence reflects that refinancing at either month 24 or month 30 is implausible if not impossible. Debtors project that the first refinancing will occur 24 months after construction begins and that the hypothetical lender will lend 70% loan to value against the market value of unsold inventory of fractional units. *See hotelAVE Report*, Exhibit E at 13. This loan, the Debtors contend, would yield approximately $107 million in refinance proceeds. *Id*. hotelAVE found that hospitality lenders and debt brokers would not lend against the fractional inventory, but would lend against the project assuming "whole ownership" or hotel use. *Id*. This type of loan, according to lenders and brokers surveyed, would yield only $75 million of loan proceeds. *Id*.

The Debtors project that the second refinancing will occur 30 months after construction begins (only 8 months into operation) and will yield $31.5 million in loan proceeds. *Id*. at 14. The Debtors contemplate that the basis for the loan will be the forward 12 month cash flow of non-fractional interests (income from rental management agreements, from renting unsold fractional units, from renting the 4 slowest season months, and from other resort elements). hotelAVE found that hospitality real estate lenders viewed this cash flow as not financeable. Mr. Balsam's report details comments from mortgage brokers and hospitality lenders supporting those conclusions. *See hotelAVE Report*, Exhibit E. Those comments include, among others:

Month 24 Refinance – Fractional Inventory Loan:

- Very difficult refinance execution;

- Few lenders provide this type of finance;

- Not likely to obtain sufficient proceeds to pay off Exit Loan, jeopardizing subordinate payment classes;

- Lenders will underwrite to the downside risk of alternative use based on the premise that the sales of the fractional units stall or fail;

33

- Lenders will underwrite to the best alternative use that is permitted by zoning, and potential alternative uses include transient occupancy hotel, condo rental program/Airbnb, whole ownership sale.

- Proceeds would be at 50-60% loan to value of this alternative use at rates starting at 8%+; and

- Lenders would expect refinance proceeds of approximately $75 million at 50% loan to value.

Month 30 Refinance – Front Desk Loan (Hotel Portion only):

- Consensus among survey participants is that this is not achievable based on the developer's plan;

- The developer is proposing a refinance based on a 6 to 7 month operating history of the resort.  The property will not be stable at this point, meaning there is insufficient revenue and expense history, no track record of rental participation from fractional owners, and the number of fractional owners at this point is still relatively small (31% according to the model);

- Lenders would require a few years of stabilized and seasoned cash flow to understand seasonality, rate and occupancy volatility, rental participation revenue, and ancillary revenue and expenses from the other business lines;

- Most lenders viewed this as a business or cash flow loan, not a real estate loan.  It would be more akin to a management company loan or "front desk" loan, and valued accordingly.  Front desk loans range from 16-24% cap rates, or 1.0-1.5x gross revenue.

- Though completely unrealistic and overstated based on the modeling errors, the developer's numbers at 1.0x gross revenue would equal $18.4 million, which is far less than the $31.5 million contemplated in the Debtors' proforma business plan.

*See hotelAVE Report*, Exhibit E at 59–60.  Thus, the evidence demonstrates that the Debtors cannot satisfy section 1129(a)(11) because they cannot accomplish the proposed refinancings.

**E.    The Plan Seeks To Manufacture An Impaired Consenting Class.**

In order for the Plan to be confirmed under section 1129(b) of the Bankruptcy Code, at least one impaired class of creditors must approve the plan.  11 U.S.C. § 1129(a)(10), (b).  Under section 1122(a), "a plan may place a claim or interest in a particular class only if such claim or an interest is substantially similar to the other claims or interests of such class."  *Id.* § 1122(a).  While

a plan proponent may not place dissimilar claims together in the same class (such as secured and unsecured claims), the Code does not expressly require that all substantially similar claims be placed in the same class. *In re Novinda Corp.*, 585 B.R. 145, 154 (10th Cir. BAP (Colo.) 2018). However, courts have acknowledged that "while a restriction on classification of similar claims is not expressly embodied in § 1122(a), it should be implied based upon basic concepts of fairness and in order to preserve the balance of power among creditors in a Chapter 11 case." *In re City of Colo. Springs Spring Creek Gen. Improvement Dist.,* 187 B.R. 683, 688 (Bankr. D. Colo. 1995).

As a result, bankruptcy courts generally permit separate classification of similar claims, subject to the caveat that "separate classification may not be used to gerrymander the vote on plan confirmation." *In re Novinda Corp.*, 585 B.R. at 154. "Bankruptcy courts have consistently adhered to this 'one clear rule,' i.e., debtors may not separately classify claims under § 1122 for the purposes of obtaining an impaired consenting class under § 1129(a)(10)." *Id.* (quoting *In re Greystone III Joint Venture*, 995 F.2d 1274, 1279 (5th Cir. 1991)); *In re Autterson*, 547 B.R. 372, 397 (Bankr. D. Colo. 2016) ("The main judicial gloss on § 1122(a) is that the subsection prohibits a debtor from separately classifying similar claims to gerrymander a consenting class."); *In re City of Colo. Springs,* 187 B.R. at 687–88 (same). "If a creditor objects to the classification scheme on gerrymandering grounds, most courts require the plan proponent to justify the classification." *In re Rocky Mountain Land Co.*, 2014 WL 1338292, at *15. Permissible justifications vary based on the circumstances, but "[i]n many bankruptcies, the proffered reasons…will be insufficient to warrant separate classification." *Matter of Briscoe Enterprises, Ltd.*, *II*, 994 F.2d 1160, 1167 (5th Cir. 1993). Under the Plan, Debtors seek to obtain an impaired consenting class by (1) separately classifying similar claims based on a false and inflated valuation of ACRC's real estate and (2)

substantively consolidating the Debtors' estates in order to create a voting class in ACRC that would not otherwise exist.

**i.  Gerrymandering Classes Based On A False Valuation.**

The Plan sets forth ten classes of claims and interests that are based on a false, inflated, and undisclosed valuation of ACRC's real estate:

| Classification | Description |
|---|---|
| Classes 1 A thru 1TT | Allowed Mechanics Lien Secured Claims |
| Class 2 | Allowed Claim of GPIF |
| Class 3 | Allowed Claim of Revere |
| Class 4 | Allowed EB5 Claims |
| Class 5 | Allowed Letter of Credit Claims |
| Class 6 | Allowed Mezzanine Debt Claims |
| Class 7 | Allowed Other Priority Claims |
| Class 8 | Allowed General Unsecured Claims |
| Class 9 | Subordinated Claims |
| Class 10 | Interests |

*See Plan*, Dkt. 652 at 26.

Under the HVS Appraisal, total asset value is $75 million.  *See* Exhibit D, *HVS Appraisal*. Consequently, there should only be four classes of claims:

| Classification | Description |
|---|---|
| Classes 1 A thru 1TT | Allowed Mechanics Lien Secured Claims |
| Class 2 | Allowed Claim of GPIF |
| Class 3 | Allowed Claim of Revere |
| Class 4 | Allowed General Unsecured Claims |

The true value of the collateral ($75 million) is only sufficient to cover the DIP financing ($5.1 million), mechanics lien claims ($25.6 million), GPIF's claim ($38.2 million), and a portion of Revere's claim ($11 million).  Pursuant to section 506(a), Revere will have a secured claim to the extent of the value of the collateral ($6.1 million) and an unsecured claim for the remainder of its claim ($4.9 million).  *See* 11 U.S.C. § 506(a).  All other claims (currently separately classified as classes 4-10 under the Plan) are simply general unsecured claims, and there is no justification

for their separate classification.  *See In re 266 Washington Assoc.*, 141 B.R. 275, 282 (Bankr. E.D.N.Y. 1992) ("Unsecured claims will, generally speaking, compromise one class, whether trade, tort, publicly held debt, or a deficiency of a secured creditor" because "they are claimants of equal legal rank entitled to share pro rata in values remaining after payment of secured and priority claims.").  As such, only four classes of claims are appropriate: mechanics lien claims, GPIF's claim, Revere's secured claim, and general unsecured claims.

By proposing ten classes under the Plan, Debtors seek to gerrymander the classes in order to obtain an impaired consenting class.  Class 6 contains mezzanine debt claims, which is defined to include claims owed by either or both Debtors to friends and family of Mr. Fox, including Robert A. Fox, David A. and Donna L. Gerson, Grant Place Fund LLC, Telesoft Management Cash Balance Plan, Arnold Whitman, Ken Fox, Candy Allen, or Michael Margolis (the "Mezzanine Lenders").  Dkt. 653-1 at 17.  The Debtors know that the Mezzanine Lenders will vote in favor of the Plan, so by isolating them into a separate class, Debtors are manufacturing an impaired consenting class in violation of section 1122(a).  The purpose of the "one clear rule" is to ensure that this type of class gerrymandering is not permitted.  *In re Novinda Corp.*, 585 B.R. at 154; *In re City of Colorado Springs*, 187 B.R. at 688 ("Unless there is some requirement of keeping similar claims together, nothing would stand in the way of a debtor seeking out a few impaired creditors (or even one such creditor) who will vote for the plan and placing them in their own class.").

Considering the true value of the collateral, the claims in classes 4-10 are general unsecured claims.  These claims are substantially similar and no legitimate reason exists for their separate classification.  It is clear that only four classes of creditors are needed, and that the Plan separately classifies similar claims based on an inflated valuation of the real estate in order to manufacture an impaired consenting class.  As such, the Plan violates section 1122(a).

ii.     **Substantive Consolidation For Voting Purposes.**

In addition to impermissible class gerrymandering, Debtors seek to obtain an impaired consenting class by substantively consolidating the Debtors' estates "for voting purposes" in order to create a voting class in ACRC that would not otherwise exist.  The Plan states that it is a "single plan of reorganization for the jointly administered Chapter 11 cases, and constitutes a substantive consolidation of the Debtors' Estates for voting purposes."  Dkt. 653-1 at 25.  The Plan therefore "constitutes a single plan for the Debtors for voting purposes."  *Id.*

The Mezzanine Lenders have no security interests in ACRC's real estate and no unsecured claims against ACRC—their deeds of trusts and promissory notes were granted by ACS.  *See* Ex. \_.  Consequently, the Mezzanine Lenders are only permitted to vote on ACS's plan.  By consolidating the estates for voting purposes, Debtors are attempting to create a voting class in ACRC that does not exist.  Because Debtors know that the Mezzanine Lenders will vote in favor of the Plan, this use of substantive consolidation is a form of gerrymandering.  As with class gerrymandering, Debtors' attempt to create an impaired consenting class by consolidating the estates for voting purposes should not be allowed.

F.     **The Plan Violates The Absolute Priority Rule.**

To the extent Debtors do not seek substantive consolidation of their estates, the Plan's issuance of equity interests in the Reorganized Debtors to non-creditors of ACRC violates the absolute priority rule.  In order for the Plan to be confirmed under section 1129(b), Debtors must show that the plan does not discriminate and is fair and equitable with respect to each class of claims or interests that is impaired and has not accepted the plan.  *See* 11 U.S.C. § 1129(b)(1).  The condition that a plan be fair and equitable includes the requirement that "[w]ith respect to a class of interests…the holder of any interest that is junior to the interests of such class will not receive or retain under the plan on account of such junior interest any property."  *Id.* § 1129(b)(2)(C)(ii).

38

This requirement, known as the absolute priority rule, "requires that certain classes of claimants be paid in full before any member of a subordinate class is paid." *In re Geneva Steel Co.*, 281 F.3d 1173, 1180 n.4 (10th Cir. 2002). "Under this rule, unsecured creditors stand ahead of investors in the receiving line and their claims must be satisfied before any investment loss is compensated." *Id.* "Failure to comply with the absolute priority rule is fatal to the proposed plan of reorganization." *In re Dean*, 166 B.R. 949, 954 (Bankr. D.N.M. 1994).

The Plan violates the absolute priority rule because it provides for the issuance of equity interests in the Reorganized Debtors to the Mezzanine Lenders. *Plan*, Dkt. 652 at 32 (providing that "each [Mezzanine Lender] shall receive certain equity interests in the Reorganized Debtors…regardless of which Debtor is liable or obligated on the Allowed Mezzanine Debt claims."). The Mezzanine Lenders are not creditors of ACRC, as their deeds of trusts and promissory notes were granted by ACS alone. *See, e.g.*, *Arnold Whitman Proof of Claim*, Case No. 19-14200, Claim No. 45-1 at 10. Issuing equity interests in the Reorganized Debtors to non-creditors (such as the Mezzanine Lenders) violates the absolute priority rule given the fact that the Mezzanine Lenders aren't even creditors of ACRC and unsecured creditors of ACRC will only recover a portion of their unsecured claims.

Debtors cannot argue that the Plan meets the requirements of the "new value" exception to the absolute priority rule. "The new value exception allows courts to find that an interest holder in a Chapter 11 debtor whose plan violates the absolute priority rule may in some circumstances retain the interest because they provide 'new value' to the debtor, in the form of new capital or similar contributions." *In re Summers*, 594 B.R. 707, 711 (Bankr. D. Colo. 2018); *see also In re Rocky Mountain Land Co.*, 2014 WL 1338292, at *10. New value contributions must be "substantial, necessary to the success of the reorganization, and equal to or exceeding the value of

the retained interest in the estate." *In re Summers*, 594 B.R. at 711. The Plan gives no indication that the Mezzanine Lenders are putting any new capital or similar contributions into the Reorganized Debtors in exchange for their equity interests. Because the Plan violates the absolute priority rule and cannot meet the requirements of the new value exception, it cannot be confirmed.

## G.    The Plan Improperly Consolidates The Debtors.

Finally, the Debtors' Plan proposes substantive consolidation of the estates of ACS and ACRC "for voting purposes." *See Plan*, Dkt. 652 at § 3.1(b). Substantive consolidation is an extraordinary remedy that "treats separate legal entities as if they were merged into a single survivor left with all the cumulative assets and liabilities" for purposes of the bankruptcy case, including treatment under a reorganization plan. *In re Owens Corning, Inc.*, 419 F.3d 195, 205 (3d Cir. 2005); *see also In re Augie/Restivo Baking Co.*, 860 F.2d 515, 518 (2d Cir. 1988). The result is that "claims of creditors against separate debtors morph to claims against the consolidated survivor." *In re Falls Event Ctr. LLC*, 600 B.R. 857, 867 (Bankr. D. Utah 2019) (quoting *In re Owens Corning*, 419 F.3d at 205).

Because the Bankruptcy Code does not expressly authorize consolidation of separate entities into a single case, "judicially developed standards control whether substantive consolidation should be granted in any given case." *In re Stewart*, 571 B.R. 460, 469 (Bankr. W.D. Okla. 2017). Courts have found that a presumption against substantive consolidation exists and the party seeking to enforce consolidation has the burden of establishing the necessity of ordering consolidation. *See In re Auto-Train Corp., Inc.*, 810 F.2d 270, 276 (D.C. Cir. 1987). In this process, courts will "conduct a searching inquiry to ensure that consolidation yields benefits offsetting the harm it inflicts on objecting parties." *Id.* Most courts have recognized that substantive consolidation is a remedy to be used "sparingly." *See In re Owens Corning*, 419 F.3d at 209; *In re Augie/Restivo Baking Co.*, 860 F.2d at 518.

The Plan states that it is "not premised upon the substantive consolidation of the Debtors, except for voting purposes," *see* Dkt. 652 at 34, but other sections of the Plan reflect a different intent.  For example, section 6.8(c) of the Plan contemplates issuing "equity interests, membership interests, or similar ownership interests in the Reorganized Debtors" to holders of "Allowed Mezzanine Debt Claims, regardless of which Debtor is liable or obligated on the Allowed Mezzanine Debt Claims."  Dkt. 652 at 37; *see also id.* at 32 (providing that "each such Holder of an Allowed Mezzanine Debt Claim shall receive certain equity interests in the Reorganized Debtors…regardless of which Debtor is liable or obligated on the Allowed Mezzanine Debt claims.").  These provisions indicate that a creditor of ACS will own equity in the Reorganized Debtors (and therefore Reorganized ACRC), even if ACRC is not obligated on such creditors' claim.  In other words, under the Plan a non-creditor of ACRC will somehow end up owning equity in ACRC.  The Plan clearly seeks to consolidate the Debtors for more than "voting purposes only," but substantive consolidation is not appropriate here and the Debtors have made absolutely no attempt to satisfy the necessary elements of an extreme remedy.

Although the Tenth Circuit does not have recent guidance on substantive consolidation, courts within the Tenth Circuit have followed the standard in *In re Augie/Restivo Baking Co.*, where the Second Circuit stated that the "critical factors" related to substantive consolidation are: (1) "whether creditors dealt with the entities as a single economic unit and did not rely on their separate identity in extending credit," or (2) "whether the affairs of the debtors are so entangled that consolidation will benefit all creditors."  *See* 860 F.2d at 518.  One Colorado bankruptcy court combined guidance from multiple cases,[15] stating that substantive consolidation should be granted where: (1) "the debtor's financial affairs are so intertwined with the other entities' that it is either

---

[15] In addition to *In re Augie/Restivo Baking Co.*, frequently-cited statements of the substantive consolidation doctrine appear in *In re Owens Corning*, 419 F.3d at 211 and *In re Auto-Train*, 810 F.2d at 276.

impossible or costly to untangle them," (2) "creditors have dealt with the various entities as a single unit," or (3) "there is a substantial identity between the entities and consolidation is necessary to avoid some harm or realize some benefit." *In re Riviera Drilling & Expl. Co.*, BR 10-11902, 2012 WL 6719591, at *9 (Bankr. D. Colo. Dec. 19, 2012), *aff'd*, 502 B.R. 863 (10th Cir. BAP (Colo.) 2013) (citing *In re Augie/Restivo Baking Co.*, 860 F.2d 515 and *In re Auto-Train*, 810 F.2d 270).

Although courts have articulated slightly different standards, each focuses on two inquiries: the identity between the entities to be consolidated and the impact of consolidation on creditors. *See In re Augie/Restivo Baking Co.*, 860 F.2d at 518; *In re Riviera Drilling & Expl. Co.*, 2012 WL 6719591, at *9. The construction loan agreement that underlies GPIF's secured claim is between GPIF and ACRC. *See Construction Loan Agreement*, Exhibit F. GPIF did not "deal with the [Debtors] as single economic unit" and did in fact "rely on their separate identity in extending credit." *See In re Augie/Restivo Baking Co.*, 860 F.2d at 518. GPIF relied on the corporate formalities between the Debtors in securing the loan agreement and did not treat ACS and ACRC as a single unit. Furthermore, the assets and liabilities of the Debtors are not "so entangled that consolidation will benefit all creditors." *Id.*

Because ACRC's financial affairs are not "so intertwined" with ACS's affairs that it would be "impossible or costly to untangle them," failure to consolidate Debtors will not result in any unfairness to creditors. *See In re Riviera Drilling & Expl. Co.*, 2012 WL 6719591, at *9. In reality, there is no reason whatsoever to consolidate these Debtors, and none has even been proffered by the Debtors. Conversely, consolidating the Debtors will result in unfairness to GPIF and other creditors who relied on the corporate formalities and financial condition of ACRC alone in extending credit. "[B]ecause substantive consolidation is extreme…and imprecise, this 'rough justice' remedy should be rare and, in any event, one of last resort after considering and rejecting

other remedies." *In re Owens Corning*, 419 F.3d at 211.  Considering the reluctance of courts to apply this doctrine, and the complete lack of justification to do so here, the Debtors' request for substantive consolidation should be denied.

## IV.    CONCLUSION

The Court cannot approve the Plan because it violates well-established bankruptcy law and because there are no facts that would justify the radical departure from precedent in this case.  By the time of the confirmation hearing, the Debtors will have been in bankruptcy for nearly a year.  And despite all of that time, the Debtors have failed to put forward a plan that can be confirmed.  The Debtors admit that the Plan is entirely dependent upon the Court's approval of the Exit Financing, but they fail to offer the Court any legal grounds on which the Exit Financing could be approved.  The best the Debtors can offer is a Plan that multiplies their debt in the hopes that two years from now the finished project will be worth three times what it is worth today.  Put simply, this Plan is doomed to fail.  Having allowed the Debtors every opportunity to reorganize, but without any legal basis to approve the Plan, the Court should reject the Plan and order a sale of the property.

Respectfully submitted,

**BRACEWELL LLP**

By:   */s/ Jason G. Cohen*
      Jason G. Cohen
      Texas Bar No. 24050435
      jason.cohen@bracewell.com
      Nancy McEvily Davis
      Texas Bar No. 24078971
      nancy.davis@bracewell.com
      711 Louisiana, Suite 2300
      Houston, Texas 77002
      Telephone: (713) 223-2300
      Facsimile:  (713) 221-1212

*COUNSEL FOR GPIF ASPEN CLUB LLC*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on March 31, 2020, a true and correct copy of the foregoing was served electronically via the court's ECF noticing system on all parties registered to receive notice.

*/s/ Jason G. Cohen*
Jason G. Cohen